Howard E. King (77012)
hking@khpslaw.com
Henry D. Gradstein (89747)
hgradstein@khpslaw.com
Andres Monserrate (324991)
amonserrate@khpslaw.com
**KING, HOLMES, PATERNO & SORIANO, LLP**
1900 Avenue of the Stars, 25th Floor
Los Angeles, CA  90067
Telephone:  (310) 282-8989

Edwin F. McPherson (106084)
emcpherson@mcpherson-llp.com
Pierre B. Pine (211299)
ppine@mcpherson-llp.com
**McPHERSON LLP**
1801 Century Park East, 24th Floor
Los Angeles, CA  90067
Telephone:  (310) 553-8833

Steven G. Sklaver (237612)
ssklaver@susmangodfrey.com
Kalpana D. Srinivasan (237460)
ksrinivasan@susmangodfrey.com
**SUSMAN GODFREY L.L.P**.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
Telephone:  (310) 789-3100

Attorneys for Plaintiffs
(Additional Counsel for Plaintiffs Listed on Signature Page)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SOUNDGARDEN, a Partnership; TOM WHALLEY, as Trustee of the Afeni Shakur Trust; JANE PETTY; HOLE, a Partnership; STEVE EARLE, individually and on behalf of all others similarly situated, | CASE NO. |
| | **CLASS ACTION** |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR BREACH OF CONTRACT** |
| vs. | **JURY TRIAL DEMANDED** |
| UMG RECORDINGS, INC., a Delaware corporation, | |
| Defendant. | |

Plaintiffs Soundgarden, a partnership, Tom Whalley, trustee of the Afeni Shakur Trust, Jane Petty, Hole, a partnership, and Steve Earle (collectively "Plaintiffs"), on behalf of themselves and all other similarly situated recording artists, and the heirs, successors or assigns of recordings artists, allege as follows:

## NATURE OF THE ACTION

1.    Master recordings ("Master Recordings")—the original sound recordings of songs—are the embodiment of a recording artist's life's work and musical legacy.  They are the irreplaceable primary source of recorded music. Master Recordings are essential to releasing re-mixed and re-mastered versions of previously released material in new configurations; creating new releases from previously-unreleased tracks, outtakes, and alternative versions from recording sessions; and generating new sources of revenue as technology evolves.  Plaintiffs, and the class they seek to represent, are recording artists and the heirs, successors or assigns of recording artists, who entered into recording agreements with UMG Recordings, Inc. ("UMG") or its predecessors-in-interest to create and furnish Master Recordings embodying their musical works to UMG for their mutual commercial benefit and safekeeping.

2.    UMG acknowledged the great trust and confidence reposed in UMG by its recording artists and the need to protect their musical legacy embodied in the Master Recordings.  As its website touts: "Our vast catalog of recordings and songs stretches back over a century and comprises the largest, most diverse and culturally rich collection of music ever assembled....Knowing that music, a powerful force for good in the world, is unique in its ability to inspire people and bring them together, we work with our artists and employees to serve our communities.  We are the home for music's greatest artists, innovators and entrepreneurs."

3.    UMG's "intellectual property," which includes "the original studio master recordings," is described as among UMG's "most prized and valuable assets."  UMG promises to maintain and store them "only by secure, company-

approved methods." It promises to "use them responsibly so that we deliver the best possible service to our artists." It confirms that "we are all responsible for protecting them" and promises to "tak[e] all reasonable steps to make sure they are not damaged, abused, destroyed, wasted, lost or stolen." Finally, UMG represents that it will "[s]peak[] up immediately if we see abuse or misuse of company assets."

4.      However, UMG did not protect the Master Recordings that were entrusted to it. It did not take "all reasonable steps to make sure they are not damaged, abused, destroyed, wasted, lost or stolen," and it did not "speak[] up immediately [when it saw] abuse or misuse" of assets. Instead, UMG stored the Master Recordings embodying Plaintiffs' musical works in an inadequate, substandard storage warehouse located on the backlot of Universal Studios that was a known firetrap. The Master Recordings embodying Plaintiffs' musical works stored in that warehouse were completely destroyed in a fire on June 1, 2008 ("the Fire"). UMG did not speak up immediately or even ever inform its recording artists that the Master Recordings embodying their musical works were destroyed. In fact, UMG concealed the loss with false public statements such as that "we only lost a small number of tapes and other material by obscure artists from the 1940s and 50s." To this day, UMG has failed to inform Plaintiffs that their Master Recordings were destroyed in the Fire.

5.      Yet, even as it kept Plaintiffs in the dark and misrepresented the extent of the losses, UMG successfully pursued litigation and insurance claims which it reportedly valued at $150 million to recoup the value of the Master Recordings. UMG concealed its massive recovery from Plaintiffs, apparently hoping it could keep it all to itself by burying the truth in sealed court filings and a confidential settlement agreement. Most importantly, UMG did not share any of its recovery with Plaintiffs, the artists whose life works were destroyed in the Fire—even though, by the terms of their recording contracts, Plaintiffs are entitled to 50% of those proceeds and payments.

6.     Plaintiffs bring this class action on behalf of themselves and all similarly situated recording artists, and their heirs, successors or assigns, to recover (1) their contractual entitlement to 50% of any settlement proceeds and insurance payments received by UMG for the loss of the Master Recordings, and (2) 50% of any remaining loss of value not compensated by such settlement proceeds and insurance payments.

## THE PARTIES

7.     Plaintiff Soundgarden is a partnership of Kim Thayil, Matt Cameron and Ben Shepherd.  Soundgarden is an American rock and roll band formed in Seattle, Washington in 1984 by Chris Cornell, Kim Thayil, and Hiro Yamamoto. Lead singer and founder Chris Cornell unfortunately passed away in 2017. Soundgarden was one of the creators of what music critics dubbed the grunge style of alternative rock and has sold more than 10,000,000 records in the United States and more than 25,000,000 records worldwide. Soundgarden has been nominated for multiple Grammy Awards, winning the award for "Spoonman" in 1993 for best metal performance and the award for best hard rock performance in 1997 for their hit song "Black Hole Sun."   In 1988, members of Soundgarden entered into a recording agreement with A&M Records, a predecessor to UMG.  On information and belief, Master Recordings embodying the musical works of Soundgarden were stored in the warehouse leased by UMG at the Universal Studios backlot and destroyed in the Fire.

8.     Plaintiff Tom Whalley, as Trustee of the Afeni Shakur Trust, is the owner, assignee, and successor in interest to all contractual rights of the artist Tupac Shakur ("Tupac") at issue in this action.  Tupac is considered one of the greatest and most important rap musicians of all time, having sold over 75,000,000 records worldwide. In 2017, he was posthumously inducted into the Rock & Roll Hall of Fame in his first year of eligibility. *Rolling Stone* has named Tupac in the list of the 100 Greatest Artists of all time.  Tupac was also an actor, having appeared in more

than a dozen movies.  Tupac entered into a recording agreement with Interscope Records, a predecessor to UMG. On information and belief, Master Recordings embodying the musical works of Tupac were stored in the warehouse leased by UMG at the Universal Studios backlot and destroyed in the Fire.

9.     Plaintiff Jane Petty ("Jane") was the wife of Tom Petty ("Petty") and is the owner, assignee, and successor in interest to all contractual rights of Petty at issue in this action.  Petty was an American singer/songwriter, multi-instrumentalist, record producer and actor, as well as the lead singer of Tom Petty and Heartbreakers formed in 1976.  In his career, he sold more than 80,000,000 records worldwide.  He was inducted into the Rock & Roll Hall of Fame in 2002.  From at least February 6, 1984, Petty entered into recording agreements with MCA Records, a predecessor of UMG.  Petty assigned a fifty percent (50%) interest in certain of his recording agreements with UMG to Jane, including a fifty percent (50%) interest in all master recordings released by UMG through a certain time period, including seminal albums Damn the Torpedoes, Full Moon Fever and Southern Accents.   On information and belief, Master Recordings embodying the musical works of Petty owned by Jane were stored in the warehouse leased by UMG at the Universal Studios backlot and destroyed in the Fire.

10.     Plaintiff Hole is a partnership of Courtney Love and Eric Erlandson. Hole is one of the most commercially successful rock bands in history fronted by a woman, Courtney Love.  Hole has received numerous accolades, including four Grammy Award nominations.  They were also commercially successful, selling over three million records in the United States alone, and had a far reaching influence on contemporary female artists.  Music and feminist scholars have also recognized the band as the most high-profile musical group of the 1990s to discuss gender issues in their songs, due to Love's aggressive and violent lyrical content, which often addressed themes of body image, abuse, and sexual exploitation.  In 1993, Hole entered into a recording agreement with Geffen Records, a predecessor of UMG.

On information and belief, Master Recordings embodying the musical works of Hole were stored in the warehouse leased by UMG at the Universal Studios backlot and destroyed in the Fire.

11.     Plaintiff Steve Earle ("Earle") is an American singer who has released over 15 studio albums.  In or about 1985, Earle entered into a recording agreement with MCA Records, a predecessor in interest of UMG Recordings, Inc.  That agreement, as amended from time to time, remained in effect through at least 2008.  On information and belief, Master Recordings embodying the musical works of Earle were stored in the warehouse leased by UMG at the Universal Studios backlot and destroyed in the June 1, 2008 fire.

12.     Plaintiffs are informed and believe and, based upon such information and belief, allege that Defendant UMG Recordings, Inc. is a Delaware corporation with its principal place of business in Los Angeles County, California.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

14.     This Court has personal jurisdiction over UMG because: (a) UMG is located and has its principal place of business in Santa Monica, California, and (b) the Fire and the destruction of the Master Recordings occurred in Studio City, California.  For the same factual reasons, venue in this District exists pursuant to 28 U.S.C. § 1391(b) and (c) because UMG resides and is subject to personal jurisdiction in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### *The 2008 Universal Fire*

15.　As "the world's leading music company," "the home for music's greatest artists, innovators and entrepreneurs," and "home to the most iconic and influential labels & brands in music," and having admittedly undertaken "to make sure" that Master Recordings "are not damaged, abused, destroyed, wasted, lost or stolen," UMG knew or should have known industry standards for storing and preserving Master Recordings.  These include the manner in which discs and reels are situated on shelves, the security and stability of the facility, the proper temperature and humidity for storage in the facility, reducing risk of exposure to bright light and strong magnetic fields in the facility, reducing risk of exposure to water damage in the facility, and other standards including, most significantly, that the facility is firesafe.

16.　At all relevant times until 2004, UMG was a sister company to Universal City Studios Productions, formerly known as Vivendi Universal Entertainment LLP ("VUE"), and Universal City Studios LLC, formerly known as Universal City Studios LLP ("UCS").  In 2004, VUE and UCS were sold by Vivendi SA, to General Electric, and are now owned by NBC Universal Media, LLC ("NBC").  At or shortly after the sale, or about May 4, 2004, after years of co-existing as sister companies, UMG and VUE entered into an "Office Lease" which included the warehouse on the Universal Studios lot where UMG stored the Master Recordings that were destroyed in the Fire.

17.　On December 23, 2009 UMG sued NBC, VUE and UCS (collectively, the "Fire Defendants") in Los Angeles County Superior Court, Case No. SC106213, to recover damages for its fire loss (the "Fire Lawsuit").  Numerous filings in that action remain redacted and under seal, at the request of UMG.  UMG alleged in its Second Amended Complaint that the Fire Defendants "failed to maintain several deluge sprinkler systems in working condition, failed to maintain in working

condition several fire hydrants thereby hampering the ability of the firefighters who responded to the Fire to prevent its spread, failed to implement proper sprinkler systems, failed to follow "hot work" guidelines, and persistently ignored the recommendations of their fire prevention and risk assessment expert and their own experiences after a similar fire in 1990 destroyed a similar area on the back lot (the "1990 Fire")." UMG further alleged that "[i]n 1990, Defendants suffered a similar fire in the facades that destroyed virtually the same area as the June 1 Fire. Defendants reconstructed the facades after the 1990 Fire. Defendants knew that the facades were constructed using untreated, flammable, highly combustible materials, creating a significant fire risk. Defendants knew that these aging, wood facades were so closely clustered, that when they ignited, the result would not merely be a fire but a conflagration. In light of the construction of the facades and their placement, Defendants knew that there was a significant fire load on the back lot. Defendants chose to ignore this hazard."

18. UMG further alleged that "after the 1990 Fire, Defendants reconstructed the facades, but incorporated only an exterior deluge sprinkler system in the facades. Defendants were repeatedly told by fire experts that they must change the deluge sprinkler system to avoid a fire and prevent its spread. These fire experts walked through and inspected the back lot, inspected the facades, held meetings with Defendants, and issued specific warnings regarding failures of Defendants' deluge sprinklers and the corresponding significant risk of catastrophic fire. Defendants were told that they must install interior, automatic sprinklers in order to prevent and contain a fire and could do so at minimal expense. Defendants repeatedly refused to do so." UMG alleges that such warnings were issued in 1992, 1993 and 2004, as well as thereafter. Of course, the 1990 Fire, the grossly negligent conduct and the ignored warnings alleged above, *all occurred while UMG was part of the Universal Studios family of companies and imputed with this knowledge.* At a minimum, these alleged dire conditions were observable to UMG on even the most

cursory inspection of the warehouse and its location.

19.   On the evening of May 31, 2008, maintenance workers employed by one of the Fire Defendants used blowtorches to heat asphalt shingles to repair a roof on a set in the backlot of Universal Studios.  The blazing hot shingles ignited in the early morning hours of June 1, 2008, and a fire quickly swept through the backlot to the warehouse in which UMG stored the Master Recordings, destroying them all. According to recent press reports, and contrary to UMG's public statements at the time, this was UMG's "main West Coast storehouse of its most [prized] masters." By the time the fire was extinguished the next day, the metal storage shelves and Master Recordings were "reduced to heaps of ash and twisted steel."

20.   According to an investigative expose by journalist Jody Rosen in the June 2019 *New York Times Magazine*, irreplaceable Master Recordings owned by class members destroyed in the fire "included the masters of artists who recorded for Decca such as Louis Armstrong, Duke Ellington, Al Jolson, Bing Crosby, Ella Fitzgerald, Judy Garland.  The tape masters for Billie Holiday's Decca catalog were most likely lost in total.  The Decca masters also included recordings by such greats as Louis Jordan and His Tympany Five and Patsy Cline."  The fire "most likely claimed most of Chuck Berry's Chess masters and multitrack masters, a body of work that constitutes Berry's greatest recordings.  The destroyed Chess masters encompassed nearly everything else recorded for the label and its subsidiaries, including most of the Chess output of Muddy Waters, Howlin' Wolf, Willie Dixon, Bo Diddley, Etta James, John Lee Hooker, Buddy Guy and Little Walter."  "Also very likely lost were master tapes of the first commercially released material by Aretha Franklin, recorded when she was a young teenager performing in the church services of her father, the Rev. C.L. Franklin, who made dozens of albums for Chess and its sublabels."  "Virtually all of Buddy Holly's masters were lost in the fire. Most of John Coltrane's Impulse masters were lost, as were masters for treasured Impulse releases by Duke Ellington, Count Basie, Coleman Hawkins, Dizzy

Gillespie, Max Roach, Art Blakey, Sonny Rollins, Charles Mingus, Ornette Coleman, Alice Coltrane, Sun Ra, Albert Ayler, Pharoah Sanders and other jazz greats."  "Also apparently destroyed were the masters for dozens of hit singles, including Bill Haley and His Comets' "Rock Around the Clock," Jackie Brenston and His Delta Cats' "Rocket 88," Bo Diddley's "Bo Diddley/I'm A Man," Etta James's "At Last," the Kingsmen's "Louie Louie" and the Impressions' "People Get Ready."  UMG, in fact, claims to have created what it internally called a "God List" that purports to identify with "reasonable certainty" an inventory of all Master Recordings destroyed in the Fire.

21.   "The list of destroyed single and album masters takes in titles by dozens of legendary artists, a genre-spanning who's who of 20th- and 21st-century popular music."  Based on this reporting, the list includes Master Recordings embodying the Plaintiffs' recorded musical works by Soundgarden, Tupac, Petty, Hole, and Earle, and those of putative class members that include Benny Goodman, Cab Calloway, the Andrews Sisters, the Ink Spots, the Mills Brothers, Lionel Hampton, Ray Charles, Sister Rosetta Tharpe, Clara Ward, Sammy Davis Jr., Les Paul, Fats Domino, Big Mama Thornton, Burl Ives, the Weavers, Kitty Wells, Ernest Tubb, Lefty Frizzell, Loretta Lynn, George Jones, Merle Haggard, Bobby (Blue) Bland, B.B. King, Ike Turner, the Four Tops, Quincy Jones, Burt Bacharach, Joan Baez, Neil Diamond, Sonny and Cher, the Mamas and the Papas, Joni Mitchell, Captain Beefheart, Cat Stevens, the Carpenters, Gladys Knight and the Pips, Al Green, the Flying Burrito Brothers, Elton John, Lynyrd Skynyrd, Eric Clapton, Jimmy Buffett, the Eagles, Don Henley, Aerosmith, Steely Dan, Iggy Pop, Rufus and Chaka Khan, Barry White, Patti LaBelle, Yoko Ono, the Police, Sting, George Strait, R.E.M., Janet Jackson, Eric B. and Rakim, New Edition, Bobby Brown, Guns N' Roses, Queen Latifah, Mary J. Blige, Sonic Youth, No Doubt, Nine Inch Nails, Snoop Dogg, Nirvana, Hole, Beck, Sheryl Crow, Eminem, 50 Cent and the Roots.

*UMG's Coverup*

22.    Immediately after the Fire, UMG embarked on a systematic and fraudulent scheme of misrepresentation and misdirection designed to conceal the loss of the Master recordings destroyed in the Fire.  Press accounts at the time, based on statements by UMG representatives, included the following:

a. ***Billboard***: "We had no loss, thankfully.  We moved most of what was formerly stored there earlier this year to our other facilities.  Of the small amount that was still there and awaiting to be moved, it had already been digitized so the music will still be around for many years."

b. ***New York Daily News***:  "In one sense it was a loss.  In another, we were covered," said Peter LoFrumento of UMG.  "It had already been digitized, so the music will still be around for many years." LoFrumento said master recordings from major artists, including Judy Garland and the Carpenters were not harmed, as was reported elsewhere.  "We had no loss, thankfully," he said.

c. ***New York Times***:  A spokesman for a company that was storing material in the studio vault, said that a small number of tapes and other material by "obscure artists from the 1940s and '50s," including the pop singers Lenny Dee and Georgie Shaw, had been damaged.  The spokesman added that all recording tapes had been duplicated digitally.

d. ***Los Angeles Times***:  "At this point, it appears that the fire consumed no irreplaceable master recordings, just copies.  The studio and the record company both are fortunate enough to have the resources to preserve multiple copies of their source materials around the country. They've also been duplicating their recordings in high-quality digital formats, creating additional backups in the event the originals are lost."

e. ***UMG Response to journalist Nikki Finke***: "Of the small amount that was still there and waiting to be moved, it had already been digitized so

1  the music will still be around for many years to come.  And in addition
2  to being digitized, physical backup copies of what was still left at that
3  location were made and stored elsewhere."

4  23.    But as a *Washington Post* editorial recently stated: "The gulf between
5  what the media reported and what the fire destroyed couldn't be wider; it's the
6  difference between 'no loss' and what Rosen [the author of the *New York Times*
7  *Magazine* expose] terms a 'catastrophe.'"  That expose blazed through the industry
8  in June 2019 just as fiercely as the fire which swept through the Universal backlot,
9  and was the first notice to Plaintiffs and the putative class that Master Recordings
10  embodying their musical works were destroyed in the fire.

11  24.    In fact, to this day, UMG has not informed Plaintiffs that any Master
12  Recordings embodying musical works owned by them were destroyed in the fire,
13  and has refused to disclose or account to Plaintiffs for settlement proceeds and
14  insurance payments received by UMG for the loss of the Master Recordings.
15  UMG's provided pretextual, incomplete or materially false and misleading
16  explanations for the damages caused by the Fire and money received by it thereafter
17  served only to cover up its misconduct.  UMG's breaches are also continuing
18  violations in which UMG repeatedly issues royalty statements that do not identify
19  any revenues shared or payments made to Plaintiffs or members of the class as a
20  result of funds received by UMG as a result of its monetization of the Master
21  Recordings.

22  25.    During the relevant statute of limitations period, Plaintiffs had neither
23  actual nor constructive knowledge of the pertinent facts constituting their claims for
24  relief asserted herein. Plaintiffs and members of the Class did not discover, and
25  could not have discovered through the exercise of reasonable diligence, the
26  existence of any conspiracy. In addition, UMG is estopped to raise the statute of
27  limitations as a result of its fraudulent concealment of the loss of the Master
28  Recordings.

26. Accordingly, the running of any statute of limitations has been tolled with respect to the claims that Plaintiffs and the class members have as a result of the misconduct alleged herein.

## CLASS ACTION ALLEGATIONS

27. Plaintiffs bring this action on behalf of themselves and the proposed class defined as follows:

> All persons or entities, and their heirs, successors and assigns, who entered into recording agreements with UMG providing for a 50/50 sharing of revenues from furnishing, licensing or authorizing the use by others of Master Recordings embodying their musical works, which Master Recordings were stored in a warehouse leased by UMG at the Universal Studios backlot and destroyed in a fire on or about June 1, 2008.

28. This action may be properly brought and maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed class are clearly and easily ascertainable and identifiable.

29. The class for whose benefit this action is brought is so numerous that joinder of all class members is impracticable. Plaintiffs are informed and believe that there are hundreds of class members and that those class members can be readily ascertained from UMG's files and records and through discovery. The class members can be readily located and notified of this action.

30. Plaintiffs' claims are typical of the claims of the members of the class, and their interests are consistent with and not antagonistic to those of the other class members they seek to represent.

31. Plaintiffs have no interests that are adverse to, or which conflict with, the interests of the absent members of the class and are able to fairly and adequately represent and protect the interests of such a class. Plaintiffs allege viable contractual claims for damages of the type reasonably expected to be raised by members of the

13

class, and will vigorously pursue those claims. Plaintiffs are represented by experienced, qualified and competent counsel who are committed to prosecuting this action.

32.    Common questions of fact and law exist as to all members of the class that predominate over any questions affecting only individual members of the class. These common legal and factual questions that are capable of class-wide resolution that predominate over any questions affecting only individual class members include:

a.    The amounts received by UMG in settlement of the Fire Lawsuit for loss of the Master Recordings in the warehouse fire of June 1, 2008.

b.    The amounts received by UMG from its insurers for loss of the Master Recordings in the warehouse fire of June 1, 2008.

c.    Whether UMG is obligated to pay any of the settlement proceeds and insurance payments it received for loss of the Master Recordings in the warehouse fire of June 1, 2008, to class members.

d.    Whether UMG breached its contractual obligations by storing the Master Recordings in an inadequate, substandard storage warehouse located on the backlot of Universal Studios that was a known firetrap.

e.    Whether UMG fraudulently concealed its conduct.

f.    Whether Plaintiffs and the other class members suffered injury as a result of UMG's misconduct.

g.    The measure of damages suffered by Plaintiffs and the class.

33.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual litigation of the claims of all class members is impracticable.  The claims of the individual members of the Class may range from smaller sums to larger sums.  Thus, for those class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually.  And even if every member of the class could

afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the class. There will be no material difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF

(Breach of Contract – UMG's Failure to Share Revenues Derived from Master Recordings)

34. Plaintiffs hereby incorporate each of the allegations set forth above, as though fully set forth herein.

35. The written recording agreements Plaintiffs and all other class members entered into with UMG, or its predecessors, provide for a 50/50 sharing of revenues derived from furnishing, licensing or authorizing the use by others of Master Recordings embodying their musical works.

36. Plaintiffs are informed and believe, and allege thereon, that UMG confidentially settled the Fire Lawsuit in 2013, and received $150 million for the loss of the Master Recordings embodying the musical works of members of the class.

37. Plaintiffs are further informed and believe, and allege thereon, that UMG received tens of millions of dollars of additional compensation from its insurers for the loss of the Master Recordings embodying the musical works of said recording artists.

38. These settlement proceeds and insurance payments were paid on account of the Master Recordings as a lump sum replacement for the revenues

which could no longer be derived from furnishing them, authorizing their use or licensing them to third parties because they were destroyed in the fire.  Under the recording agreements, it was incumbent upon UMG to account for and pay 50% of these revenues to the Plaintiffs and class members.

39.     UMG failed to account for and pay Plaintiffs and members of the class 50% the settlement proceeds and insurance payments it received, and thereby breached the recording agreements.

40.     As a direct and proximate consequence of Defendants' breach of the recording agreements, Plaintiffs and class members have been damaged in an amount which is not yet fully ascertained, but which Plaintiffs are informed and believe, and allege thereon, equals (exclusive of interest) 50% of the settlement and insurance proceeds paid to UMG, according to proof at trial.

## SECOND CLAIM FOR RELEIF

### (Breach of Contract - Bailment)

41.     Plaintiffs hereby incorporate each of the allegations set forth above, as though fully set forth herein.

42.     In every contract, including the recording agreements, there is an implied obligation of good faith and fair dealing that neither party to the contract will undertake actions to deprive the other party of the expected fruits and benefits of the contractual relationship.  Plaintiffs and the putative class members have an expectation that under their recording agreements with UMG there will be a 50/50 sharing of revenues derived from furnishing, licensing or authorizing the use by others of Master Recordings embodying their musical works.  Moreover, U.S. copyright termination rights would not be meaningful if the Master Recordings embodying their musical works were not preserved and maintained since they are the most complete expression of the copyrighted musical work.  Thus it would breach the obligation of good faith and fair dealing for UMG to fail to take reasonable measures to preserve and maintain the Master Recordings.

16

43.     In addition to the covenant of good faith and fair dealing implying that UMG will take reasonable measures to preserve and maintain the Master Recordings for the mutual benefit of the parties, UMG has also confirmed its understanding of that obligation and made that promise express in public statements and representations on its website. UMG lists the "original studio master recordings" as among UMG's "most prized and valuable assets."  It promises to maintain and store them "only by secure, company-approved methods."  It promises to "use them responsibly so that we deliver the best possible service to our artists." It confirms that "we are all responsible for protecting them" and promises to "tak[e] all reasonable steps to make sure they are not damaged, abused, destroyed, wasted, lost or stolen."  Finally, UMG represents that it will "[s]peak[] up immediately if we see abuse or misuse of company assets."

44.     Under California law, a "voluntary bailment is made by one giving to another, with his consent, the possession of personal property to keep for the benefit of the former, or of a third party."  (Civ. Code, § 1814).  "Defined broadly, bailment is 'the delivery of a thing in trust for some special object or purpose, upon a contract, express or implied'" on terms "as various as the transactions of men." (*Greenberg Bros. v. Ernest W. Hahn, Inc.,* 246 Cal. App. 2d 529, 531 (1966)). UMG's express promises made in conjunction with its implied obligation of good faith and fair dealing in the recording agreements establish its voluntary bailment in connection with the Master Recordings.

45.     The bailee "must use at least ordinary care for the preservation of the thing deposited." (Civ. Code § 1852). If the bailment is for the benefit of the bailee, such as borrowing the property "for use" the bailee "must use great care for the preservation in safety and in good condition of the thing lent."  (Civ. Code, § 1886). Finally, with respect to UMG's concealment of the loss of the Master Recordings for eleven years, Civ. Code § 1838 provides:

> If a thing is lost or injured during its deposit, and the depositary refuses to inform the depositor of the circumstances under which the loss or injury occurred, so far as he has information concerning them, or willfully misrepresents the circumstances to him, the depositary is presumed to have willfully, or by gross negligence, permitted the loss or injury to occur.

46.    Whatever duty of care is required of UMG to preserve and maintain the Master Recordings, it is plain that as alleged above, UMG breached its duty of care through its negligence in storing the Master Recordings in the firetrap that was the Universal Studios backlot warehouse.  And given UMG's concealment of the loss of the Master Recordings for eleven years, it should be "presumed to have willfully, or by gross negligence, permitted the loss or injury to occur."  (Civ. Code § 1838).

47.    As a direct and proximate consequence of UMG's breach of the implied covenant of good faith and fair dealing and its voluntary bailment in connection with the Master Recordings, Plaintiffs and the putative class have been damaged in an amount which is not yet fully ascertained, but which Plaintiffs are informed and believe, and allege thereon, equals 50% of the value of the Master Recordings less whatever damages Plaintiffs and the putative class recover under their First Claim for Relief, according to proof at trial.

## **PRAYER**

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all other members of the class, pray for Judgment against UMG Recordings, Inc. and the Doe Defendants, and each of them, as follows:

A.    For a determination that this is a proper class action maintainable pursuant to Rule 23 of the Federal Rules Civil Procedure, certifying Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

B.     For compensatory damages in an amount in excess of $100 million, according to proof at trial;

C.     For pre- and post-judgment interest;

E.     For such fees and costs (including reasonable attorneys' fees) incurred herein as permitted by law.

F.     For such other and further relief as the Court deems just and proper, and that Plaintiffs and the class may be entitled at law or in equity.

DATED:     June 21, 2019                    Howard E. King
                                            Henry D. Gradstein
                                            Andres Monserrate
                                            KING, HOLMES, PATERNO &
                                            SORIANO, LLP

                                            Edwin F. McPherson
                                            Pierre B. Pine
                                            McPHERSON LLP

                                            Steven G. Sklaver
                                            Kalpana D. Srinivasan
                                            SUSMAN GODFREY L.L.P.

                                            Stephen E. Morrissey (187865)
                                            SUSMAN GODFREY L.L.P.
                                            smorrissey@susmangodfrey.com
                                            1201 3rd Avenue, Suite 3800
                                            Seattle, WA 98101
                                            Telephone: (206) 373-7380

                                            By:      */s/ Henry D. Gradstein*

                                            Attorneys for Plaintiffs

1

## **DEMAND FOR JURY TRIAL**

2          Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

3    jury on all issues so triable.

4

5    DATED:        June 21, 2019          Howard E. King
                                          Henry D. Gradstein
6                                         Andres Monserrate
                                          KING, HOLMES, PATERNO &
7                                         SORIANO, LLP

8                                         Edwin F. McPherson
                                          Pierre B. Pine
9                                         McPHERSON LLP

10                                        Steven G. Sklaver
                                          Kalpana D. Srinivasan
11                                        SUSMAN GODFREY L.L.P.

12                                        Stephen E. Morrissey (187865)
                                          smorrissey@susmangodfrey.com
13                                        1201 3rd Avenue, Suite 3800
                                          Seattle, WA 98101
14                                        Telephone: (206) 373-7380

15
                                          By:       */s/ Henry D. Gradstein*
16                                        _____

17                                        Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28