1  Howard E. King (77012)
   hking@khpslaw.com
2  Henry D. Gradstein (89747)
   hgradstein@khpslaw.com
3  Andres Monserrate (324991)
   **KING, HOLMES, PATERNO & SORIANO, LLP**
4  1900 Avenue of the Stars, 25th Floor
   Los Angeles, CA 90067
5  Telephone: (310) 282-8989

6  Edwin F. McPherson (106084)
   emcpherson@mcpherson-llp.com
7  Pierre B. Pine (211299)
   ppine@mcpherson-llp.com
8  **MCPHERSON LLP**
   1801 Century Park East, 24th Floor
9  Los Angeles, CA 90067
   Telephone: (310) 553-8833
10
   Attorneys for Plaintiffs
11 (Additional Counsel for Plaintiffs and Defendant Listed on Signature Page)

12            UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

14                  WESTERN DIVISION

15 SOUNDGARDEN, a Partnership; TOM       CASE NO. 2:19-cv-05449-JAK-JPR
   WHALLEY, as Trustee of the Afeni
16 Shakur Trust; JANE PETTY; STEVE       **JOINT STIPULATION REGARDING**
   EARLE, individually and on behalf of  **PLAINTIFFS' MOTION TO COMPEL**
17 all others similarly situated,         **DISCOVERY FROM DEFENDANT**

18            Plaintiffs,                 **[DISCOVERY DOCUMENT:**
                                          **REFERRED TO MAGISTRATE**
19      v.                                **JUDGE JEAN P. ROSENBLUTH]**

20 UMG RECORDINGS, INC., a               Class Cert. Mot. Due:   Jan. 17, 2020
   Delaware corporation,                 Fact Discovery Cutoff: Sept. 14, 2020
21                                        Pretrial Conference:    TBD
            Defendant.                    Trial Date:             TBD
22
                                          **Hearing:**
23                                        Date:      Nov. 14, 2019
                                          Time:      10:00 a.m.
24                                        Place:     Courtroom 690
                                                     Roybal Federal Building and
25                                                   United States Courthouse
                                                     255 E. Temple St.
26                                                   Los Angeles, CA 90012
                                          Judge:     Hon. Jean P. Rosenbluth
27
28

_____
JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

# TABLE OF CONTENTS

INTRODUCTORY STATEMENTS ............................................................... 1

    A.    Plaintiffs' Introductory Statement ........................................ 1

    B.    Defendant's Introductory Statement ..................................... 3

ISSUES IN DISPUTE ............................................................................. 6

    A.    Plaintiffs' Position ............................................................... 6

        1.    Plaintiffs Are Entitled to Relevant and Proportional Discovery. ....................................................... 6

        2.    The Information Sought Through Interrogatory 2 Is Highly Relevant. ................................................... 7

        3.    Interrogatory 2 Seeks Reasonably Proportionate Discovery ........ 12

        4.    Plaintiffs' Request for Filings, Expert Materials, and Documents from UMG's Prior Fire Litigation Are Relevant and Proportional. ..................................... 13

            a.    Request 1 Seeks Relevant, Proportional Discovery ........... 13

            b.    Request 2 Seeks Relevant, Proportional Discovery ........... 15

            c.    Request 4 Seeks Relevant, Proportional Discovery ........... 16

            d.    Request 32 Seeks Relevant, Proportional Discovery ......... 17

    B.    Defendant's Position ......................................................... 18

        1.    Since Plaintiffs' Original Theory Unraveled, They Have Attempted to State a New Theory But Seek Discovery Entirely Untethered to It. ....................... 19

        2.    UMG Has Discharged Its Discovery Obligations to Date While Plaintiffs Are Pursuing a Fishing Expedition as Their Claims Collapse. ................... 21

        3.    Plaintiffs' Motion to Compel Is Premature and Should Be Denied on This Ground Alone. ............................. 22

        4.    Plaintiffs' Discovery Requests Are Unmoored From Viable Legal Theories, Overbroad, and Burdensome. ...................... 26

            a.    Interrogatory No. 2 and Request for Production No. 4 ....... 27

            b.    Requests for Production Nos. 1, 2, 32, and 34 ................... 30

i

c.      The Only Documents Even Arguably Relevant to Plaintiffs' Claims—Meritless as They Are—Relate to Licensing and Attribution of Value to Fire-Impacted Master Recordings ............................................................... 33

CERTIFICATE OF SERVICE ......................................................................... 1

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

Pursuant to Federal Rules of Civil Procedure 33, 34, and 37, and Local Rule 37-2.2, Plaintiffs Soundgarden, Tom Whalley, Jane Petty, and Steve Earle ("Plaintiffs") submit this Joint Stipulation regarding their Motion to Compel Discovery from Defendant UMG Recordings, Inc. ("UMG").

Plaintiffs move to compel UMG to answer interrogatory 2 from Plaintiffs' First Set of Interrogatories, served August 15, 2019; and to produce documents responsive to requests 1, 2, 4, 32, and 34 from Plaintiffs' First Set of Demands for Production of Documents. On September 3, 2019, Plaintiffs sent UMG a letter requesting a meet and confer (attached as Ex. A). UMG responded with its own letter on September 17, 2019 (attached as Ex. B). The parties met and conferred on the disputes on September 18, 2019 and October 7, 2019. Despite multiple conferences, the parties have been unable to resolve the specific disputes raised through the present motion.

## INTRODUCTORY STATEMENTS

### A. Plaintiffs' Introductory Statement

This case focuses on musical artists' contract rights to share in Defendant UMG's litigation and insurance proceeds derived from what UMG previously claimed were its alleged losses of master recordings embodying the work of these artists in a June 1, 2018 fire on an NBCUniversal ("NBCU") lot.

More than 9 years ago, on June 24, 2010, then-counsel for UMG wrote a letter to NBCU that unequivocally stated that it had *already* conducted a "substantial investigation of the assets lost in the fire" and that "UMG lost more than 118,000 original music recordings dating back decades." Ex. C at 2-3. Now, UMG switched counsel, and *refuses* to identify what those recordings were that UMG claimed were lost in the prior litigation and in related prior-litigation documents. To date, in this case, UMG has yet to produce *any* documents from the underlying litigation, and has answered only part of one interrogatory. It appears that UMG's discovery-avoidance strategy is a just a tactic designed to try to enforce (through self-help) its requested motion for a discovery stay, Dkt. 28, in violation of the Court's Standing Order that clearly states: "Discovery is not

stayed prior to the Scheduling Conference or after dates have been set unless otherwise ordered by the Court." Dkt. 12, at 9.

It is long past time for UMG to cease this discovery game. The Court should order UMG immediately (1) to identify which artists' master recordings UMG claimed were lost in order to justify two prior fire-related litigation recoveries, and (2) to produce requested materials that were generated for, or were already produced in, the prior litigations.

UMG's central objection to providing the relevant discovery at issue is essentially that class certification and merits discovery should be bifurcated, because UMG opposes the fact that the requests seek information about the named Plaintiffs and other members of the proposed class. This objection has no merit. Discovery has not been bifurcated into individual and class phases, and Plaintiffs face a rapidly-approaching class certification deadline. "[A]bsent an order from the District Judge which bifurcates (or approves bifurcation [of]) discovery into phases (*e.g.*, fact discovery, expert discovery, class certification discovery), [a] defendant must respond fully and completely to all discovery requests." *See In re Toys R Us-Delaware, Inc. Fair and Accurate Credit Transactions Act (FACTA) Litigation*, Case No. ML 08-1980 MMM (FMOx), 2010 WL 4942645, at *5 (C.D. Cal. July 29, 2010). The cases previously cited by UMG as supposedly supporting its objections are easily distinguishable. Moreover, answering an interrogatory regarding, and producing key documents showing, the positions that UMG took in the very previous litigations which are the central focus of the current dispute will not pose any significant burden to UMG. *See, e.g.*, *Bower v. Wright Medical Tech.*, Nos. CV 17-3178-CAS (KSx), CV 17-3196-CAS (KSx), 2018 WL 4945312, at *4 (C.D. Cal. Sept. 12, 2018) (ordering reproduction of discovery from relevant prior litigation "in its entirety in this action"); *Guiden v. Leatt Corp.*, No. 5:10–CV–00175, 2013 WL 122346612, at *2, *3 (W.D. Ky. Apr. 30, 2012) (ordering production of prior deposition transcripts and expert reports and finding no burden); *aff'd*, 2013 WL 4500319, at *1

2

(W.D. Ky. Aug. 21, 2013) (finding no error in magistrate judge's order compelling production of prior litigation files).

**B.    Defendant's Introductory Statement**

Plaintiffs hastily filed this action on the basis of an incorrect belief—derived solely from a *New York Times Magazine* article—that the vault fire destroyed UMG's original master recordings related to Plaintiffs and that UMG concealed that destruction from Plaintiffs.   But that entire premise for Plaintiffs' lawsuit is wrong, as UMG informed Plaintiffs both before *and* after Plaintiffs filed suit that UMG had not lost original master recordings related to four of the five Plaintiffs.   And for the fifth (Soundgarden), UMG informed the band in May 2015—*more than four years* before Plaintiffs filed suit (and therefore outside the statute of limitations)—that the fire destroyed two 1/2" stereo masters related to the album *Badmotorfinger*.   *See* Verified Response to Interrogatory No. 1 at 4; *see also* Dkt. 30-1 ¶¶ 3, 5.

With their original theory having fallen apart, Plaintiffs (who seek to represent a putative class) have abandoned it and instead filed a First Amended Complaint ("FAC") asserting equally baseless yet more radical theories of recovery that are untethered to Plaintiffs' recording agreements.   With these new claims on life support too—indeed, Plaintiffs have already signaled their intention to amend their Complaint again—Plaintiffs are attempting to find new plaintiffs and angles to prop up their claims.   To do so, Plaintiffs are pursuing commercially sensitive yet wildly overbroad discovery that is not relevant or proportional to their current, ill-conceived claims.   But Plaintiffs fail to mention that UMG offered to do a search for documents from the prior litigation that actually would be proportional to their claims.   Plaintiffs rejected UMG's reasonable offer because they are interested instead in misusing the discovery process to find new plaintiffs and gin up new claims, as they have no viable ones.

Plaintiffs have changed their theory of the case in an attempt to skirt the inconvenient fact that UMG did not lose original master recordings related to four of the five named Plaintiffs.   Their FAC now claims that Plaintiffs are entitled to a share of

UMG's litigation recoveries from its fire-related lawsuits against its landlords and insurer "whether or not [the recordings were] actually destroyed," as long as those original masters "were among those that UMG claimed were destroyed or lost in the Fire in order to recover insurance or litigation proceeds" (FAC ¶ 30), on the theory that such recoveries triggered "royalty" obligations (*id.* ¶ 39). But this theory only flies as far as Plaintiffs' contracts permit. Those agreements, which the FAC attaches, confirm Plaintiffs are only entitled to royalties when UMG "*license*[*s*]" the original master recordings to third parties. *Id.* ¶ 40 (emphasis added) (quoting contract provisions).

Faced with the impossible task of arguing UMG's litigation settlements constitute "licenses" under the recording agreements, Plaintiffs have made the remarkable assertion that "[w]hen UMG entered [settlement] agreements with warehouse owners and insurance companies, *it retroactively permitted* a specific, and otherwise *prohibited 'use' of the masters—their destruction—in exchange for flat fee payments*." Opp. to MTD FAC at 6 (emphasis added). But such a nonsensical, brazen characterization of "licensing" (and one not pleaded in the FAC, either) still does not show a "license" occurred under the recording agreements. Moreover, Plaintiffs have admitted that UMG *could not* have licensed the original masters after the fire because they were allegedly destroyed. FAC ¶ 46 ("These settlement proceeds and insurance payments were paid on account of the Master Recordings as a lump sum replacement for the revenues *which could no longer* be derived from . . . licensing them to third parties because they were destroyed in the fire." (emphasis added)).

Even if Plaintiffs' new theory—*i.e.*, that UMG's litigation settlements were "retroactive" licenses of the original master recordings to UMG's landlord and insurer—held water, the only types of documents that could possibly be relevant and proportional to it would be documents indicating that UMG licensed such original master recordings or that attribute a value (or "flat fee"—per the recording agreements) to any lost original master recordings related to Plaintiffs in connection with such a license (whether or not the masters were ultimately determined to have been destroyed). Instead, Plaintiffs'

Motion to Compel focuses on obtaining documents and information *unrelated* and *not proportionate* to this theory, demanding that UMG "[i]dentify *all artists* with master recordings that UMG *claimed*, *asserted*, or *implied* in any prior litigation, in any insurance dispute, or in connection with settlements of litigation or insurance disputes, were, or may have been, damaged or lost in, by, or as a result of the June 1, 2008 fire on the NBCUniversal lot." *See* Interrogatory No. 2 (emphasis added). And Plaintiffs seek broad swaths of documents without respect to their relevance to *Plaintiffs'* claims (as opposed to UMG's claims at issue in the prior lawsuits), including (a) "[u]nredacted copies of all redacted filings in the FIRE CASE" (RFP. No 1); "[a]ny and all DOCUMENTS produced by [UMG] to NBCUniversal Media LLC in the FIRE CASE" (RFP No. 32); and "[a]ny and all DOCUMENTS produced by [UMG] to AXA Ins. Co. in the INSURANCE CASE" (RFP No. 34).

Beyond its lack of merit, Plaintiffs' present Motion is premature. Plaintiffs unilaterally terminated the parties' meet and confer over the discovery requests they now move on here **even though UMG proposed several compromises** (none of which Plaintiffs mention here). UMG has provided sworn interrogatory responses to Plaintiffs with information concerning the status of original master recordings relating to the named Plaintiffs in this lawsuit. UMG has also offered the named Plaintiffs the opportunity to inspect those original master recordings at UMG's storage facilities, which is obviously the best "proof of life"—*i.e.*, the best evidence that those recordings did not burn. And UMG is prepared to search for the following documents from its *NBCU* litigation files:

- Any filed or served documents (including pleadings, deposition transcripts, and expert reports) from UMG's *NBCU* litigation files in which a monetary value is ascribed to any original master recordings related to Plaintiffs, whether or not those original masters were actually destroyed in the fire or not; and

- Any filed or served documents from UMG's *NBCU* litigation files in which the parties discuss or memorialize the licensing of destroyed original master recordings related to Plaintiffs in exchange for or as part of a settlement payment.

These documents, and not the boundless categories requested by Plaintiffs, are the only ones that would even arguably be relevant and proportional to Plaintiffs' claims in the FAC.  But Plaintiffs rejected UMG's offer to search for these materials, which should tell this Court all it needs to know about Plaintiffs' unreasonable position.

Plaintiffs' Motion should be denied, or in the alternative, granted only as to those limited categories of documents from the *NBCU* litigation that actually relate to Plaintiffs' claims under their contracts.

### ISSUES IN DISPUTE

**A.    Plaintiffs' Position**

UMG should be compelled to answer Plaintiffs' interrogatory 2, and to produce documents responsive to Plaintiffs' document requests 1, 2, 4, 32, and 34. These six requests are focused on eliciting an initial set of materials highly relevant to a single, core factual issue: Did UMG recover proceeds in prior fire-related litigations based on the purported losses asserted by UMG of master recordings of Plaintiffs' work? It will not be burdensome for UMG to share the requested information related to this issue with Plaintiffs. It is, after all, UMG's prior litigation statements, discovery, monetization efforts, and conduct at issue.

**1.    Plaintiffs Are Entitled to Relevant and Proportional Discovery.**

Under the Federal Rules, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Plaintiffs here bear the initial burden of demonstrating the disputed requests seek relevant information. *See Glaukos Corp. v. Ivantis, Inc.*, Case No. CV 18-00620-JVS (JDEx), 2019 WL 3000647, at *2 (C.D. Cal. May 29, 2019). Upon such a showing, the burden shifts to UMG to justify withholding relevant information. *Id.*

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

## 2.      The Information Sought Through Interrogatory 2 Is Highly Relevant.

Plaintiffs' interrogatory 2 asks for UMG to "Identify all artists with master recordings that UMG claimed, asserted, or implied in any prior litigation, in any insurance dispute, or in connection with settlements of litigation or insurance disputes, were, or may have been, damaged or lost in, by, or as a result of the June 1, 2008 fire on the NBCUniversal lot." UMG objected to this interrogatory as follows: "UMG incorporates each of its General Objections stated above. UMG further objects to this Interrogatory on the grounds that it is untethered to the allegations in this lawsuit and instead makes a blanket demand for information regarding artists who are not currently, and may never be, parties to this action. Accordingly, Plaintiffs improperly seek information not relevant to Plaintiffs' claims or proportional to the needs of this case. Moreover, as UMG informed Plaintiffs prior to August 15, 2019, no original masters relating to Shakur, Petty, Earle, or Hole were destroyed in the 2008 fire. This lawsuit has no viable named plaintiff, and the discovery process cannot be used to find one. *See In re Facebook Privacy Litig.*, 2015 WL 3640518, at *3 (N.D. Cal. June 11, 2015) ('[A] plaintiff may not seek information from a defendant to find a proper representative to keep the case alive.'); *Douglas v. Talk Am., Inc.*, 266 F.R.D. 464, 467 (C.D. Cal. 2010) (plaintiffs cannot 'use the discovery process to go "fishing" to find [] new class representative[s]'). UMG also objects to Interrogatory No. 2 on the grounds that it is overly broad, unduly burdensome, oppressive, and harassing. In particular, Interrogatory No. 2 targets information about non-parties. The Interrogatory is also vague and ambiguous because, among other reasons, it does not define the term 'master recordings.' Additionally, this Interrogatory targets information subject to a protective order in the fire litigation against NBCUniversal and contained in a confidential settlement agreement from that action. Finally, UMG objects to Interrogatory No. 2 for the reasons stated in the Stay Motion and Motion to Dismiss—Plaintiffs cannot state a cognizable claim for relief. Based on the foregoing objections and the General

1  Objections above, UMG will not provide information responsive to this Interrogatory."
2  UMG should be compelled to answer this question.

3  UMG is wrong to contend that Plaintiffs' use of the term "master recordings"
4  renders this interrogatory too vague and ambiguous to even attempt to answer. "The
5  responding party must exercise reason and common sense in answering discovery."
6  *Brown v. Castillo*, No. CV-F-02-6018 AWI DLB, 2006 WL 1408444, at *1 (E.D. Cal.
7  May 22, 2006). "[O]bjections to interrogatories as vague and ambiguous, with no
8  response, will rarely be upheld." *Id.*; *see Thompson v. Sosa*, No. 03cv1726-IEG (BLM),
9  2006 WL 8446283, at *3 (S.D. Cal. Feb. 13, 2006). It is hard to believe that a
10 sophisticated entity like UMG does not understand what Plaintiffs are asking.
11 Nevertheless, as already offered to the parties' meet and confer, any alleged ambiguity
12 in the question can be avoided if UMG identifies all artists whose recordings UMG itself
13 claimed were lost. UMG can, if it wishes to do so, reserve objections in the response as
14 to whether or not certain of the claimed lost materials qualified technically as "master
15 recordings" on which royalties to the artists may be owed. UMG, however, cannot do
16 what it is doing so far: refuse to answer altogether. *Cf. United States v. Englund*, 235
17 F.R.D. 675, 684 (E.D. Cal. 2006) (holding, in requests for admissions context, that
18 "[w]hen the purpose and significance of a request are reasonably clear, courts do not
19 permit denials based on an overly-technical reading of the request") (citing *Holmgren v.*
20 *State Farm Mut. Auto. Ins. Co.,* 976 F.2d 573, 580 (9th Cir. 1992)).

21 Aside from its vagueness excuse, UMG fails to raise a meaningful relevance
22 challenge to interrogatory number 2 insofar as it seeks information about named
23 Plaintiffs. UMG's original written objections stated only that "as UMG informed
24 Plaintiffs prior to August 15, 2019, no original masters relating to [named Plaintiffs]
25 Shakur, Petty, Earle, or [former Plaintiff] Hole were destroyed in the 2008 fire," while
26 (at least implicitly) admitting that "original masters" relating to Plaintiff Soundgarden
27 were destroyed. But whether or not some of the royalty-bearing master recordings
28 embodying the work of any Plaintiff was actually lost in the Fire (which remains a

8

1    subject of dispute[1]) has nothing to do with the *separate* question whether UMG *claimed,*
2    *asserted, or implied* that master recordings of these artists' work were lost in prior
3    litigation, and thus whether UMG's prior litigation recoveries were in any related to
4    purported losses of master recordings of Plaintiffs' work.

5           UMG refuses to answer the broader interrogatory—seeking identification of *all*
6    of the artists whose recordings UMG claimed were lost to obtain its prior settlements,
7    not limited to the named Plaintiffs—for a different reason. According to UMG, all
8    "information about non-parties" is irrelevant and undiscoverable prior to class
9    certification. That is not the law in the Ninth Circuit, which recognizes that "the better
10   and more advisable practice" is to permit class discovery prior to certification. *See*
11   *Doninger v. Pacific Nw. Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977); *see also Brown*,
12   2018 WL 6074580, at *5 ("BOA was apparently unwilling to meet and confer over
13   appropriate email discovery, objecting instead that this RFP 'prematurely seeks class-
14   wide merit-based discovery prior to certification of a class.' Again, that objection is
15   OVERRULED; the District Court declined to phase discovery. Parties routinely produce
16   internal email communications relevant to the subject matter of the lawsuit." (citation
17   omitted)).

18          Here, discovery regarding what other artists' recordings UMG alleged were lost
19   is relevant, at minimum, to numerosity and commonality questions likely to arise at the
20   certification stage. *See Youngblood v. Family Dollar Stores, Inc.*, Nos. 09 Civ. 3176
21   (RMB) (FM), 10 Civ. 7580 (RMB) (FM), 2011 WL 1742109, at *4 (S.D.N.Y. Jan. 5,
22   2011). The discovery requested is also relevant to the Plaintiffs' claims. Information
23   about UMG's overall claimed loss in prior litigations, and the extent of the claimed loss

24

25

26

27   [1] The referenced post-litigation communications regarding Shakur, Petty, and Earle are nowhere near as definitive as UMG described in this discovery objection. UMG's carefully crafted, heavily lawyered denials regarding Shakur, Petty, and Earle rely, among other things, on an unduly narrow definition of the term "original master." UMG does not dispute that at least one Soundgarden "original master" was lost.

28

9

in terms of artists and recordings, is relevant to determining Plaintiffs' potential shares owed from UMG's overall prior-litigation recoveries.

The authorities UMG cites as supposedly supporting its blanket refusal to provide any discovery materials mentioning artists other than the named Plaintiffs are easily distinguishable. UMG's initial formal objections cited two cases. The first case, *In re Facebook Privacy Litig.*, No. 5:10–cv–02389–RMW, 2015 WL 3640518, at *1 (N.D. Cal. June 11, 2015), in fact supports Plaintiffs. UMG tried to suggest otherwise by misleadingly quoting the following highlighted language out of context: "Facebook counters that Plaintiff improperly seeks this contact information to find potential named plaintiffs that can assist in prosecution and bolster Plaintiff's standing. The court agrees that *a plaintiff may not seek information from a defendant to find a proper representative to keep the case alive.* But where a plaintiff also legitimately seeks such identifying information to support her motion for class certification, she is entitled to relief." *Id.* at *3. UMG's objections similarly relied on an out-of-context, and misleadingly altered, quotation from *Douglas v. Talk America, Inc.*, 266 F.R.D. 464, 467 (C.D. Cal. 2010). The *Douglas* court merely refused a request to reopen discovery aimed at finding new plaintiffs after class certification had already been denied. *Id.* Here, of course, no class certification motion has yet been filed.

The cases cited by UMG in more recent meet and confer communications about this issue are no more helpful to its cause. UMG first relies on *Knutson v. Blue Cross & Blue Shield of Minnesota*, 254 F.R.D. 553, 553 (D. Minn. 2008). At least one other court has expressly declined to follow that decision, concluding that information about other potential class members can indeed be relevant to class certification issues. *See Sedtal v. Genuine Parts Co.*, No. 1:08–CV–413–TH, 2009 WL 2216593, at *6 (E.D. Tex. July 23, 2009). The decisions of courts in this district on this issue are in accord with *Sedtal* rather than with *Knutson*. *See, e.g., Castillo v. Bank of America N.A.*, Case No. CV 17-00580-DOC-KESx, 2018 WL 6074580, at *2 (C.D. Cal. Sept. 28, 2018).

*Knutson* is also factually distinguishable. In that opt-in FLSA case, the plaintiff expressly sought contact information for other potential opt-in plaintiffs "solely for the purpose of inviting others to join this litigation." 254 F.R.D. 553, at 557. The plaintiff failed to articulate any other potential relevance theories for seeking that information. *Id*. Courts have declined to follow *Knutson* where the named plaintiffs and their counsel were not seeking information about other class members for the sole purpose of finding additional litigants. *See, e.g.*, *Borup v. CJS Solutions Group, LLC*, No. 18-CV-1647 (PAM/DTS), 2019 WL 582112, at *4 (D. Minn. Feb. 13, 2019); *Doyon v. Rite Aid Corp.*, 279 F.R.D. 43, 48 (D. Me. 2011) (declining to follow *Knutson* where class member information was relevant to Rule 23 certification issues).[2]

UMG fares no better relying on *Dziennik v. Sealift, Inc.*, No. 05-CV-4659 (DLI)(MDG), 2006 WL 1455464, at *1 (E.D.N.Y. May 23, 2006). In that putative employment contract breach class action, the defendant, unlike UMG here, *did not* refuse all discovery of information regarding class members other than the named plaintiffs. Instead, the defendant *produced* the list of class members in various categories as well as sample contracts for the various categories, albeit with some redactions. *Id.* The plaintiffs' motion to compel, which was denied without prejudice, only sought an order requiring the defendant to remove the redactions. *Id.* at *2. The decision provides no support for UMG's position. *See Youngblood*, 2011 WL 1742109, at *4 (distinguishing and declining to follow *Dziennik* where "there [wa]s no indication that Plaintiffs ha[d] anything but a good faith need for employee contact information for the purpose of establishing the propriety of class certification," and "the information sought [was] relevant—indeed essential—for Plaintiffs to establish that common issues

---

[2] At least one other court has expressly declined to follow *Knutson*, concluding that information about other potential class members is relevant prior to the conditional certification of an opt-in class action. *See Sedtal v. Genuine Parts Co.*, No. 1:08–CV–413–TH, 2009 WL 2216593, at *6 (E.D. Tex. July 23, 2009). And to the extent *Knutson* stands for a general rule that class member contact information is not relevant, courts in this district have held otherwise. *See, e.g.*, *Castillo*, 2018 WL 6074580, at *2.

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

1  predominate over individual issues in this case" (quotation marks and alterations in
2  original omitted)).

3      Likewise, *In re Mortgagors of Temple-Inland Mort. Corp.*, No. CIV. A. 99-CV-
4  4633, 2001 WL 177181, at *1 (E.D. Pa. Jan. 24, 2001), does not support UMG's
5  discovery conduct here. There, after the court dismissed the named plaintiffs' claims,
6  plaintiffs' counsel asked the court to permit it to continue onward without a client. *Id.*
7  The court, similar to the *Douglas* court, rejected this request on the grounds that there
8  was no live controversy. *Id.* at *2. Here, while UMG clearly hopes that its motion to
9  dismiss Plaintiffs' claims will be granted with prejudice, no such ruling has issued.

10      **3.      Interrogatory 2 Seeks Reasonably Proportionate Discovery**

11      UMG's written response to interrogatory 2 contains impermissible boilerplate
12  references to proportionality. *See Bragel Int'l, Inc. v. Kohl's Dept. Stores*, Case No. CV
13  17-7414 RGK (SSx), 2018 WL 7890682, at *5 (C.D. Cal. Nov. 14, 2018) (noting that
14  "courts have also rejected boilerplate assertions that a discovery request is
15  'disproportionate' and require that 'objections based on proportionality' be 'explained
16  with specificity'); *Manufacturing Automation & Software Sys., Inc. v. Hughes*, Case No.
17  CV 16-8962-CAS (KSx), 2017 WL 5641120, at *4 (C.D. Cal. Sept. 21, 2017). The
18  references made in UMG's written responses to supposed overbreadth, undue burden,
19  and harassment are also unsupported boilerplate.

20      Finally, UMG's confidentiality objection is entirely baseless–particularly since
21  UMG has delayed negotiating a confidentiality order, which could fully protect any
22  sensitive information. *See, e.g.*, *Antiaging Institute of of California, Inc. v. Solonova,*
23  *LLC*, 2016 WL 6920676, at *2 (C.D. Cal. June 29, 2016) ("With respect to claims
24  of confidentiality, a protective order would more than adequately address
25  the objections."). Plaintiffs sent UMG a draft protective order on July 29, 2019. Ex. D
26  (email chain between counsel regarding protective order drafting). On August 17, 2019,
27  UMG indicated it would revise Plaintiffs' draft within two weeks. *Id.* UMG next
28  indicated on September 17, 2019 that it would send its overdue edits to the protective

order draft "next week." *Id.* But to this day, UMG still has not yet responded with any edits of any kind to Plaintiffs' draft protective order. Yet UMG now somehow seeks to bootstrap its delays into an excuse to not produce discovery. The Court should not countenance such misconduct from UMG. *Cf.* Initial Patent Order for Cases Assigned to Judge John A. Kronstadt ¶ 1.5 ("Absent a Court order, discovery cannot be withheld on the basis of confidentiality. The Court's Standing Protective Order shall govern discovery unless the Court enters a different protective order, which may be entered by the assigned Magistrate Judge without further order from the District Judge.").

### 4. Plaintiffs' Request for Filings, Expert Materials, and Documents from UMG's Prior Fire Litigation Are Relevant and Proportional.

The Court should also order UMG to produce documents which are similarly relevant to answering the question whether UMG made money from the purported losses of master recordings of Plaintiffs' work in UMG's prior litigation. The requested documents, which include filings, expert materials, and documents from UMG's prior fire litigations, were requested in document requests 1, 2, 4, 32, and 34. All of these requests seek highly relevant documents.

### a. Request 1 Seeks Relevant, Proportional Discovery

Request 1 seeks "Unredacted copies of all redacted filings in the FIRE CASE." UMG objected to this requested as follows: "UMG incorporates each of its General Objections stated above. UMG further objects to this Demand on the grounds that it is completely untethered to the allegations in *this* lawsuit and instead makes a blanket demand for all sealed court materials in *another* litigation, without regard to whether those materials relate in any way to Plaintiffs, their claims or agreements, or sound recordings embodying performances by Plaintiffs. Accordingly, Plaintiffs improperly seek the production of documents that are not relevant to Plaintiffs' claims or proportional to the needs of this case. UMG also objects to Demand for Production No. 1 on the grounds that it is overly broad, unduly burdensome, oppressive, and harassing. In particular, the Demand targets confidential information, without regard to relevance,

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

including confidential information belonging to third parties and proprietary business information subject to a protective order in the FIRE CASE. *See Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135–36 (no presumption that material from a prior litigation subject to a protective order should be accessible in subsequent litigation). Finally, UMG objects to this Demand for the reasons stated in the Stay Motion. Based on the foregoing objections, UMG will not search for or produce documents responsive to this Demand, but UMG is willing to meet and confer to discuss whether this Demand can be narrowed in light of UMG's objections."

These documents could hardly be more relevant. Plaintiffs specifically alleged in the First Amended Complaint ("FAC") that "UMG successfully pursued litigation and insurance claims which it reportedly valued at $150 million to recoup what UMG itself alleged to be the value of lost Master Recordings," and further, that "UMG concealed its massive recovery from Plaintiffs, apparently hoping it could keep it all to itself by burying the truth in sealed court filings and a confidential settlement agreement." FAC ¶ 5; *see also id.* ¶ 18. ("Numerous filings in that action remain redacted and under seal, at the request of UMG.").

UMG's primary objection to this request is identical to the primary argument raised regarding Plaintiffs' interrogatory 2. UMG claims that it need not turn over documents unless they explicitly reference a named Plaintiff. UMG has indicated that, as a result, it will eventually, at some unknown time in the future, agree to review the requested documents, but will only produce the ones that name Soundgarden, Shakur, Petty or Earle (yet even with that improper limitation, has still not produced anything).

As previously discussed, UMG assumes discovery has been bifurcated in this action, which it has not been. In addition, it makes no sense to suggest that only documents which literally reference Plaintiffs by name are the only ones that are relevant. Documents identifying the total amount of UMG's claimed loss and the total amount of recovery, for example, would be relevant to the named Plaintiffs' claims for damages, regardless of whether Plaintiffs (or any other artists) are specifically named in

14

the documents. All prior litigation files related to the alleged scope of the loss, the sources of those alleged losses, UMG's damages theories and measurements, and the amounts and terms of UMG's eventual recoveries should be produced.

Plaintiffs' requests for easily-available files from prior UMG prior litigations are also proportional. UMG cannot prove that gathering and re-producing those litigation files will somehow impose an undue burden. Courts have recognized in analogous contexts that re-producing files from a prior litigation poses no significant discovery burden. *See Bower*, 2018 WL 4945312, at *4.

Beyond repeating its boilerplate statements in its initial written objections, UMG has not articulated why the document requests currently at issue are disproportionate or unduly burdensome. In fact, UMG has already agreed to gather these very files. It just insists, based on a meritless legal argument, that it must thereafter review these documents and withhold any that do not specifically mention the named Plaintiffs. The broad standard of relevance and the fact that discovery is not bifurcated does not allow UMG's cherry-picking tactics, all designed to conceal rather than reveal the truth.

### b.    Request 2 Seeks Relevant, Proportional Discovery

Request 2 seeks "All expert materials of Larry Gerbrandt, including but not limited to expert reports, RELATING TO the FIRE CASE." UMG objected to this request as follows: "UMG incorporates each of its General Objections stated above. UMG further objects to this Demand on the grounds that it is completely untethered to the allegations in *this* lawsuit made by *these* Plaintiffs. Instead, the Demand asks for materials—some of which may be redacted—in *another* litigation, without regard to whether those materials related in any way to Plaintiffs, their claims or agreements, or sound recordings embodying performances by Plaintiffs. Consequently, Plaintiffs improperly seek the production of documents that are not relevant to Plaintiffs' claims or proportional to the needs of this case. UMG also objects to Demand for Production No. 2 on the grounds that it is overly broad, unduly burdensome, oppressive, and harassing. In particular, the Demand targets potentially confidential information with

1  regard to relevance. Finally, UMG objects to this Demand for the reasons stated in the
2  Stay Motion. Based on the foregoing objections, UMG will not search for or produce
3  documents responsive to this Demand, but UMG is willing to meet and confer to discuss
4  whether this Demand can be narrowed in light of UMG's objections."

5      This request, too, arises directly from one of the central allegations in the FAC,
6  namely, that "Plaintiffs are informed and believe, UMG itself calculated" the value of
7  the Master Recordings lost in the Fire "to be approximately $150 million in expert
8  opinions it submitted in the Fire Lawsuit." FAC ¶ 50. UMG's objections to this request
9  fail for the same reasons previously discussed above related to Request 1.

10      **c.      Request 4 Seeks Relevant, Proportional Discovery**

11      Request 4 seeks "an unredacted copy of the 'Gods List' referred to in the
12  Opposition to Defendants' Motion *In Limine* No. 4 in the FIRE CASE." UMG objected
13  to this request as follows: "UMG incorporates each of its General Objections stated
14  above. UMG further objects to this Demand on the grounds that it is completely
15  untethered to the allegations in *this* lawsuit made by *these* Plaintiffs. Instead, the
16  Demand asks for material from *another* litigation, without regard to whether it relates in
17  any way to Plaintiffs, their claims or agreements, or sound recordings embodying
18  performances by Plaintiffs. Consequently, Plaintiffs improperly seek the production of
19  a document that is not relevant to Plaintiffs' claims or proportional to the needs of this
20  case. Additionally, the Demand targets a document subject to a protective order in the
21  FIRE CASE. Finally, UMG objects to this Demand for the reasons stated in the Stay
22  Motion. Based on the foregoing objections, UMG will not search for or produce the
23  document responsive to this Demand, but UMG is willing to meet and confer to discuss
24  the propriety of this Demand."

25      The FAC specifically identifies the requested highly relevant document: "UMG .
26  . . created what it internally called a 'God List' that purports to identify with 'reasonable
27  certainty' an inventory of all Master Recordings destroyed in the Fire." UMG's

28

1   objections to this request fail for the same reasons previously discussed above related to

2   Request 1 and 2.

3            **d.      Request 32 Seeks Relevant, Proportional Discovery**

4            Request 32 seeks "Any and all DOCUMENTS produced by YOU to

5   NBCUniversal Media LLC in the FIRE CASE"; similarly, request 34 seeks "Any and

6   all DOCUMENTS produced by YOU to AXA Ins. Co. in the INSURANCE CASE."

7   UMG objected to this request as follows: "UMG incorporates each of its General

8   Objections stated above. UMG further objects to this Demand on the grounds that it is

9   completely untethered to the allegations in this lawsuit and instead makes a blanket

10   demand for discovery materials in another litigation, without regard to whether those

11   materials relate in any way to Plaintiffs, their claims or agreements, or sound recordings

12   embodying performances by Plaintiffs. Accordingly, Plaintiffs improperly seek the

13   production of documents that are not relevant to Plaintiffs' claims or proportional to the

14   needs of this case. UMG also objects to Demand for Production No. 32 on the grounds

15   that it is overly broad, unduly burdensome, oppressive, and harassing. In particular, the

16   Demand targets UMG's confidential information without regard to relevance, including

17   proprietary business information subject to a protective order in the FIRE CASE.

18   Finally, UMG objects to this Demand for the reasons stated in the Stay Motion. Based

19   on the foregoing objections, UMG will not search for or produce documents responsive

20   to this Demand, but UMG is willing to meet and confer to discuss whether this Demand

21   can be narrowed in light of UMG's objections."

22            These documents—which have already been collected, reviewed, and produced

23   for prior litigations—are also highly relevant. They will shed light on, among other

24   things, what the information shared in these prior litigations indicated about UMG's

25   claimed loss and about the valuation of the loss. UMG's objections to this request fail

26   for the same reasons previously discussed above related to Requests 1, 2, and 4.

27

28

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

## B.      Defendant's Position[3]

Plaintiffs' initial theory of the case—that they were owed revenues related to the *loss* of original master recordings—quickly fell apart when UMG informed them, both in email correspondence and in a verified interrogatory response, that *no* original master recordings embodying the works of named Plaintiffs were destroyed in the 2008 fire (except for Soundgarden, whose claims are plainly time-barred because UMG informed the band of such losses in May 2015).  UMG's efforts to inform Plaintiffs about the status of the original master recordings that they professed to care about give lie to any notion that UMG is not engaged in a good-faith effort to provide *relevant* discovery.

Disabused of their original theory of recovery—that UMG obtained and then concealed settlement recoveries for the loss of original master recordings related to Plaintiffs—Plaintiffs' FAC and Opposition to UMG's Motion to Dismiss now set forth damages theories completely *untethered* to the royalty provisions in Plaintiffs' recording agreements.  To trigger the royalty provisions of those contracts, UMG must have "licensed" the master recordings to others.  Accordingly, only those documents from the underlying fire and insurance litigations related to licensing or attributing specific value to such licensing revenue could possibly be relevant.  By contrast, the discovery requests Plaintiffs seek to compel are vastly broader and unrelated to their claims and contracts so as to render them harassing.  Plaintiffs' Motion should therefore be denied, or in the alternative, granted only as to the limited categories of documents that would be relevant and proportional to their claims, as UMG sets forth herein.

---

[3] On October 22, 2019, UMG informed Plaintiffs that the formatting of their arguments in the Joint Stipulation "does not follow the format required by Local Rule 37-2.1 to set forth the specific answer and response to each discovery request at issue."  In response, Plaintiffs revised their portion as reflected here.  The structure of UMG's written response here has been framed by Plaintiffs' revised framing of the issues.

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

1.      **Since Plaintiffs' Original Theory Unraveled, They Have Attempted to State a New Theory But Seek Discovery Entirely Untethered to It.**

Contrary to Plaintiffs' assertion that UMG has been engaged in "discovery game[s]" and "tr[ied] to enforce (through self-help) its requested motion for a discovery stay," UMG has fully complied with its discovery obligations to date and has worked diligently to respond to Plaintiffs' inquiries seeking information about the status of original master recordings embodying Plaintiffs' works.  Now that Plaintiffs have received those responses from UMG—responses that confirm UMG lost no original master recordings related to four of the five original named Plaintiffs and that UMG informed Soundgarden at least as early as May 2015 that UMG had lost original masters relating to the band in the fire—they have switched tacks, seeking documents untethered to their claims in the hope of finding new plaintiffs, inventing new, even more fanciful claims than those asserted in the FAC, or harassing UMG (or all three).

Plaintiffs filed their original complaint ten days after *The New York Times Magazine* published a story about the 2008 fire on the Universal Studios backlot.  That article stated that master recordings featuring performances by dozens of artists had purportedly been destroyed in the fire.  Soundgarden, Tupac Shakur (here represented by Tom Whalley), Tom Petty (here allegedly represented by Jane Petty), Steve Earle, and Hole were included in the article's list, Dkt. 14-17 at 85–86, and all of them (or parties purporting to assert their interests) were originally named as plaintiffs in this litigation.  One week after the article was published, but before this suit was filed, Plaintiffs' counsel sent UMG a letter "request[ing] that UMG promptly furnish us with a complete inventory of all master recordings . . . that were destroyed in the fire." Declaration of Nathaniel L. Bach ("Bach Decl."), Ex. 1 (Letter from Howard King, Plaintiffs' Counsel, to Sir Lucian Grainge, UMG Chairman & CEO (June 18, 2019)).

On June 20, 2019—the day before Plaintiffs filed their original complaint— UMG informed Plaintiffs' counsel that no original masters related to Hole had been lost in the fire.  Dkt. 28-3 at 6.  Plaintiffs nonetheless filed the original complaint, alleging "[o]n

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

information and belief" that masters embodying the works of Soundgarden, Shakur, Petty, Earle, *and Hole* had been destroyed in the fire.  Dkt. 1 ¶¶ 7–11 (emphasis added).  After Plaintiffs' counsel filed that complaint, they continued to demand updates about the status of UMG's master recordings related to their clients.  In response to requests that UMG "focus attention on getting us the status of the masters" for "Soundgarden, Earle, Tupac, [and] Petty," Dkt. 28-4 at 9—requests made nearly two weeks after UMG moved to dismiss the original complaint (*see* Dkt. 14)—UMG did precisely that as to each of these artists:

- *Steve Earle*:  Of the 11 assets impacted by the fire, none was an original master recording.
- *Tupac Shakur*:  Of the four assets impacted by the fire, none was an original master recording.
- *Tom Petty*:  No original master recordings were lost in the fire.

Dkt. 28-7 at 22–23.

On August 26, 2019, UMG's counsel presented to Plaintiffs' counsel written correspondence from over four years ago sent to Kim Thayil (Soundgarden's lead guitarist and co-founder) and the band's manager that conclusively demonstrates the band's awareness that UMG had lost two compiled album master 1/2" analog reels from the album *Badmotorfinger* in the fire.  *See* Dkt. 30-1.  Despite that loss, and as reflected in the email correspondence, UMG was still able to issue a remastered album—with Soundgarden's knowledge and participation—using a digital audio tape safety copy.  *Id.* ¶ 3.  Specifically, the emails indicate that:

- On May 26, 2015, Ron Saint Germain, who worked on the original album, wrote to Amy Decker, one of the Soundgarden's managers (and it appears he also wrote to Chris Cornell, the band's co-founder and lead singer), saying "In light of the fact that the Masters were lost in the Universal fire . . . ."  That email was passed on later that day to Kim Thayil.
- In a June 3, 2015 email to Jeff Fura (Director of A&R at Universal Music Enterprises), Kim Thayil wrote:  "I'm sure the band knows, or was told that the 1/2 tapes were destroyed, and that to remaster we need to remix.  I think they know that Terry wants to do the remix and 5.1 surround mix also."
- In a June 8, 2016 draft email to the band that she first sent to Jeff Fura for his review, Amy Decker wrote:  "As you are aware, the 1/2 stereo analog master

for this album, which is what would normally be used to do a stereo remaster, was destroyed in a fire at the Universal vault."

- On June 17, 2016, Jeff Fura wrote to Amy Decker about the loss of an "album master reel."

- And on June 23, 2016, in an email to Jeff Fura, Kim Thayil referred to the "loss of BMF [*Badmotorfinger*] masters in the Universal warehouse fire."

*See* Dkt. 30-1, Ex. 1 at 9, 12, 15, 21, 23. These emails eviscerate Plaintiffs' other original theory—that UMG actively concealed from Plaintiffs (and artists more generally) its fire losses.

Instead of opposing UMG's motion to dismiss the original complaint, Plaintiffs filed their FAC on August 16, 2019, dropping Hole as a plaintiff but still asserting claims on behalf of Soundgarden (notwithstanding the clear time-bar), along with Petty, Shakur, and Earle (even though no original masters related to these artists were lost). Having been told that UMG lost no original masters relating to Plaintiffs and having no information to establish otherwise, Plaintiffs now claim they are entitled to a portion of UMG's litigation-settlement recoveries "whether or not" original masters were actually destroyed (FAC ¶ 30), as long as UMG "claimed, asserted, or implied" to its litigation counterparts that such masters were lost (Interrogatory No. 2). But Plaintiffs' new theory is still reliant on and tethered to the actual language of Plaintiffs' recording agreements, each of which only triggers a royalty obligation when master recordings are *licensed* to third parties.

### 2.    UMG Has Discharged Its Discovery Obligations to Date While Plaintiffs Are Pursuing a Fishing Expedition as Their Claims Collapse.

On September 18, 2019, as part of the Parties' ongoing meet-and-confer efforts regarding the discovery at issue here, UMG asked Plaintiffs if they would be interested in coming on site to UMG's storage facilities to inspect assets related to the named Plaintiffs, including original master recordings, to demonstrate that none of their original masters were destroyed in the fire (aside from those previously identified to Soundgarden). Bach Decl. ¶ 4. Plaintiffs said they were interested in doing so, and

UMG has been preparing for such an inspection to occur by preparing a spreadsheet identifying the locations where such assets reside. *Id.*. UMG was expecting negotiations over that inspection process to continue when Plaintiffs served their motion to compel.

In addition, as part of the parties' ongoing meet and confer, and despite UMG's challenge to the FAC's new "monetization" theory of contract damages, UMG advised Plaintiffs on October 7 that it is willing to undertake a search for documents in the *NBCU* litigation file, if any, that assign monetary value to the loss of original masters related to the named Plaintiffs. *Id.* ¶ 5. Plaintiffs' counsel informed UMG's counsel that he would discuss this idea with his co-counsel. *Id.* But again, instead of receiving a response to UMG's offer, UMG received this motion. *Id.*

Moreover, on October 11, 2019, UMG provided its verified response to Plaintiffs' Interrogatory No. 1, which asked UMG to "[i]dentify all artists who had any master recordings damaged or lost in, by, or as a result of the June 1, 2008 fire on the NBCUniversal lot." In that verified response, UMG confirmed yet again that no original masters embodying named Plaintiffs' performances were destroyed in the 2008 fire or—in Soundgarden's case—that UMG informed the band years ago about lost masters. Plaintiffs sent UMG the instant motion to compel the next business day after UMG served the verified response to Interrogatory No. 1, seeking documents that are both irrelevant and not proportional to their claims.

### 3.  Plaintiffs' Motion to Compel Is Premature and Should Be Denied on This Ground Alone.

As UMG explained during the parties' meet and confer efforts, Plaintiffs' motion to compel is premature. *See* Bach Decl. ¶ 6. *First*, because Plaintiffs suddenly and unilaterally ended the parties' meet and confer efforts prior to their completion, this motion is premature and should be denied. As noted above, UMG left the parties' October 7 telephone call with the impression that Plaintiffs' counsel would seriously consider its good-faith offer to search for relevant documents from the *NBCU* litigation file. *See id.* ¶ 5. Instead of receiving a response, UMG received this motion. *Id.* But

in order to satisfy the meet-and-confer requirement, the parties must "meaningfully discuss each contested discovery dispute in a genuine effort to avoid judicial intervention." *Fitzwater v. Bank of Am., N.A.*, 2015 WL 4110789, at *1–2 (D. Nev. July 7, 2015) (citation omitted) (denying motion to compel in part because parties had not specifically addressed relevant discovery requests).  Because the parties' discussions regarding Plaintiffs' outstanding discovery requests were cut short, the Court should at least deny the motion and order the parties to continue their meet-and-confer efforts so that, if the parties are unable to reach agreement, they may bring more fully developed issues to this Court's attention, with the benefit of Judge Kronstadt's rulings on the pending motions.  *See Big Baboon, Inc. v. Dell, Inc.*, 2010 WL 11459799, at *4 (C.D. Cal. Mar. 16, 2010) (requiring parties to continue prematurely concluded meet and confer process).

*Second,* Plaintiffs are moving to compel less than two weeks before the District Court is slated to hear UMG's fully-briefed Motion to Stay Discovery and case-dispositive Motion to Dismiss the FAC.  UMG first moved this Court for a Protective Order Staying Discovery well over two months ago, on August 9, 2019.  Dkt. 20.  The District Court struck that motion on the ground that "[m]atters involving a stay are determined by the assigned district judge," and ordered that a new motion to stay be briefed on an expedited schedule, *see* Dkt. 26, pursuant to which UMG's stay motion has been fully briefed since September 4, 2019.  UMG's Motion to Dismiss the FAC—which followed Plaintiffs' decision to file an amended complaint rather than to oppose UMG's first motion to dismiss—has similarly been fully briefed since October 4, 2019, pursuant to the District Court's scheduling order specifically setting deadlines for that motion.  *See* Dkt. 29.

As UMG explained to Plaintiffs' counsel, neither the parties nor the Court is well served by Plaintiffs' filing of a discovery motion in advance of the November 4 hearing on UMG's Motion for Stay of Discovery and Motion to Dismiss.  Bach Decl. Ex. 2.  All parties' positions on discovery and its scope are certain to be informed and affected by

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

Judge Kronstadt's rulings on those pending motions. Indeed, anything that UMG writes now will likely be stale by the time this motion to compel is considered and ruled upon by this Court, at which time the parties will have guidance (or even a ruling) from Judge Kronstadt that is certain to affect both the merits of Plaintiffs' arguments and UMG's position in response thereto.

A more appropriate and efficient course of action would have been for Plaintiffs to raise these issues after the hearings on November 4th, and after the parties had completed their meet and confer in light of the hearing and any rulings. Therefore, Plaintiffs' Motion should be denied without prejudice to being raised at the appropriate time when both the Court and the parties will have the benefit of guidance from Judge Kronstadt. *See Sepulveda v. Dep't of Treasury*, 295 F. App'x 160, 160–61 (9th Cir. 2008) (district court did not abuse its discretion by denying as premature a motion to compel documents because the court had yet to rule on a pending motion to dismiss); *see also Nance v. May Trucking Co.*, No. 3:11-cv-0537-CAB-DHB, Dkt. 34 at 1 (S.D. Cal. Jan. 24, 2012) ("find[ing] Plaintiffs' requested pre-certification discovery is premature in light of the pending Motion to Dismiss, and [therefore] DEN[YING] Plaintiffs' Motion to Compel without prejudice"); *Thomas v. Felker*, 2011 WL 2225133, at *3 (E.D. Cal. June 7, 2011) (denying motion to compel as "premature" and further finding that "any motion to compel will be found premature until the court has issued its final ruling on the [pending] motion to dismiss"); *Hill v. Asset Acceptance, LLC*, 2014 WL 1289578, at *2 (S.D. Cal. Mar. 27, 2014) (denying without prejudice motion to compel discovery where "a ruling . . . [was] premature in light of the pending motion to compel arbitration").

*Third*, Plaintiffs disingenuously argue that UMG's objections to class-related discovery have "no merit" because "[d]iscovery has not been bifurcated into individual and class phases." As UMG recently argued in the parties' Joint Rule 16(b)/26(f) Report, "if discovery proceeds [in this case], *it should be phased*." Dkt. 37 at 11 (emphasis added). Such "[p]hasing is appropriate in these circumstances given that

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

Plaintiffs have demanded documents going back decades and sought documents well beyond what would be required for class certification, including premature identification of alleged putative class members." *Id.* "As set forth in UMG's motion to dismiss and stay motion, Plaintiffs should be required to show that they have a claim, standing, and that the case can proceed as a class" before broad class-related discovery proceeds, particularly where "the varying nature of [the] contractual rights [across artists' recording agreements] makes this case [is] inherently unsuited to class treatment." *Id.*

On October 7, 2019, in response to the parties' Joint Report, the District Court issued a scheduling order setting pretrial deadlines, noting the "schedule *is without prejudice to a further review based on the outcome of the pending motion to dismiss and motion to stay*." Dkt. 41 at 1(emphasis added) (citing Dkts. 28, 36). The Court similarly noted that—"if necessary"—"[t]he parties will be invited to submit proposed dates for the final pretrial conference and trial . . . upon the Court's final ruling on the motions." *Id.* at 1–2. Thus, while Plaintiffs complain above that they "face a rapidly-approaching class certification deadline" in January 2020, the District Court's most recent scheduling order expressly contemplates "further review" of pre-trial deadlines "based on the outcome of the pending motion to dismiss and motion to stay." *Id.* at 1; *see also* Dkt. 19 at 2 ("To the extent a modification of these dates are necessary, counsel shall include a request in the Joint Rule 16(b)/26(f) Report . . . .").

To date, UMG has not moved to bifurcate class and merits discovery—*and indeed has not served any discovery of its own upon Plaintiffs*—because doing so would have been premature in light of (1) UMG's pending Motion to Stay Discovery and Motion to Dismiss the FAC; (2) the District Court's repeated suggestions that the pre-trial deadlines in this case would be revisited in light of its rulings on the pending motions (*e.g.*, Dkt. 41); and (3) Plaintiffs' assertion that they intend to file yet another amended complaint to correct factual inaccuracies in its current pleading (*see* Bach Decl. ¶ 3).

In the event that Plaintiffs' claims are not dismissed and discovery not stayed, UMG asks the Court to stay any consideration of this Motion until after the Court

decides whether it is proper to bifurcate discovery in this case, as UMG requested in the Parties' Joint Report (Dkt. 37 at 12):

| First phase of fact discovery (as to named Plaintiffs' claims only) | 4 months, commencing after ruling on motion to dismiss, if FAC survives dismissal |
|---|---|
| Motion for class certification | To be filed within 30 days of completion of the first phase of discovery |
| Second phase of fact discovery (if class is certified) | 6 months, commencing if and when class is certified by the Court |
| Expert discovery | 3 months |

Such phasing is wholly appropriate.[4]  *See, e.g.*, *Munro v. Univ. of S. Cal.*, 2018 WL 2584611, at *2 (C.D. Cal. May 11, 2018) ("Under the scheduling order currently in place, discovery has  been  bifurcated  into  a class certification phase and  a  merits phase."); *Yingling v. eBay, Inc.*, 2010 WL 373868, at *1 (N.D. Cal. Jan. 29, 2010) ("[T]he district court issued a scheduling order which bifurcated discovery into two phases:  (1) class certification discovery . . . and (2) merits discovery thereafter.").

### 4.   **Plaintiffs' Discovery Requests Are Unmoored From Viable Legal Theories, Overbroad, and Burdensome.**

If the Court confronts the merits of Plaintiffs' Motion at this time, it should be denied.  As Plaintiffs' Opposition to UMG's Motion to Dismiss makes clear (Dkt. 38 at 3–8), their claims are reliant on their ability to demonstrate that UMG "licensed" the master recordings related to Plaintiffs.  Without such a license, no royalty payment obligation is triggered.  Therefore, Plaintiffs have had to engage in linguistic gymnastics in an attempt to argue for the existence of a license.  Plaintiffs now implausibly assert

---

[4] Unlike in *Castillo*, upon which Plaintiffs rely, the Court here has *not yet* ruled on the phasing issue.  In *Castillo*, the district court had previously declined to bifurcate discovery.  2018 WL 6074580, at *5.

that the licenses occurred when UMG settled with the warehouse owners and its insurer, thereby "retroactively" licensing the destruction of the recordings in exchange for flat-fee payments. *Id.* at 6. As UMG argued more fully in its Reply in support of the Motion to Dismiss the FAC (*see* Dkt. 39 at 4–6), this (unpleaded) "retroactive" licensing argument simply makes no sense.[5] It should not serve as the basis for Plaintiffs' sweeping discovery requests.

### a. Interrogatory No. 2 and Request for Production No. 4

Interrogatory No. 2 demands that UMG "[i]dentify all artists with master recordings that UMG claimed, asserted, or implied in any prior litigation, in any insurance dispute, or in connection with settlements of litigation or insurance disputes, were, or may have been, damaged or lost in, by, or as a result of the June 1, 2008 fire on the NBCUniversal lot." Relatedly, RFP No. 4 demands production of "an unredacted copy of the 'Gods List' referred to in the Opposition to Defendants' Motion *In Limine* No. 4 in the FIRE CASE," which allegedly "purports to identify with 'reasonable certainty' an inventory of all Master Recordings destroyed in the Fire" (FAC ¶ 21).

UMG objected to Interrogatory No. 2 because it makes a blanket demand for information regarding artists that are not, and may well never be, parties to this action and targets information unrelated to—or at the very least well beyond the scope of—Plaintiffs' licensing-based contract theory. However, UMG did provide information as to named Plaintiffs in its verified response to Interrogatory No. 1. Likewise, UMG objected to RFP No. 4 because whether non-plaintiff artists appeared on a list from a separate litigation is irrelevant to Plaintiffs' current, licensing-based contract claims. However, during the meet and confer UMG offered to let Plaintiffs inspect any original masters embodying their performances that are currently in UMG's archives, to put to rest any concerns about whether those still exist. And UMG also proposed searching its

---

[5] For example, because there is no plausible argument that the insurance company somehow destroyed the master recordings, the notion that UMG somehow "retroactively" licensed the insurer to engage in such destruction is facially absurd.

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

1  litigation files for any material related to the licensing of original masters embodying

2  named Plaintiffs' performances or ascribing monetary value to those recordings.

3       UMG's approach makes sense here because the recording agreements on which

4  Plaintiffs rely all require "licensing" as a condition precedent to trigger UMG's royalty

5  obligations.  If UMG did not license the original masters at issue, Plaintiffs' lawsuit

6  cannot stand.  Thus, Plaintiffs' effort to compel responses to these requests—requests

7  that go well beyond the scope of that fundamental licensing question—should be denied.

8       *First*, there is no question that UMG has provided (or offered to provide)

9  discovery to Plaintiffs concerning *named* Plaintiffs.  The real dispute here is that named

10  Plaintiffs are more interested in learning about artists who are not parties to this dispute

11  before named Plaintiffs have even proceeded past the pleading stage—let alone before

12  Judge Kronstadt addresses whether discovery should be bifurcated or whether this case

13  is one that could ever be certified.  UMG should not be made to embark on such broad

14  class-wide discovery in these circumstances, as UMG requested in the parties' Joint

15  Report.  *See supra* section B.3.

16       *Second*, Plaintiffs' effort to distinguish cases UMG previously referenced in its

17  objections or meet-and-confer communications misses the broader point that runs

18  through such authority:  "Courts have ordinarily refused to allow discovery of [putative]

19  class members' identities at the pre-certification stage out of concern that plaintiffs'

20  attorneys may be seeking such information to identify potential new clients, rather than

21  to establish the appropriateness of certification."  *Dziennik v. Sealift, Inc.*, 2006 WL

22  1455464, at *1 (E.D.N.Y. May 23, 2006); *see Douglas v. Talk Am., Inc.*, 266 F.R.D.

23  464, 467 (C.D. Cal. 2010) ("[P]laintiff seeks to use the discovery process to go 'fishing'

24  . . . to find a new class representative who might be found suitable by the district court.");

25  *Knutson v. Blue Cross & Blue Shield of Minn.*, 254 F.R.D. 553, 557 (D. Minn. 2008)

26  ("Discovery sought solely for the purpose of inviting others to join this litigation . . .

27  would not be not relevant to the particular claims and defenses currently asserted in this

28  case."); *In re Mortgagors of Temple-Inland Mortg. Corp.*, 2001 WL 177181, at *2 (E.D.

28

Pa. Jan. 24, 2001) ("Plaintiffs' counsel cannot use the Federal Rules of Civil Procedure as a device to force defendant to assist them in finding a plaintiff.").

Here, Plaintiffs argue they may properly "seek[] identification of *all* of the artists whose recordings UMG claimed were lost to obtain its prior settlements" because "[i]nformation about UMG's overall claimed loss in prior litigations, and the extent of the claimed loss in terms of artists and recordings, is relevant to determining Plaintiffs' potential shares owed from UMG's overall prior-litigation recoveries." But it is entirely unclear why the specific *identities* of artists identified in the prior suits is relevant to determining the "extent" of UMG's claimed losses, which UMG publicly stated at the time—and has stated again in this suit—involved over 100,000 of UMG's assets.[6]

*Third*, as mentioned above, the notion that the settlement agreements with the warehouse owners and UMG's insurer constituted *ex-post* licenses to destroy master recordings that UMG owned is implausible and strains credulity. Accordingly, whether recordings embodying the works of any given artist were lost in the fire, or whether UMG previously claimed they had been lost in the fire, is irrelevant. Without a plausible license (or bailment agreement or tort claim), Plaintiffs cannot obtain revenue pursuant to their recording agreements. The only documents therefore that would be relevant to Plaintiffs' claims would be those, if any, that confirm a license occurred between UMG and its litigation counterparts or those (b) where UMG ascribed monetary value to Plaintiff-related original masters that it believed it lost in the fire. These are the documents most centrally relevant to Plaintiffs' claims but they have affirmatively rejected UMG's offer to search for them. Bach Decl. ¶¶ 5–6, Ex. 2.

---

[6] Plaintiffs' suggestion that UMG negotiate a protective order to address its concerns with identifying specific artists' names misses the mark, as it ignores that Plaintiffs (who have failed even to state a claim of their own, *see* Dkt. 36-1, and have no viable plaintiff, *see* Dkt. 28-7) **have no right under the Federal Rules to view private information regarding artists having no interest or involvement in this suit**.

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

### b.    Requests for Production Nos. 1, 2, 32, and 34

Plaintiffs' effort to compel production of essentially every document produced in the prior litigation should similarly be denied.  With these requests, Plaintiffs dropped any pretense that they are seeking material in any way tailored to the claims at issue in *this* litigation.  Nevertheless, as explained above, UMG has been engaged in good-faith efforts to interpret Plaintiffs' (ever evolving) theory of the case and to propose the production of *relevant* material.  In response, Plaintiffs filed the present motion.

*First*, Plaintiffs claim their overbroad document requests are "relevant to answering the question whether UMG made money from [its] purported losses of master recordings" in the prior litigation.  But the relevant question is not Plaintiffs' erroneously characterized question of "whether UMG made money" in prior litigation regarding the fire; it is whether UMG's recoveries in those prior lawsuits somehow triggered specific *royalty provisions* in Plaintiffs' specific recording agreements, all of which require as a condition precedent that *licensing* has occurred.  This Court should not countenance Plaintiffs' effort to obscure the relevance inquiry here beyond recognition by claiming it involves "whether UMG made money."[7]  This argument is the linchpin of Plaintiffs' present Motion and highlights the fanciful nature of their claims and efforts to find documents to support those (or other) claims.

*Second*, Plaintiffs' requests for unredacted copies of *all* redacted filings from the *NBCU* litigation (RFP No. 1), *all documents* produced by UMG to NBCU in that litigation (RFP No. 32), and *all documents* produced by UMG to AXA in the insurance litigation (RFP No. 34) *are not proportional* to the needs of the case.  Notably, Plaintiffs' requests have not sought a particular *subset* of documents from the prior litigation

---

[7] Plaintiffs' assertion that "UMG made money" in the underlying litigations deliberately mischaracterizes UMG's recoveries and offensively suggests—without any factual basis—that UMG *profited* from its very significant fire losses.  Indeed, as Plaintiffs know, and as the public litigation docket makes clear, UMG's settlement with its insurer was recovery for the repair and replacement of fire-damaged assets.  Likewise, any claim that UMG's settlement with its landlord allowed UMG to obtain a windfall from the fire is made out of whole cloth.

1   "related to" a particular topic, despite their apparent suggestion to the contrary here.

2   Instead, they have simply levied blanket requests for documents previously produced or

3   filed, regardless of whether any such productions are relevant to the claims here (which,

4   of course, are by no means coterminous with those in the prior litigation).   Plaintiffs'

5   request for *all* filings or productions are plainly not tethered to their more narrow desire

6   to determine whether UMG recovered proceeds in prior fire-related litigation based on

7   the purported losses asserted by UMG of masters embodying Plaintiffs' work.   Nor are

8   they tethered to the even smaller universe of documents that actually relates to the FAC's

9   primary claim:  that artists did not receive their fair share of royalties under the recording

10   agreements.   Under the language of the agreements, as stated in the FAC, those royalties

11   could only be derived from "licensing" revenue.   Accordingly, any documents unrelated

12   to the licensing of masters that UMG produced to either NBCU or AXA are *irrelevant*

13   to the present case.

14   *Glaukos Corp. v. Ivantis, Inc.*, 2019 WL 3000647 (C.D. Cal. May 29, 2019),

15   which Plaintiffs cite, is instructive.   There, the court denied a motion to compel the

16   production of "all documents" regarding the relevant patent because the requesting party

17   could propound "more narrowly tailored RFPs or Interrogatories regarding other

18   branches in the asserted patent family."   *Id.* at *2–3 (also denying request for "[a]ll

19   documents relating to any pre-suit investigation of Ivantis's alleged infringement of

20   Glaukos's Asserted Patents").   As it has been since before Plaintiffs filed suit, UMG is

21   willing to confer with Plaintiffs to provide information that is relevant and proportional

22   to the claims asserted.   Blanket requests for all litigation materials in another suit are not

23   so tailored and should be rejected here.

24   Plaintiffs are seeking to reopen settled litigation by demanding the entire file so

25   that they can attempt to determine whether they can contort those proceedings into

26   supporting a licensing theory under the contracts.   But they are trying to blow straight

27   past the issue of licensing, seeking documents that might potentially reflect artists

28   names, whether or not in the context of a license and whether or not a monetary value

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

was attributed to masters related to those artists.  It should tell this Court all it needs to know that Plaintiffs have rejected UMG's offer to search for and produce such documents.

*Third*, Plaintiffs are wrong to assert that producing documents previously produced in prior litigation "will not pose any significant burden to UMG."   In *In re Facebook, Inc. Shareholder Derivative Privacy Litigation*, for example, the district court rightly rejected the notion that there is "minimal or nonexistent" burden in producing documents "previously produced in other lawsuits," noting instead that "the sheer scope of [Plaintiffs'] discovery request[s] [may] place[] a substantial burden on Defendant." 2019 WL 452034, at *2 (N.D. Cal. Feb. 5, 2019) (granting stay of discovery under the PSLRA "during the pendency of Defendants' motions to dismiss").  So, too, here: Plaintiffs seek *all* discovery and *all* redacted filings from two separate, prior lawsuits without regard to whether the "sheer size" of such requests is in any way proportional to the potential relevance of these documents to Plaintiffs' (very different) claims in *this* suit.

*Fourth*, whether or not Plaintiffs are entitled to class discovery at this juncture, RFP No. 2—which seeks all expert material related to Larry Gerbrandt—is not relevant to Plaintiffs' current theory of damages.  Plaintiffs' theory as articulated in their Opposition to UMG's motion to dismiss—and notably, *not* in the FAC—is that UMG "retroactively permitted" the "destruction" of masters "in exchange for flat fee payments."  Dkt. 38 at 6.  In other words, UMG granted a license to destroy the recordings.  But the underlying litigation against the warehouse owners related to UMG's fire *losses*; and it was those losses Mr. Gerbrandt was hired to evaluate. Plaintiffs should not get documents irrelevant to their damages theory in order in help them gin up new claims when they have not stated plausible ones to date.  The Court should reject Plaintiffs' request for the Gerbrandt material on relevancy grounds.

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

1

    **c.**  **The Only Documents Even Arguably Relevant to Plaintiffs'**

2

       **Claims—Meritless as They Are—Relate to Licensing and**

3

       **Attribution of Value to Fire-Impacted Master Recordings**

4

    Plaintiffs' wildly overbroad fishing expedition for documents should be denied in

5

its entirety, particularly given the implausible nature of their claims.  However, to the

6

extent the Court is inclined to require the production of certain documents, the Court

7

should order UMG to produce the only documents that would be relevant to Plaintiffs'

8

claims in the FAC and proportional to the needs of the case.  Indeed, these are the records

9

UMG has previously offered to search for and produce:

10
11
12

- Any filed or served documents (including pleadings, deposition transcripts, and expert reports) from UMG's *NBCU* litigation files in which a monetary value is ascribed to any original master recordings related to Plaintiffs, whether or not those masters were actually destroyed in the fire or not; and

13
14

- Any filed or served documents from UMG's *NBCU* litigation files in which the parties discuss or memorialize the licensing of destroyed original master recordings related to Plaintiffs in exchange for or as part of a settlement payment.

15

    Plaintiffs' prior rejection of UMG's offer to produce these documents confirms

16

that Plaintiffs are not interested in learning whether UMG obtained licensing fees that it

17

failed to share with artists but rather in obtaining every document they can get their

18

hands on in order to come up with a claim that can withstand minimal scrutiny.  That's

19

not the point of discovery, and Plaintiffs' discovery games should not be countenanced.

20

Dated: October 24, 2019

21

        By:*/s/ Mark Hatch-Miller*

22

        Mark Hatch-Miller

23

        Howard E. King
        Henry D. Gradstein

24

        Andres Monserrate
        KING, HOLMES, PATERNO &

25

        SORIANO, LLP

26

        Edwin F. McPherson
        Pierre B. Pine

27

        McPHERSON LLP

28

        Steven G. Sklaver (237612)
        ssklaver@susmangodfrey.com

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

Kalpana D. Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Meng Xi (280099)
mxi@susmangodfrey.com
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

Stephen E. Morrissey (187865)
smorrissey@susmangodfrey.com
SUSMAN GODFREY LLP
1201 3rd Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 373-7380

Mark H. Hatch-Miller (*pro hac vice*)
mhatchmiller@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

Attorneys for Plaintiffs

Dated: October 24, 2019          **GIBSON, DUNN & CRUTCHER LLP**

15

16

17

18

19

20

21

22

23

By:*/s/ Scott A. Edelman*
Scott A. Edelman

Scott A. Edelman (SBN 116927)
sedelman@gibsondunn.com
Deborah L. Stein (SBN 224570)
dstein@gibsondunn.com
Nathaniel L. Bach (SBN 246518)
nbach@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Defendant
UMG RECORDINGS, INC.

24

25

26

27

28

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of October, 2019, I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

*/s/ Mark Hatch-Miller*

JOINT STIP RE PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM DEFENDANT