1  Howard E. King (77012)
   hking@khpslaw.com
2  Henry D. Gradstein (89747)
   hgradstein@khpslaw.com
3  Andres Monserrate (324991)
   **KING, HOLMES, PATERNO & SORIANO, LLP**
4  1900 Avenue of the Stars, 25th Floor
   Los Angeles, CA 90067
5  Telephone: (310) 282-8989

6  Edwin F. McPherson (106084)
   emcpherson@mcpherson-llp.com
7  Pierre B. Pine (211299)
   ppine@mcpherson-llp.com
8  **MCPHERSON LLP**
   1801 Century Park East, 24th Floor
9  Los Angeles, CA 90067
   Telephone: (310) 553-8833
10
   Attorneys for Plaintiffs
11 (Additional Counsel for Plaintiffs and Defendant Listed on Signature Page)

12                UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                    WESTERN DIVISION

15 SOUNDGARDEN, a Partnership; TOM          CASE NO. 2:19-cv-05449-JAK-JPR
   WHALLEY, as Trustee of the Afeni
16 Shakur Trust; JANE PETTY; STEVE          **JOINT STIPULATION REGARDING**
   EARLE, individually and on behalf of     **PLAINTIFFS' THIRD MOTION TO**
17 all others similarly situated,           **COMPEL DISCOVERY FROM**
                                            **DEFENDANT**
18            Plaintiffs,
                                            **[DISCOVERY DOCUMENT:**
19      v.                                  **REFERRED TO MAGISTRATE**
                                            **JUDGE JEAN P. ROSENBLUTH]**
20 UMG RECORDINGS, INC., a
   Delaware corporation,                    Class Cert. Mot. Due:  Mar. 31, 2020
21                                          Fact Discovery Cutoff: Sept. 14, 2020
            Defendant.                      Pretrial Conference:    TBD
22                                          Trial Date:             TBD

23                                          **Hearing:**
                                            Date:    March 5, 2020
24                                          Time:    10:00 a.m.
                                            Place:   Courtroom 690
25                                                   Roybal Federal Building and
                                                     United States Courthouse
26                                                   255 E. Temple St.
                                                     Los Angeles, CA 90012
27                                          Judge:   Hon. Jean P. Rosenbluth

28

---

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTORY STATEMENTS ...................................................................... 1

    A.    Plaintiffs' Introductory Statement ......................................... 1

    B.    Defendant's Introductory Statement ..................................... 4

ISSUES IN DISPUTE .................................................................................. 7

    A.    Interrogatory No. 1 ............................................................. 7

        1.    Plaintiffs' Request and Defendant's Response ............... 7

        2.    Plaintiffs' Position ..................................................... 11

            a.    Legal Standard .............................................. 11

            b.    Interrogatory No. 1 Seeks Relevant Information ............... 11

            c.    UMG's Other Objections to Interrogatory No. 1 Fail ......... 12

            d.    UMG Failed to Fully Answer Interrogatory No. 1 .............. 13

        3.    Defendant's Position ................................................... 15

    B.    Demand No. 8 .................................................................. 21

        1.    Plaintiffs' Request and Defendant's Response ............. 21

        2.    Plaintiffs' Position ..................................................... 22

        3.    Defendant's Position ................................................... 23

    C.    Demand No. 9 .................................................................. 23

        1.    Plaintiffs' Request and Defendant's Response ............. 23

        2.    Plaintiffs' Position ..................................................... 23

        3.    Defendant's Position ................................................... 24

    D.    Demand No. 16 ................................................................ 25

        1.    Plaintiffs' Request and Defendant's Response ............. 25

        2.    Plaintiffs' Position ..................................................... 26

        3.    Defendant's Position ................................................... 27

    E.    Demand No. 41 ................................................................ 28

        1.    Plaintiffs' Request and Defendant's Response ............. 28

        2.    Plaintiffs' Position ..................................................... 29

        3.    Defendant's Position ................................................... 29

i

6966212v1/102884

Pursuant to Federal Rules of Civil Procedure 33, 34, and 37, and Local Rule 37-2.2, Plaintiffs Soundgarden, Tom Whalley, Jane Petty, and Steve Earle submit this Joint Stipulation regarding their Third Motion to Compel Discovery from Defendant UMG Recordings, Inc. ("UMG"). Specifically, Plaintiffs move to compel UMG to fully answer their Interrogatory No. 1  and to produce all documents responsive to their Demands for Production ("Demands") Nos. 8, 9, 16 and 41. The parties have met and conferred regarding all of these discovery requests, and about UMG's written objections and responses to the requests at issue. The parties are unfortunately unable to resolve their disputes and require Court intervention.

## INTRODUCTORY STATEMENTS

### A.    Plaintiffs' Introductory Statement

This case is about a June 1, 2008 fire on an NBCUniversal ("NBCU") lot that destroyed numerous historically- and economically-significant original master recordings. In 2010, then-counsel for UMG wrote a letter to NBCU stating, in relation to one of the two prior disputes at issue here, that UMG had conducted a "substantial investigation of the assets lost in the fire," that the investigation found "UMG lost more than 118,000 original music recordings dating back decades," and that UMG had "thus identified the assets that were lost." UMG and NBCU later reached a confidential settlement. UMG also settled an insurance coverage dispute related to the fire with AXA.

Plaintiffs' Interrogatory No. 1 sought information about what master recordings were actually lost in the fire. This information is relevant because, amongst other reasons, UMG apparently will contend what was *actually* lost in the fire is somehow different from what UMG previously *told* NBCU and AXA was lost. UMG raised improper objections to this relevant discovery request, and, purportedly subject to those objections, only provided Plaintiffs with an incomplete and evasive answer to the question posed. Fed. R. Civ. P. 37(a)(4) ("[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond.").

There were *nearly 17,000* unique artist names on the list of purportedly lost original music recordings UMG provided to NBCU and AXA when UMG sought to and did monetize those recordings, and those names were reproduced in this case in a document Bates stamped as UMG_SG-0000032. Those names included Tupac Shakur, Tom Petty, and Steve Earle, and the names of many other prominent recording artists such as: Aaron Neville, Al Green, Albert Lee, Andy Summers, Antonio Carlos Jobim, Arthur Lee, Barry White, Bauhaus, Bill Withers, Blues Traveler, Booker T. Jones, Burt Bacharach, Cannonball Adderley, Captain & Tenille, Captain Beefheart & His Magic Band, Cat Stevens, Chuck Berry, Dennis Brown, Devo, Elvis Costello & The Attractions, Elvis Presley, Extreme, Fairport Convention, Flying Burrito Brothers/Gram Parsons, George Harrison, Gerry Mulligan, Gin Blossoms, Herb Albert & The Tijuana Brass, Human League, Humble Pie, Ike & Tina Turner, Janet Jackson, Jim Carroll, Jimmie Rodgers, Jimmy Cliff, Joan Baez, Joe Cocker, Joe Jackson, John Cale, Jonny Lang, Lesley Gore, Liza Minnelli, Lou Reed, Milton Nascimento, Monster Magnet, O.M.D., Oingo Boingo, Paul Desmond, Peggy Lee, Peter Frampton, Phil Ochs, Procol Harum, Quincy Jones, Richie Havens, Rick Wakeman, Robyn Hitchcock & The Egyptians, Run D.M.C., Sergio Mendes, Simple Minds, Soul Asylum, Squeeze, Status Quo, Sting, Styx, Supertramp,  The Carpenters, The Coup, The Cure, The Feelies, The Go-Go's, and The Police.

In stark contrast, UMG's response to Interrogatory No. 1, after reciting a host of improper objections and caveats, identifies *just 19 artists* whose "original master recordings"[1] UMG contends "were affected" by the fire. The only artists listed in the response prepared for this litigation (all of whom also appear on UMG_SG-0000032) are: …And You Will Know Us by the Trail of Dead, Beck, Bryan Adams, David Baerwald, Elton John, Jimmy Eat World, Les Paul, Michael McDonald, Nirvana, Peter

---

[1] Even if not every original music recordings listed in documents provided to NBCU/AXA was an "original master recording," the gap between UMG's prior list of 17,000 artists and its new list of 19 is so broad as to call the new response into question.

Frampton, R.E.M., Sheryl Crow, Slayer, Sonic Youth, Soundgarden, Suzanne Vega, Surfaris, White Zombie, and Yesterday & Today (also known as Y&T).

UMG's objections and caveats to Interrogatory No. 1 suggest that UMG omitted from its new list the names of artists whose recordings UMG contends that it has not yet *reconfirmed* as lost *after* the NBCU/AXA disputes were resolved and money received. That is completely improper discovery gamesmanship and, indeed, logically backwards. If UMG determined artists' recordings were lost during a prior investigation, it cannot now deny its prior representations without a specific factual basis for the denial. That is particularly true where UMG's objections to Interrogatory No. 1 make clear that the company has no current plans to complete a full investigation during the course of discovery in this case—which would have to be done in order to conclusively deny its prior statements to other litigation adversaries about what was lost in the fire.

In short, UMG cannot have it both ways. UMG told prior litigation adversaries that nearly 17,000 artists' original music recordings were lost. If UMG is unwilling to live with its prior representations—by listing in response to Interrogatory No. 1 all the artists from the prior list whose listed works included "original master recordings"— then it must respond fully to Interrogatory No. 1, rather than undertaking only a selective review of past conclusions and cabin the answers with meritless objections.

The two other disputes raised in this motion to compel are straightforward. First, Plaintiffs' Demands Nos. 8 and 9 seek highly relevant information that can be produced with no undue burden: The transcripts of all depositions taken in the prior NBCU litigation. UMG has agreed to cherry-pick what it will and won't produce, agreeing only to produce two of these transcripts[2] and also agreed to provide a list of the rest to Plaintiffs. But with less than two months to go before the current class certification deadline and with the case proceeding through merits discovery as well after UMG's

---

[2] One of the deposition transcripts that UMG has now agreed to provide Plaintiffs is that of Larry Gerbrant, an expert witness from the NBCU case. This specific transcript was requested in separate Demand No. 7, which UMG had previously objected to but has since withdrawn.

3

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

motion to stay was denied, there is no reason for UMG to wait any longer before producing *all* of these transcripts. The Court should order UMG to reproduce all of these transcripts quickly, just as it ordered UMG to reproduce all its productions to NBCU in the same prior litigation.

Second, Plaintiffs' Demands Nos. 16 and 41 seek all of the recording agreements that are associated with any of the original music recordings listed in the list of lost original music recordings produced to NBCU/AXA, as well as those associated with what UMG now claims were *actually* lost recordings, *i.e.*, those that were already listed in the existing response to, or that will soon be listed in UMG's forthcoming complete response to, Interrogatory No. 1. UMG has produced a database of some recording agreements previously exchanged with NBCU, but it refuses to confirm whether the database includes *all* the requested contracts. During the meet-and-confer process, UMG took the position for class certification purposes that Plaintiffs may rely on a partial sampling of contracts that UMG chooses to produce, but of course that is akin to having the fox guard the henhouse, and UMG has not provided any principled reason, other than its say-so, as to why it will and won't produce some contracts for its hand-picked sampling approach. It is UMG's burden, not Plaintiffs', to ensure that all of these highly relevant agreements have been produced.

**B.    Defendant's Introductory Statement**

Plaintiffs' demand that UMG identify—via sworn interrogatory and under penalty of perjury—"all artists who had any master recordings damaged or lost in, by, or as a result of the June 1, 2008 fire on the NBCUniversal lot" essentially requires UMG to conduct anew a thorough, worldwide investigation of *all* its musical assets and associated recordkeeping related to *thousands* of artists across multiple secure locations in the United States and United Kingdom at extraordinary and unprecedented burden and expense.  Under Rule 33, a responding party "must furnish information that is *available to it* and that can be given *without undue labor and expense*." Wright & Miller, Fed. Prac. & Proc. § 2174 (3d ed.) (emphasis added).  Parties are "not required to conduct

extensive research in order to answer an interrogatory," *Gorrell v. Sneath*, 292 F.R.D. 629, 632 (E.D. Cal. 2013), and "interrogatories that require a party to make extensive investigations, research, or compilation or evaluation of data for the opposing party"— as Interrogatory No. 1 undoubtedly does—"are in many circumstances," as here, "improper." Wright & Miller, *supra*, § 2174.

Plaintiffs misleadingly suggest that the investigation undertaken in the immediate aftermath of the fire and in the context of the *NBCU* and *AXA* litigations definitively identified lost original master recordings, such that inclusion of an artist's name on then-contemporaneous working lists of potentially lost assets indicates the irreplaceable loss of original masters embodying the works of that artist. That is wrong, as is made clear by the sworn declaration of Patrick Kraus, Senior Vice President of Recording Studios & Archive Management. In reality, as Mr. Kraus testifies, those working lists (like the so-called "GOD List") identified myriad potentially lost assets aside from original master recordings, including production masters, protection copies, work tapes, safeties, videos, as well as non-recorded music items such as artwork, session notes, and more. Kraus Decl. ¶ 8. And, given that much of the contemporaneous record of the NBCUniversal vault's assets at the time of the fire was *itself* destroyed in the fire, UMG's post-fire working lists were essentially well-informed estimates of what overall assets might have been destroyed—*i.e.*, a world apart from the sworn identification of lost original masters Plaintiffs seek today. Indeed, UMG knows today that those post-fire working lists were definitively wrong, as UMG has found many of the very assets contained on those lists on the shelves of UMG's archives. Plaintiffs' Interrogatory No. 1 therefore seeks to compare apples to oranges—the post-fire investigation does not resemble the different, absolutist investigation Plaintiffs demand today.

Plaintiffs' continued misunderstanding about UMG's post-fire investigation and the present status of UMG's vault appears to derive largely from numerous inaccuracies and false statements in *The New York Times Magazine*'s reporting about the fire. Indeed, UMG has already determined through its current investigation that it has on its vault

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL DISCOVERY FROM DEFENDANT

shelves assets that were incorrectly reported as destroyed in that article. And Plaintiffs' demand for verified responses about whether original master recordings were destroyed is ultimately not necessarily germane to UMG's ability to commercially exploit the recordings. This is because, even where original master recordings were not impacted by the fire and are available to UMG, UMG often works from duplicates or digitized versions because the fidelity of the original master has so deteriorated from overuse, chemical interactions over time, or other technical reasons—reasons unrelated to any damage or degradation from the fire. Kraus Decl. ¶ 14.

To undertake the (improper) globe-spanning investigation Plaintiffs demand would—for reasons Mr. Kraus explains in detail—require a substantial diversion of UMG's workforce as well as the hiring of additional individuals at great expense, and would ultimately take years to complete for the nearly 17,000 artists Plaintiffs identify. UMG knows this because for nearly eight months it has been conducting its own inquiry into fire-impacted assets as part of an effort, predating this suit, to provide transparency to the artist community. In that time, UMG has received inquiries from 392 artists, and to date has completed its review of assets and been in communication with 165 artists—including the 19 artists identified in UMG's Second Amended Response to Interrogatory No. 1. That endeavor has required the effort of 19 full-time individuals, 30 more from UMG, and an additional 30 at Iron Mountain, at a cost more than $1.4 million to date, which represents an average of almost $8,500 for *each* of the 165 artists for whom the inquiry has been completed. UMG remains committed to providing transparency to inquiring artists. But Plaintiffs' demand that the effort be broadened to nearly 17,000 artists—as would be required to verifiably, accurately, and fully respond to Interrogatory No. 1—would impose an extraordinary and impermissible burden on UMG.

Plaintiffs' additional requests related to the production of recording agreements, RFP Nos. 16 and 41, are also improper. In response to the Court's prior rulings, UMG has already provided Plaintiffs thousands of artist-related agreements produced during the *NBCU* litigation. Rather than actually *review* the many thousands of recording

agreements it has already received, Plaintiffs essentially ask UMG to do the job for them by "confirm[ing] whether the database includes *all* the requested contracts." Before Plaintiffs may demand that UMG expend additional resources searching for yet *more* recording agreements, it is Plaintiffs' obligation to demonstrate the need for that additional production. Having failed to even review what they have received (or identify in their motion *any* specific recording agreements that are missing), they have not established any basis to compel the production of more. And, to be clear, UMG never "took the position for class certification purposes that Plaintiffs may rely on a partial sampling of contracts," as Plaintiffs state. Rather, UMG conveyed during the meet-and-confer process its willingness to discuss and negotiate an agreement stipulating that the thousands of already produced agreements constituted a more-than-sufficient set to examine for the purpose of class-certification briefing.

Finally, Plaintiffs' motion as it relates to RFPs No. 8 and 9 will shortly be moot because UMG has already begun and will soon complete its production of all deposition transcripts and associated exhibits from the *NBCU* litigation.

## **ISSUES IN DISPUTE**

### A.   **Interrogatory No. 1**

#### 1.   **Plaintiffs' Request and Defendant's Response**

Interrogatory No. 1, served on August 16, 2019, states:

"Identify all artists who had any master recordings damaged or lost in, by, or as a result of the June 1, 2008 fire on the NBCUniversal lot."

UMG objected and responded to this interrogatory as follows on December 23, 2019, after a series of meet-and-confers on UMG's prior objections:

"UMG incorporates each of its General Objections stated above. UMG further objects to this Interrogatory on the grounds that it is untethered to the allegations in this lawsuit and instead makes a blanket demand for information regarding artists who are not currently, and may never be, parties to this action. UMG also objects to Interrogatory No. 1 on the grounds that it is overly broad, unduly burdensome, oppressive, and

7

harassing. In particular, the Interrogatory targets information about non-parties. This lawsuit has no viable named plaintiff, and the discovery process cannot be used to find one. *See Douglas v. Talk Am., Inc.*, 266 F.R.D. 464, 467 (C.D. Cal. 2010) (plaintiffs cannot 'use the discovery process to go "fishing" to find [] new class representative[s]'). The Interrogatory is also vague and ambiguous because, among other reasons, it does not define the term 'master recordings.' UMG further objects to Interrogatory No. 1 to the extent it implies master recordings were owned by anyone other than UMG; for each of the named Plaintiffs, their recording agreements are clear that UMG owns the master recordings embodying Plaintiffs' performances.

"Subject to and without waiving any of the foregoing general and specific objections, and based on the best information currently available to it, UMG responds as follows:

"In the wake of the inaccurate The New York Times Magazine article concerning the 2008 fire on the NBCUniversal lot, UMG set up a process to provide information about the UMG assets in its archives to artists or their representatives who raised concerns about whether UMG assets related to such artists were impacted by that fire. That effort has involved multiple teams of people reviewing multiple systems, historic records, and assets in UMG's worldwide archives. That process remains ongoing and is expected to continue for the foreseeable future, certainly well into 2020, if not beyond.

"In that process, UMG has attempted to identify whether the fire affected any of UMG's original master recordings—*i.e.*, analog or digital audio recording media containing the individual audio tracks comprising the initial fixation of the original elements of a recording session (e.g., a multitrack recording) and/or analog or digital audio recording media containing the initial 'flat' mix output of an audio mixing session of such individual audio tracks. The assets confirmed to date as damaged, destroyed, or lost (i.e., 'affected') in, by, or as a result of the June 1, 2008 fire that could be original master recordings relate to the artists listed below, with explanatory context as provided:

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

1  "…And You Will Know Us by the Trail of Dead: Certain analog tapes that could
2  have been original flat master recordings embodying the performances of this artist were
3  affected, but UMG has copies on the same type of recording media for many of them.

4  "Beck: Certain original master recordings embodying the performances of this
5  artist were affected, but UMG has replacements of all of these affected assets.

6  "Bryan Adams: Certain original master recordings embodying the performances
7  of this artist were affected, but UMG has safeties and replacements of all such assets.

8  "David Baerwald: Certain analog tapes embodying the performances of this artist
9  were affected, but it is unclear if they were original master recordings, and UMG has
10  replacements for all of them.

11  "Elton John: Certain original master recordings embodying the performances of
12  this artist were affected, and UMG is still working with the artist to determine the extent
13  of such impact.

14  "Jimmy Eat World: Certain original digital master recordings embodying the
15  performances of this artist were affected, but UMG has digital clones of these digital
16  assets.

17  "Les Paul: An original master recording of a radio transcription embodying the
18  performance of this artist was affected.

19  "Michael McDonald: Certain multitrack drum worktapes embodying the
20  performances of this artist were affected.

21  "Nirvana: Certain original master recordings embodying the performances of this
22  artist were affected, but UMG has replacements or copies of all of them.

23  "Peter Frampton: An original master recording embodying the performance of
24  this artist was affected.

25  "R.E.M.: A reel marked 'flat' of one song from a soundtrack embodying the
26  performance of this artist was affected, but UMG has copies of this asset in the same
27  format.

28

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

1   "Sheryl Crow: Certain original flat mixes embodying the performances of this
2   artist were affected, but UMG has replacement copies.

3   "Slayer: A ½ inch flat original master recording embodying the performance of
4   this artist was affected.

5   "Sonic Youth: Certain original multitrack master reels embodying live
6   performances of this artist were affected.

7   "Soundgarden: As stated in UMG's Amended Objections and Responses to
8   Plaintiffs' Interrogatory No. 1, served on October 11, 2019, UMG lost original master
9   recordings embodying the performances of Soundgarden in the 2008 fire. Indeed, the
10  email correspondence attached to UMG's Amended Objections and Responses to
11  Plaintiffs' Interrogatory No. 1 shows that by no later than May 2015, UMG informed
12  Soundgarden members and a band manager that the two ½ inch stereo masters related
13  to *Badmotorfinger* had been lost in the fire. Notwithstanding this loss, UMG was still
14  able to successfully issue a remastered release of the album *Badmotorfinger* using a
15  digital audio tape safety copy, with Soundgarden's knowledge and participation.

16  "Suzanne Vega: Certain affected assets may have been original flat masters
17  embodying the performances of this artist, but UMG has replacements on the same type
18  of recording media.

19  "Surfaris: Certain tapes are missing from UMG's inventory which may have been
20  original master recordings embodying the performances of this artist and may have been
21  affected by the fire, although these conclusions are not definitive.

22  "White Zombie: An original digital multitrack asset embodying the performance
23  of this artist was affected, but UMG has an exact digital clone.

24  "Yesterday & Today (Y & T): Certain original master recordings embodying the
25  performances of this artist were affected, but UMG has replacements for all such assets."

26

27

28

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

1           **2.**     **Plaintiffs' Position**

2              **a.**     **Legal Standard**

3         As relevant to this and all other disputed issues discussed herein, under the Federal

4 Rules, "[p]arties may obtain discovery regarding any nonprivileged matter that is

5 relevant to any party's claim or defense and proportional to the needs of the case,

6 considering the importance of the issues at stake in the action, the amount in controversy,

7 the parties' relative access to information, the parties' resources, the importance of the

8 discovery in resolving the issues, and whether the burden or expense of the proposed

9 discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Plaintiffs bear the initial

10 burden of demonstrating the disputed requests seek relevant information. *See Glaukos*

11 *Corp. v. Ivantis, Inc.*, Case No. CV 8:18-00620-JVS (JDEx), 2019 WL 3000647, at *2

12 (C.D. Cal. May 29, 2019). Upon such a showing, the burden shifts to UMG to justify

13 withholding relevant information. *Id.*

14              **b.**     **Interrogatory No. 1 Seeks Relevant Information**

15         UMG's relevance arguments set forth in its written objections to Interrogatory

16 No. 1 are not persuasive.

17         UMG first suggests that this interrogatory is "untethered to the allegations in *this*

18 lawsuit." UMG is incorrect. Plaintiffs' operative pleading seeks—in addition to a

19 recovery on the First Claim for Relief on behalf of all artists who UMG told NBCU and

20 AXA had lost master recording (*i.e.*, those whose master recordings were listed on the

21 spreadsheets shared with these prior litigation adversaries)—a recovery of separate and

22 additional damages on the remaining claims and causes of action on behalf of those

23 artists whose recordings were *actually*, not just *reportedly*, lost. *See, e.g.*, Amend.

24 Compl. ¶ 57 ("As a direct and proximate consequence of UMG's breach of the implied

25 covenant of good faith and fair dealing and its voluntary bailment in connection with the

26 Master Recordings, Plaintiffs and the putative class have been damaged in an amount

27 which is not yet fully ascertained, but which Plaintiffs are informed and believe, and

28 allege thereon, equals 50% of the value of the Master Recordings less whatever damages

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

1 | Plaintiffs and the putative class recover under their First Claim for Relief, according to
2 | proof at trial.").

3 | UMG next suggests that Interrogatory No. 1 seeks irrelevant information because
4 | the requested information encompasses artists beyond the four currently named
5 | Plaintiffs. As the Court has previously recognized in connection with prior motions to
6 | compel in this putative class case, discovery is not bifurcated or phased, and Plaintiffs
7 | are entitled to seek information about other potential class members' claims. *See*
8 | *Doninger v. Pacific Nw. Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977) (recognizing
9 | that "the better and more advisable practice" is to permit class discovery prior to
10 | certification); *Castillo v. Bank of America N.A.*, No. 8:17-cv-00580-DOC-KESx, 2018
11 | WL 6074580, at *5 (C.D. Cal. Sept. 28, 2018); *In re Toys R Us-Delaware, Inc. Fair and*
12 | *Accurate Credit Transactions Act (FACTA) Litigation*, Case No. ML 08-1980 MMM
13 | (FMOx), 2010 WL 4942645, at *5 (C.D. Cal. July 29, 2010).

14 | In short, Interrogatory No. 1 seeks highly and centrally relevant information, and
15 | UMG's relevance objections therefore should be overruled.

16 | ### c.     UMG's Other Objections to Interrogatory No. 1 Fail

17 | UMG's other objections to Interrogatory No. 1 have no merit either. UMG bears
18 | the burden of persuasion as to these other objections. The objections raised in UMG's
19 | current       response—based       on      purported      boilerplate     claims    of    (1)
20 | overbreadth/burden/oppression/harassment,  and  (2) vagueness/ambiguity—are  easily
21 | resolved.[3]

22 | *First*, UMG purports to challenge Interrogatory No. 1 on various
23 | burden/proportionality-related grounds. But these UMG objections rely solely on
24 | boilerplate rhetoric. UMG's objections do not explain *what undue burden* UMG would
25 | face in fully responding to the question posed about what master recordings were truly

---

[3] UMG's further objection that the question posed by Plaintiffs "implies master recordings were owned by anyone other than UMG" is just an argument, and not a proper objection to a discovery request under any of the Federal Rules of Civil Procedure.

12

1   lost. *See Bragel Int'l, Inc. v. Kohl's Dept. Stores*, Case No. CV 17-7414 RGK (SSx),

2   2018 WL 7890682, at *5 (C.D. Cal. Nov. 14, 2018) (noting that "courts have also

3   rejected boilerplate assertions that a discovery request is 'disproportionate' and require

4   that 'objections based on proportionality' be 'explained with specificity'");

5   *Manufacturing Automation & Software Sys., Inc. v. Hughes*, Case No. CV 16-8962-CAS

6   (KSx), 2017 WL 5641120, at *4 (C.D. Cal. Sept. 21, 2017).

7         *Second*, UMG asserts that Interrogatory No. 1 is vague and ambiguous because it

8   does not define the term "master recording." Yet in responding following this objection,

9   UMG supplied its own definition for this commonly-understood industry term. UMG

10  defines the term as follows: An "analog or digital audio recording media containing the

11  individual audio tracks comprising the initial fixation of the original elements of a

12  recording session (*e.g.*, a multitrack recording) and/or analog or digital audio recording

13  media containing the initial 'flat' mix output of an audio mixing session of such

14  individual audio tracks." Plaintiffs agree that, for discovery purposes, the definition

15  UMG provided is adequate for UMG to use for the purpose of responding to these

16  discovery requests.  UMG's linguistic games therefore are not grounds for avoiding

17  answering the discovery at issue.

18        **d.**    **UMG Failed to Fully Answer Interrogatory No. 1**

19        After purporting to reserve its various objections (and only after meeting-and-

20  conferring with Plaintiffs over these objections), UMG wrote an "answer" to the

21  interrogatory. But the answer UMG provided appears to be evasive and incomplete. *See*

22  Fed. R. Civ. P. 37(a)(4); *see, e.g.*, *Ellis v. Infinite Labs, LLC*, Case No. SACV 13-00241

23  JLS (ANx), 2014 WL 12617353, at *1 (C.D. Cal. May 1, 2014) (compelling defendant

24  to supplement prior evasive interrogatory responses and "fully answer, without objection

25  or equivocation"). UMG previously told NBCU and AXA that *nearly 17,000* artists lost

26  original music recordings. Even assuming some portion of those identified artists'

27  recordings do not meet UMG's current definition of "original master recordings," it is

28

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

1  utterly inconceivable that *just 19 artists* (or anything close to that) actually lost such

2  recordings.

3          A careful reading of UMG's answer appears to reveal the real reason why only 19

4  artists were listed in the current response. The list of artists is preceded in the answer by

5  a lengthy caveat (*i.e.*, a poorly-disguised objection) that begins with a description of a

6  "process" that UMG set up "to provide information about the UMG assets in its archives

7  *to artists or their representatives who raised concerns about whether UMG assets*

8  *related to such artists were impacted.*" UMG explains that this "process remains

9  ongoing and is expected to continue for the foreseeable future, certainly well into 2020,

10  *if not beyond.*" Thus, UMG contends that only assets it listed in the interrogatory

11  response as "confirmed to date as damaged, destroyed, or lost (*i.e.*, 'affected')" are those

12  that UMG recently *re-examined*, in response to contacts from specific artists or their

13  representatives, *after* the prior UMG settlements with NBCU and AXA. UMG is

14  improperly answering a different interrogatory than was asked.

15          UMG's response is not based on a diligent inquiry and reasonable investigation

16  seeking *all* responsive information called for by the interrogatory. *See, e.g.*, *Shyh-Yih*

17  *Hao v. Wu-Fu Chen*, No. C10–00826 LHK (HRL), 2011 WL 741225, at *1 (N.D. Cal.

18  Feb. 24, 2011). Instead, UMG appears to have self-servingly *limited* its response to

19  eliminate all artists previously listed on documents exchanged with NBCU and AXA

20  (such as UMG_SG-0000032), based on nothing more than its say-so and its mere

21  supposition that a re-examination of the scope of the fire loss today might yield different

22  results.

23          The Court should end these discovery games and grant the motion to compel.

24  UMG could include in its response to Interrogatory No. 1 the names of all artists whose

25  original master recordings appeared on the prior list exchanged with NBCU/AXA *unless*

26  UMG has a specific factual basis for concluding that a specific master recording *was not*

27  impacted—and if so, it needs to disclose all such facts. Or, UMG might choose to answer

28  the interrogatory by referencing the prior list, while separately listing each original

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

1   master recording that a subsequent UMG investigation confirmed was not lost despite

2   the earlier representation. But it is improper for UMG to suggest—as it does very clearly

3   in the current response given to Interrogatory No. 1—that UMG is declining to seek or

4   provide conclusive answers to Plaintiffs' question before the close of fact discovery in

5   this case.

6   **3.   Defendant's Position**

7   Plaintiffs' motion seeks to compel UMG to undertake a practically impossible,

8   extraordinarily burdensome undertaking to respond to Interrogatory No. 1, before

9   Plaintiffs' claims have even survived a motion to dismiss and where UMG has already

10  informed Plaintiffs that UMG did not suffer a loss of original master recordings relating

11  to three of the four Plaintiffs.  Plaintiffs' unprecedented demand should be rejected.

12  Rule 33 explains that a party answering interrogatories "must furnish the

13  information available to the party." Fed. R. Civ. P. 33(b)(1)(B).  Specifically—and

14  importantly—it "must furnish information that is available to it and that can be given

15  *without undue labor and expense*."  Wright & Miller, *supra*, § 2174 (emphasis added).

16  And because "a party cannot ordinarily be forced to prepare its opponent's case,"

17  "interrogatories that require a party to make extensive investigations, research, or

18  compilation or evaluation of data for the opposing party are in many circumstances

19  improper." *Id.*; *see also United States v. $209,815 in United States Currency*, 2015 WL

20  1927431, at *4 (N.D. Cal. Apr. 28, 2015) (denying motion to compel supplemental

21  response where respondent did "not have further documents to identify at th[e] time,

22  and, in any event, 'a reasonable effort,' not 'extensive research' is all that is required to

23  adequately respond to interrogatories" (citation omitted)); *Gorrell*, 292 F.R.D. at 632

24  (noting the "responding party is not required to conduct extensive research in order to

25  answer an interrogatory" and denying motion to compel interrogatory response where

26  responding "would be [overly] burdensome").

27  For example, in *Blanton v. Torrey Pines Property Management, Inc.*, 2017 WL

28  1957560, at *4 (S.D. Cal. May 10, 2017), the court found an interrogatory to be

15

"overbroad and overly burdensome" because, *inter alia*, "the data sought would require excessive amounts of time to collect" and would require "files to be pulled at great burden and expense" to defendant.  So too here.  Specifically, Plaintiffs' demand that UMG "[i]dentify all artists who had any master recordings damaged or lost in, by, or as a result of the June 1, 2008 fire on the NBCUniversal lot" is unduly burdensome, oppressive, and disproportionate to the needs of this case for reasons articulated at length in the declaration of Patrick Kraus.

As Mr. Kraus explains, shortly after *The New York Times Magazine*'s June 2019 article about the 2008 fire, UMG began receiving inquiries from recording artists and their representatives regarding the impact of the fire on UMG assets that might embody their performances.  Kraus Decl. ¶ 3.  In an effort to provide transparency to the artist community—and before Plaintiffs filed this lawsuit—UMG set up a process to provide information about assets in UMG's archives to inquiring artists or their representatives. *Id.*  Since approximately June 27, 2019, UMG has dedicated a team of 19 researchers across multiple locations in the United States and the United Kingdom "who work exclusively on this effort." *Id.* ¶ 4.  Additionally, approximately 30 existing UMG staff spend a portion of their time on this work, as well as approximately 30 Iron Mountain staff in their Hollywood, California and Boyers, Pennsylvania vault locations. *Id.*  As of Wednesday, February 12, 2020, UMG has received inquiries from 392 artists, and to date, UMG has completed its review of assets for 165 artists. *Id.*  By demanding that UMG complete investigations into the remainder of the 17,000 artists that appear on the "GOD list," Plaintiffs seek to force UMG to undertake this same detailed, burdensome investigation on behalf of artists who have not yet even made such an inquiry of UMG, and may never do so.

UMG's effort to date has come at extraordinary effort and expense.  Since the publication of *The New York Times Magazine* article, UMG has spent more than $1.4 million in its effort to determine whether UMG assets embodying the performances of inquiring artists were destroyed in the fire.  Kraus Decl. ¶ 11.  That amounts to roughly

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

$8,500 for *each* of the 165 of artists for whom UMG has determined one way or another whether assets embodying their performances were destroyed in the fire.   *Id.* Completing this task "with verifiable accuracy and certainty in a matter of weeks or even months" for the nearly 17,000 artists Plaintiffs identify "would require an extraordinarily difficult, costly, and time-consuming effort," for reasons explained by Mr. Kraus in passages that merit quoting at length. *Id.* ¶ 6.  As Mr. Kraus testified:

> Determining whether a work embodying the performance of an individual artist was destroyed in the fire is ***not as simple as identifying assets from a prior inventory or record and attempting to locate those items today.*** There is ***no comprehensive inventory or record of the assets*** (master recordings or otherwise) that were inside the vault at the time of the fire. Indeed, many of the records purporting to identify the contents of the vault at the NBCUniversal lot at the time of the fire were themselves destroyed in the fire, significantly ***compounding the difficulty of identifying which assets were in the vault at the time of the fire***.  Moreover, UMG acquired catalogs of musical assets from other, pre-existing labels over the years and UMG is at the mercy of whatever documentation those companies kept and transferred to UMG, which was often incomplete or inaccurate.

> Some paper records purporting to document portions of the vault's contents were salvaged from the vault during  the fire.  My understanding is that these paper documents were among those used to generate internal working lists and drafts of lists, like the so-called "GOD List," of what assets might have been lost in the fire.  These assets include original master recordings, but also production masters, protection copies, work tapes, safeties, videos, as well as non-recorded music items such as artwork, session notes, and more. ***Many of these salvaged paper records were themselves already out of date or otherwise inaccurate at the time of the fire***.  For example, some of these paper records listed assets that had since been transferred from the NBCUniversal lot vault to one of UMG's many other facilities across the globe or to some other location, including potentially the artists themselves or others in the industry.  In many instances, the salvaged records do not provide any indication of such a transfer. ***Therefore, the mere inclusion of an asset in these prior vault records does not definitively establish that the particular asset was in fact destroyed in the fire***.  Indeed, UMG has determined that ***many of the assets on this list are on our shelves today***.

The process for determining what UMG assets were destroyed in the fire is *complex, lengthy, and different for each individual artist*. For each artist inquiry, individuals at UMG must first review all available documentation and recordkeeping related to assets that may have been inside the lot vault. For each identified asset, *UMG must manually search our database and systems for that asset or a suitable alternative source asset across its storage facilities around the world*, including Hollywood, California; Boyers, Pennsylvania; Woolwich, UK; Hayes, UK; and our offices in Japan, Australia, Canada and France, *using data that have proven to not always be accurate*. Even then, certain assets that are not located within UMG's vaults might simply be outside UMG's possession temporarily while being used as source material for a project. For any one artist, the entire process can take as long as several weeks and might require coordination across eight or more facilities in three states and multiple countries by ten or more people.

*For assets that are older, the process is especially complicated and time-consuming*. For example, thousands of associated assets held at our facilities around the world might relate to one particular artist. The first step in inventorying those assets is to go through inventory data for each of the assets individually and identify what they are. For these older assets, we often must rely on the accuracy of data collected from information that was originally written on a box in a studio or by a third party and which was then subsequently transferred to a database. Where the information was not catalogued reliably at the time the recordings were originally created, more investigative work by our team is required. Once we have conveyed the information to the artist or the artist's representative, there often is further dialogue between our team and the artist and/or the artist's representatives which has sometimes resulted in locating additional assets that were not in a UMG facility but which may be in the possession of the artist, a producer, another record company, or a recording studio.

*See* Kraus Decl. ¶¶ 7–10 (emphasis added).

Mr. Kraus's sworn testimony more than adequately "explain[s] what undue burden UMG would face in fully responding to the question posed about what master recordings were truly lost." *See supra* section A.2.c. Indeed, Mr. Kraus testified that reliably and accurately completing the investigative process for the nearly 17,000 artists Plaintiffs have identified could very well cost tens of millions of dollars (if not more), would take years, would likely require "moving significant resources away from UMG's

18

1   day-to-day business operations," and—even then—"it likely will be ultimately

2   impossible for UMG to determine with a high degree of confidence precisely which

3   UMG original master recordings related to certain artists were or were not destroyed in

4   the fire."  Kraus Decl. ¶¶ 11, 15.

5          All of Plaintiffs' arguments suggesting otherwise are unavailing.

6          *First*, Plaintiffs decry UMG's "mere supposition that a re-examination of the

7   scope of the fire loss today might yield different results" as those suggested by the

8   inquiries made in the aftermath of the fire.  Of course, this is not merely a uninformed

9   "supposition."  *See supra* section A.2.d.  As Mr. Kraus made clear, "[m]any" of the

10  records that were used to "generate internal working lists and drafts of lists, like the so-

11  called 'GOD List'"—from which Plaintiffs have derived their 17,000 figure—"were

12  themselves already out of date or otherwise inaccurate at the time of the fire" and

13  therefore included items that UMG has since learned were not in the vault at the time of

14  the fire and are in fact "on [UMG's] shelves today."  Kraus Decl. ¶ 8.  Moreover, the

15  17,000 figure likely includes artists for which the lost assets were not original master

16  recordings but rather other assets like "production masters, protection copies, work

17  tapes, safeties, videos, as well as non-recorded music items such as artwork, session

18  notes, and more."  *Id.*  Of course, neither Mr. Kraus nor anyone else at UMG can swear

19  under oath to the loss of *original master recordings* based solely or even primarily upon

20  the artists' inclusion among the nearly 17,000 names Plaintiffs have lifted from

21  recordkeeping materials from over a decade ago based upon an investigation with

22  different aims and metrics.

23         *Second*, Plaintiffs assert that "UMG previously told NBCU and AXA that *nearly*

24  *17,000* artists lost original music recordings" and that it is "utterly inconceivable" that

25  this figure is "anything close" to only the 19 artists UMG has specifically identified to

26  date in response to Interrogatory No. 1.  But UMG has never made any such "utterly

27  inconceivable" suggestion.  Again, Plaintiffs are misconstruing the purpose and results

28  of the post-fire investigation and working lists used in connection with that effort, which,

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

as UMG previously told Plaintiffs in a sworn interrogatory, "reflected UMG's then best, evolving understanding of potentially fire-impacted assets generally, and were not specifically targeted at or limited to original master recordings."  UMG's Amended Response to Interrogatory No. 2 (December 2, 2019).  It is therefore not correct to say or suggest that UMG previously told NBCU that it definitively lost original music recordings for nearly 17,000 artists.  As Mr. Kraus's declaration states, "the mere inclusion of an asset in these prior vault records [*e.g.*, the 'GOD List'] does not definitively establish that the particular asset was in fact destroyed in the fire.  Indeed, we have determined that many of the assets on this list are on our shelves today."  Kraus Decl. ¶ 8.  Plaintiffs' apparent miscomprehension here appears to stem in part from incorrect information provided in *The New York Times Magazine* article on which Plaintiffs admit their complaint is based.

*Third*, Plaintiffs claim that UMG is "improperly answering a different interrogatory than was asked."  Not so.  UMG's efforts to date have in fact provided Plaintiffs with full and complete information to the best of UMG's evolving knowledge—and can continue to do so on an ongoing basis—as to those artists for whom UMG has been able to complete its investigation, even though—again—"a responding party is not required to conduct extensive research in order to answer an interrogatory." *Gorrell*, 292 F.R.D. at 639 (denying motion to compel on these grounds); *Garcia v. Blahnik*, 2016 WL 3854584, at *3 (S.D. Cal. July 15, 2016) (denying plaintiff's motion to compel a further response from defendants—where defendants stated there was "no greater detail available"—because the "Court cannot compel Defendants to provide information they claim does not exist").  Such an impermissibly "extensive" search is exactly what Plaintiffs are seeking to compel here.

At bottom, Plaintiffs seek to force UMG to verify an interrogatory response that it simply cannot, and certainly not on the basis of the record before it.  UMG's response to date for Interrogatory No. 1 is based on UMG's ongoing but evolving investigation, which began before and separately from this litigation and is meant to respond to

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

inquiries from the artist community.  UMG has provided to Plaintiffs the only responsive information it can verify based on its current investigation.  Plaintiffs' demand that UMG conduct a holistic, worldwide investigation on Plaintiffs' own timeline so that Plaintiffs can attempt to prop up their own claims is the very definition of an improper and burdensome fishing expedition.  Mr. Kraus's declaration makes this reality crystal clear. Plaintiffs' motion to compel should be denied.

**B.     Demand No. 8**

**1.     Plaintiffs' Request and Defendant's Response**

Demand No. 8, served on July 24, 2019, seeks:

"To the extent not produced in response to Demand No. 2, all deposition transcripts, including any exhibits thereto, of UMG witnesses reviewed by Larry Gerbrandt in the FIRE CASE."

UMG objected to this demand as follows on August 22, 2019:

"UMG incorporates each of its General Objections stated above. UMG further objects to this Demand on the grounds that it is completely untethered to the allegations in *this* lawsuit made by *these* Plaintiffs. Instead, the Demand asks for materials—some of which may be redacted—in *another* litigation, without regard to whether those materials relate in any way to Plaintiffs, their claims or agreements, or sound recordings embodying performances by Plaintiffs. Consequently, Plaintiffs improperly seek the production of documents that are not relevant to Plaintiffs' claims or proportional to the needs of this case. UMG also objects to Demand for Production No. 8 on the grounds that it is overly broad, unduly burdensome, oppressive, and harassing. In particular, the Demand targets confidential information, without regard to relevance, including confidential information belonging to third parties and proprietary business information subject to a protective order in the FIRE CASE. Finally, UMG objects to this Demand for the reasons stated in the Stay Motion. Based on the foregoing objections, UMG will not search for or produce documents responsive to this Demand, but UMG is willing to

21

1   meet and confer to discuss whether this Demand can be narrowed in light of UMG's
2   objections."

3       **2.      Plaintiffs' Position**

4       UMG's objections to Demand No. 8 are not at all persuasive.

5       As a category, the depositions that UMG's damages expert reviewed in the course
6   of the prior NBCU litigation are highly likely to contain information that is either
7   relevant, or that is likely to lead to the discovery of relevant information. This case and
8   the NBCU case are related. One theory of recovery articulated in the current complaint
9   here is that Plaintiffs are contractually entitled to share in the money that UMG
10  recovered in the NBCU case.

11      UMG's undue burden/proportionality objection to the request is impermissible
12  boilerplate, and contrary to common sense. All of the requested deposition transcripts
13  can be shared without any significant burden—UMG does not prove with any evidence
14  that it is unduly burdensome to somehow re-produce deposition transcripts already
15  gathered from prior litigation. UMG's proposal to first send Plaintiffs a mere list of all
16  these depositions, and then later have another fight over which specific depositions
17  should be produce (apparently to be determined by the names of the deponents alone),
18  would *add* to both parties' burden.

19      UMG's last two objections also fail. As the Court has already recognized in
20  resolving prior discovery disputes in this case, confidentiality is not a proper objection
21  to a request for relevant, proportional discovery. *See* Dkt. 53; *Antiaging Institute of*
22  *California, Inc. v. Solonova, LLC*, Case No. 2:15–cv–3416–AB (FFMx), 2016 WL
23  6920676, at *2 (C.D. Cal. June 29, 2016) ("With respect to claims of confidentiality, a
24  protective order would more than adequately address the objections.").

25      UMG's stay motion has also been denied. *See* Dkt. 65.

26

27

28

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

### 3. Defendant's Position

As with RFP No. 9, UMG is currently preparing for production all deposition transcripts, including all associated exhibits, from the *NBCU* litigation, which will render this request moot.

## C. Demand No. 9

### 1. Plaintiffs' Request and Defendant's Response

Demand No. 9, served on July 24, 2019, seeks:

"All other deposition transcripts, including all exhibits thereto, generated in the FIRE CASE."

UMG objected to this demand as follows on August 22, 2019:

"UMG incorporates each of its General Objections stated above. UMG further objects to this Demand on the grounds that it is completely untethered to the allegations in *this* lawsuit made by *these* Plaintiffs. Instead, the Demand asks for materials—some of which may be redacted—in *another* litigation, without regard to whether those materials relate in any way to Plaintiffs, their claims or agreements, or sound recordings embodying performances by Plaintiffs. Accordingly, Plaintiffs improperly seek the production of documents that are not relevant to Plaintiffs' claims or proportional to the needs of this case. UMG also objects to Demand for Production No. 9 on the grounds that it is overly broad, unduly burdensome, oppressive, and harassing. In particular, the Demand targets confidential information, without regard to relevance, including confidential information belonging to third parties and proprietary business information subject to a protective order in the FIRE CASE. Finally, UMG objects to this Demand for the reasons stated in the Stay Motion. Based on the foregoing objections, UMG will not search for or produce documents responsive to this Demand, but UMG is willing to meet and confer to discuss whether this Demand can be narrowed in light of UMG's objections."

### 2. Plaintiffs' Position

UMG's objections to Demand No. 8 are not at all persuasive.

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL DISCOVERY FROM DEFENDANT

As a category, the depositions taken for the prior NBCU litigation are highly likely to contain information that is either relevant, or that is likely to lead to the discovery of relevant information. This case and the NBCU case are related. One theory of recovery articulated in the current complaint here is that Plaintiffs are contractually entitled to share in the money that UMG recovered in the NBCU case.

UMG's undue burden/proportionality objection to the request is impermissible boilerplate, and contrary to common sense. All of the requested deposition transcripts can be shared without any significant burden—UMG does not prove with any evidence that it is unduly burdensome to somehow re-produce deposition transcripts already gathered from prior litigation. UMG's proposal to first send Plaintiffs a mere list of all these depositions, and then later have another fight over which specific depositions should be produce (apparently to be determined by the names of the deponents alone), would *add* to both parties' burden.

UMG's last two objections also fail. As the Court has already recognized in resolving prior discovery disputes in this case, confidentiality is not a proper objection to a request for relevant, proportional discovery. *See* Dkt. 53; *Antiaging Institute of California*, 2016 WL 6920676, at *2.

UMG's stay motion has also been denied. *See* Dkt. 65.

### 3.    Defendant's Position

UMG has met and conferred with Plaintiffs in good faith regarding this request. In the midst of what UMG believed were ongoing discussions, Plaintiffs sent UMG the Joint Stipulation regarding Plaintiffs' Third Motion to Compel.  Two days later, and pursuant to the parties' continuing meet and confer, UMG produced *NBCU* deposition transcripts for Larry Gerbrandt and Beth Lopez-Barron, along with all associated exhibits.  At Plaintiffs' request, UMG also sent a list of all other individuals deposed in the *NBCU* litigation.

The *NBCU* litigation involved not only testimony and information regarding UMG's damages from the 2008 fire but also testimony regarding the details and

24

1   underlying cause of the fire itself.  Nevertheless, despite the fact that many deposition

2   transcripts contain information that is irrelevant to this case, UMG is currently preparing

3   for production to Plaintiffs all deposition transcripts, including all associated exhibits,

4   from the *NBCU* litigation, which will render this request moot.

5   **D.     Demand No. 16**

6          **1.     Plaintiffs' Request and Defendant's Response**

7          Demand No. 16, served on July 24, 2019, seeks:

8          "All recording agreements entered into by YOU or YOUR predecessors which

9   RELATE TO, concern or encompass master recordings destroyed in the FIRE."

10         UMG objected to this demand as follows on August 22, 2019:

11         "UMG incorporates each of its General Objections stated above. UMG further

12  objects to Demand for Production No. 16 because it seeks confidential and private

13  information concerning individuals who are not party to this action and who would not

14  even be members of a putative class. Indeed, certain recording artists might have strong

15  objections to having their recording agreements shared with others in the industry. *Cf.*

16  *Golez v. Potter*, 2011 WL 6002612, at *1 (S.D. Cal. Nov. 29, 2011) (rejecting plaintiff's

17  discovery request for attendance records of *non-party* employees on privacy grounds);

18  *Hampton v. City of San Diego*, 147 F.R.D. 227, 230–31 (S.D. Cal. 1993) (reviewing files

19  of non-party police officers *in camera* out of 'concern' for their 'privacy rights').

20  Accordingly, UMG objects to this Demand because it is overly broad, unduly

21  burdensome, oppressive, and harassing, and seeks the production of material that is not

22  relevant [to] Plaintiffs' claims and is therefore not proportional to the needs of this case.

23  UMG further objects to this Demand because it is vague and ambiguous, as UMG does

24  not know how Plaintiffs define 'encompass' or 'master recordings' in this context.

25  Finally, UMG objects to this Demand for the reasons stated in the Stay Motion. Subject

26  to and without waiver of the foregoing objections and the General Objections above, and

27  without admitting that any master recordings embodying Plaintiffs' performances were

28  destroyed in the FIRE, UMG will produce agreements between UMG (or its

25

predecessors) and named Plaintiffs that contain provisions relating to ownership of master recordings, as UMG understands that term."

### 2.      Plaintiffs' Position

UMG's objections to Demand No. 16 are easily overruled. UMG's only relevance-related argument is the erroneous contention that information about absent class members other than the named Plaintiffs is not discoverable. Discovery is not bifurcated in this case. UMG's discovery position also raises a substantial sword/shield problem because at the same time UMG refuses to produce this information, it will not also commit to avoid using information about absent class members in its opposition to class certification. UMG's agreement to produce the named Plaintiffs' recording agreements does not in any way moot this document request. UMG's only proportionality/burden objection is impermissible boilerplate with no support or proven quantification. Alleged artist privacy and confidentiality, in a case with a stipulated protective order governing the production of such information, *see* Dkt. 63, does not provide a basis for objecting to requests for relevant information. And UMG's stay motion has already been denied. *See* Dkt. 65.

That leaves only UMG's written objections based on the purported vagueness of the words "encompass" and "master recordings." But there is nothing at all ambiguous about the word "encompass." And UMG itself has now supplied (in connection with its above-discussed response to Interrogatory No. 1) a definition of "master recordings." Plaintiffs agree that will suffice for purposes of responding to this document request.

Although not mentioned in UMG's written objections, UMG has also now produced certain artist recording agreements, beyond those of the named Plaintiffs, as part of its partial production of materials from the NBCU litigation. That production, too, does not moot the need to respond to this request. UMG refuses to confirm whether the agreements produced are in fact *all* the agreements associated with master recordings lost in the fire. It is not Plaintiffs' burden to determine whether or not UMG counsel's prior production to NBCU was complete or incomplete in this respect—UMG is in

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL
DISCOVERY FROM DEFENDANT

possession of information enabling it to determine whether or not other relevant artist agreements may exist and if so, those need to be produced.

### 3.   Defendant's Position

Plaintiffs acknowledge that, in connection with its *NBCU* production, UMG produced "*certain* artist recording agreements, beyond those of the named Plaintiffs." *See supra* D.2 (emphasis added).  But Plaintiffs conveniently fail to note the magnitude of that production—specifically, the fact that among those documents UMG has already produced thousands of recording agreements.

The Federal Rules limit the scope of discovery if the material "sought is unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(2)(C)(i).  Forcing UMG to turn over to Plaintiffs even *more* recording agreements before Plaintiffs have even indicated whether they have *reviewed* the thousands they have already received would undoubtedly be duplicative and improper.  *See Hardge v. Adams*, 2009 WL 410125, at *2 (E.D. Cal. Feb. 17, 2009) (cautioning that plaintiffs must "narrowly tailor" discovery requests or risk that they be denied "as overly broad").  Plaintiffs do not argue otherwise because they cannot.

In any event, despite Plaintiffs' unadorned assertions to the contrary, their request cannot be completed within the short timeframe Plaintiffs prefer.  As explained above, UMG is currently undertaking a time-consuming and costly investigation to accurately determine which original master recordings were in fact destroyed in the fire.  Until UMG makes that determination as to a given original master recording, it cannot confirm the prior production of—or produce anew—the recording agreements and amendments that "concern or encompass" that recording or artist.  The only way to produce all of the recording agreements to Plaintiffs now without undertaking that burdensome investigation would be to hand over to Plaintiffs each and every one of UMG's recording agreements that predates the fire (including those involving UMG's predecessor entities).  That set of agreements would not only include plainly irrelevant material but

would also fail to actually move the parties any closer to determining which of those agreements "concern or encompass master recordings destroyed in the FIRE."

Again, it remains unclear from Plaintiffs' position statement on RFP No. 16 whether they have even *looked* at any of the previously produced agreements to determine whether they are, on the whole, sufficient.  That notwithstanding, if UMG determines that any additional original master recordings were in fact destroyed in the fire, it will produce available recording agreements for those related artists to Plaintiffs, assuming they have not been turned over already.

**E.     Demand No. 41**

**1.     Plaintiffs' Request and Defendant's Response**

Demand No. 41, served on November 18, 2019, seeks:

"All recording agreements entered into by YOU or YOUR predecessors which RELATE TO, concern or encompass recordings or other assets (whether or not UMG currently contends they are 'original master recordings') that UMG claimed, asserted, or implied in any prior litigation, in any insurance dispute, or in connection with settlements of litigation or insurance disputes, were, or may have been, damaged or lost in, by, or as a result of the June 1, 2008 fire on the NBCUniversal lot."

UMG objected to this demand as follows on December 18, 2019:

"UMG incorporates each of its General Objections stated above. UMG further objects that this Demand is duplicative of Plaintiffs' Demand for Production No. 16. UMG therefore objects that searching for additional recording agreements—beyond those requested by Demand for Production No. 16 and produced in response thereto by UMG on December 13, 2019—would be unduly burdensome and not proportional to the needs of this case. UMG further objects that Demand for Production No. 41 is impermissibly vague, ambiguous, and incomprehensible because it (a) does not define the terms 'recordings,' 'other assets,' or 'original master recording,' and (b) broadly seeks without explanation documents relating to recordings or other assets that UMG 'claimed, asserted, or implied' were or may have been damaged or lost in the June 1,

2008 fire. Additionally, UMG objects to this Demand for Production because it seeks documents untethered to the allegations in this lawsuit, which are related only to contractual provisions based upon the licensing of master recordings embodying Plaintiffs' performances. If, following their review of UMG's December 13, 2019 production, which contained thousands of recording agreements produced by UMG in the NBCU litigation, Plaintiffs can establish a need for additional recording agreements, UMG will meet and confer with Plaintiffs regarding the same."

### 2.     Plaintiffs' Position

UMG's objections to Demand No. 41 are also easily overruled. The requested documents are highly relevant. UMG's objection based on purported duplication of Demand No. 16 is rich—it is UMG itself that sought to persuade Plaintiffs, the Court, and the public that the list of artists whose recordings were *actually* lost may not be commensurate with the list of artists whose recordings UMG (and its prior counsel consistent with its ethical obligations under applicable rules) told NBCU and AXA were lost. UMG's undue burden objection is nothing more than boilerplate. There is nothing ambiguous about any of the terms used in this request—UMG can use its own definition of "master recordings" elsewhere provided for purposes of responding, and produce the contracts associated with any master recordings on the list of purportedly lost assets that was provided to NBCU and AXA. And as discussed above in connection with Demand No. 16, there is no basis in the Federal Rules of Civil Procedure, or any other applicable rule, for UMG's suggestion that it can rely on a prior counsel's potentially-partially-overlapping production from another case, and thereby avoid making a commitment to do its own *complete* collection, review, and production of highly relevant documents in this litigation.

### 3.     Defendant's Position

As Plaintiffs are of course aware, UMG *has already produced* thousands of recording agreements it previously produced in the *NBCU* litigation.  Indeed, in response to NBCU's document requests, UMG produced recording agreements pertaining to

29

artists on the "GOD List," and Plaintiffs have UMG's entire production made to NBCU as result of this Court's order on Plaintiffs' first motion to compel.  Those produced agreements concern artists on the now-outdated "GOD List" (*i.e.*, a list of assets that UMG believed during prior litigation may have been impacted by the fire).  UMG has therefore satisfied this demand in full—Plaintiffs simply need to review those documents that have already been provided to them.

Even if there was any daylight between the recording agreements that UMG produced in the *NBCU* litigation (and reproduced here to Plaintiffs) and the artists on the "GOD List," Plaintiffs have utterly failed to show why the thousands of agreements that they already have are insufficient for their purposes in this litigation.  This request should be denied.

Dated: February 13, 2020

**KING, HOLMES, PATERNO & SORIANO, LLP**

By:   /s/ *Howard E. King*[4]
        Howard E. King

Howard E. King
Henry D. Gradstein
Andres Monserrate
KING, HOLMES, PATERNO &
SORIANO, LLP

Edwin F. McPherson
Pierre B. Pine
McPHERSON LLP

Steven G. Sklaver (237621)
ssklaver@susmangodfrey.com
Kalpana D. Srinivasan (237460)
ksrinivasan@susmangodfrey.com
Meng Xi (280099)
mxi@susmangodfrey.com
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

---

[4]   Pursuant to L.R. 5-4.3.4(a)(2)(i), counsel for Plaintiffs, *Howard E. King*, certifies that all other counsel have consented to and authorized the filing of this document with their electronic signature.

30

Stephen E. Morrissey (187865)
smorrissey@susmangodfrey.com
SUSMAN GODFREY LLP
1201 3rd Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 373-7380

Mark H. Hatch-Miller (*pro hac vice*)
mhatchmiller@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

Attorneys for Plaintiffs

Dated: February 13, 2020    **GIBSON, DUNN & CRUTCHER LLP**

By:   /s/ *Scott A. Edelman*
          Scott A. Edelman

Scott A. Edelman (SBN 116927)
sedelman@gibsondunn.com
Deborah L. Stein (SBN 224570)
dstein@gibsondunn.com
Nathaniel L. Bach (SBN 246518)
nbach@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Defendant
UMG RECORDINGS, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on this the 13th day of February 2020, I have electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

/s/     *Mark H. Hatch-Miller*

JOINT STIPULATION REGARDING PLAINTIFFS' THIRD MOTION TO COMPEL DISCOVERY FROM DEFENDANT