UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |

| Cheryl Wynn | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) ORDER RE DEFENDANT UMG RECORDINGS, INC.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT (DKT. 36);**

**LOCAL RULE 83-9.2 JOINT REQUEST FOR DECISION ON UMG'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT (DKT. 81)**

## I.    Introduction

Soundgarden, Tom Whalley, Jane Petty, and Steve Earle brought this action against UMG Recordings, Inc. ("UMG") based on claims arising out of a 2008 fire at Universal Studios. It is alleged that Plaintiffs are musical artists -- or the owner, assignee, and successor in interest to rights of musical artists -- whose original sound recordings of songs ("Master Recordings") were stored in a warehouse leased by UMG on the backlot of Universal Studios (the "UMG Warehouse"). It is alleged that, on June 1, 2008, certain of these Master Recordings were destroyed in a fire at the UMG Warehouse. It also alleged that UMG recovered $150 million in litigation and insurance claims related to the fire.

The First Amended Class Action Complaint (the "FAC") presents six causes of action: (i) Breach of Contract; (ii) Breach of Bailment Contract[1]; (iii) Negligence; (iv) Reckless Conduct; (v) Conversion; and (vi) Misrepresentation by Omission[2]. Dkt. 25.

UMG filed a Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (the "Motion to Dismiss"). Dkt. 36. Plaintiffs filed an opposition to the Motion to Dismiss. Dkt. 38. UMG filed a reply. Dkt. 39. A hearing on the Motion to Dismiss was conducted on November 4, 2019. Dkt. 46. On November 8, 2019, the parties filed a Joint Report regarding the Court's Sua Sponte Questions Regarding CAFA Jurisdiction (the "CAFA Report"). Dkt. 49. On March 13, 2020, Plaintiffs Soundgarden and Whalley filed a Rule 41(a) Notice of Voluntary Dismissal, without prejudice, by Plaintiffs Soundgarden and Tom Whalley as to their individual claims. Dkt. 86. On March 23, 2020, Earle filed a

---

[1]  This claim also refers to the implied covenant of good faith and fair-dealing. Dkt. 25 ¶ 57.
[2]  The FAC identified this as the Seventh Cause of Action, but, in apparent oversight, there is no Sixth Cause of Action.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|----------|--------------------------|------|----------------|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

Rule 41(a) Notice of Voluntary Dismissal by Plaintiff Steve Earle. Dkt. 95. In light of the dismissal of these claims, the Motion to Dismiss is **MOOT-IN-PART** as to Soundgarden, Whalley and Earle.

For the reasons stated in this Order, the Motion to Dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART** as to Plaintiff Petty and the FAC is **DISMISSED WITHOUT PREJUDICE**, with leave to amend. The Local Rule 83-9.2 Joint Request for Decision on UMG's Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (the "Request for Decision" (Dkt. 81)) is **GRANTED**.

## II.    Subject-Matter Jurisdiction

### A.    Factual and Procedural Background

At the November 4, 2019, hearing, the Court raised *sua sponte* whether there is an issue as to subject-matter jurisdiction in the action under the home-state or local controversy exceptions of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(4)(A)-(B). Dkt. 46. The parties were directed to file a joint report stating their positions "as to the most fair and efficient means to resolve the jurisdictional issue." *Id.* The parties filed the CAFA Report on November 8, 2019. Dkt. 49. There, Plaintiffs argue that UMG "should (and indeed, must)" answer the jurisdictional question by providing certain information. *Id.* at 4. Defendant objected to this proposal, and instead argued that "jurisdictional fact-finding under CAFA" is of "limited scope." *Id.* at 9-10. The parties did not argue that a court cannot *sua sponte* raise the jurisdictional issue. Instead, the parties disagree as to the process by which the jurisdictional question should be resolved.

### B.    Analysis

#### 1.    Legal Standards

Under 28 U.S.C. § 1332(d)(2), a district court has original jurisdiction over a class action where the matter in controversy exceeds $5,000,000 and "any member of a class of plaintiffs is a citizen of a State different from any defendant." Section 1332(d)(4) provides that there are two circumstances where a district court "shall decline to exercise jurisdiction under paragraph (2)." *First*, under 28 U.S.C. § 1332(d)(4)(A), jurisdiction is to be declined

    (i)    over a class action in which

        (I)    greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

        (II)    at least 1 defendant is a defendant—

            (aa)    from whom significant relief is sought by members of the plaintiff class;

            (bb)    whose alleged conduct forms a significant basis for the claims

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | | Date | April 6, 2020 |
|---|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | | |

\#

asserted by the proposed plaintiff class; and

　　(cc)　who is a citizen of the State in which the action was originally filed; and

　(III)　principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

(ii)　during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons.

*Second*, 28 U.S.C. § 1332(d)(4)(B) provides that a district court should decline to exercise jurisdiction under (d)(2) where "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed."

The purpose of the "local controversy exception" is to "respond to concerns that class actions with a truly local focus should not be moved to federal court under [CAFA] because state courts have a strong interest in adjudicating such disputes. At the same time, this is a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole." *Bridewell-Sledge v. Blue Cross of Cal.*, 798 F.3d 923, 928 (9th Cir. 2015) (quoting S. Rep. No. 109-14 at 39 (2005)).

Although the language in Sections 1332(d)(4)(A) and (B) is mandatory as to declining jurisdiction, in general there is a distinction between considering the elements required to establish jurisdiction initially and those that show why there is an exception to exercising it. *See Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1139 & n.1 (9th Cir. 2013). "Federal jurisdiction under CAFA has three elements: (1) there must be minimal diversity of citizenship between the parties, (2) the proposed class must have at least 100 members and (3) the amount in controversy must 'exceed[ ] the sum or value of $5,000,000.' *Id.* at 1139 (quoting 28 U.S.C. § 1332(d)); *see also Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1023 (9th Cir. 2007). In contrast, Sections 1332(d)(4)(A) and (B) "fit into the statutory structure as exceptions to jurisdiction, not elements of original jurisdiction." *Serrano*, 478 F.3d at 1023. As a result, they are "not part of the prima facie case for establishing minimal diversity jurisdiction[] under CAFA, but, instead, are exceptions to jurisdiction." *Id.*

This distinction is material in that it determines which party bears the burden of proof as to whether either of the exceptions applies, as well as whether a court may raise the exceptions *sua sponte*. Because Sections 1332(d)(4)(A) and (B) are exceptions to jurisdiction, it is the party objecting to CAFA jurisdiction, if it would otherwise be established, who "bears the burden of proof as to the applicability of any express statutory exception under §§ 1332(d)(4)(A) and (B)." *Serrano*, 478 F.3d at 1024. Because the elements of minimal diversity, class size and amount in controversy are "the full extent of what subject matter jurisdiction demands," the "obligation to raise and prove" exceptions to such jurisdiction -- "even the mandatory 'local controversy' and 'home-state controversy' ones" -- rests on the party disputing subject-matter jurisdiction. *See Kuxhausen*, 707 F.3d at 1139 n.1. As a result, a court "ha[s] no charge to consider those possibilities sua sponte." *Id.* (citing *Serrano*, 478 F.3d at 1022).

\#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|----------|--------------------------|------|---------------|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

#

      2.    <u>Application</u>

The FAC adequately alleges the prima facie elements for CAFA jurisdiction as to minimal diversity, class size and amount in controversy. *See* Dkt. 25 ¶¶ 12, 21-22, 30. Defendant has not moved to dismiss this action for lack of jurisdiction or otherwise challenged subject-matter jurisdiction under CAFA. Further, Defendant states that the "threshold jurisdictional question" related to these exceptions is "resolved in favor of [the Court's] jurisdiction" and that "no jurisdictional discovery or further litigation on the issue is appropriate or necessary." Dkt. 49 at 8. Therefore, there apparently was "no charge" for the Court to have raised sua sponte whether either the local or home-state controversy exception stated in Sections 1332(d)(4)(A) and (B) applies.

For these reasons, any further issues as to subject matter jurisdiction are not addressed at this time. However, if the parties continue to disagree as to whether subject matter jurisdiction is established in light of the exceptions discussed above, they shall confer with Magistrate Judge Rosenbluth at the time and in the manner as Judge Rosenbluth directs. The purpose of this process is to establish what further discovery, if any, is necessary and appropriate to address the issue and a method for completing it in an efficient manner. The parties are encouraged to work efficiently and collaboratively with each other and with Judge Rosenbluth because the prompt resolution of this issue will serve party and judicial efficiency.[3]

III.   <u>**Request for Judicial Notice**</u>

UMG requests judicial notice of several documents so that they can be considered in connection with the Motion to Dismiss. Dkt. 36-2.

| | |
|---|---|
| **Exhibit 1** | UMG Recordings, Inc. v. NBCUniversal Media LLC, L.A. Superior Court No. 106213 (Second Amended Complaint) |
| **Exhibit 2** | UMG Recordings, Inc. v. NBCUniversal Media LLC, L.A. Superior Court No. 106213 (Opposition to Motion in Limine No. 6) |
| **Exhibit 3** | UMG Recordings, Inc. v. NBCUniversal Media LLC, L.A. Superior Court No. 106213 (Declaration Supporting Motion in Limine No. 2) |
| **Exhibit 4** | UMG Recordings, Inc. v. NBCUniversal Media LLC, L.A. Superior Court No. 106213 (Opposition to Defendants' Motion for Summary Judgment) |
| **Exhibit 5** | UMG Recordings, Inc. v. NBCUniversal Media LLC, L.A. Superior Court No. 106213, Docket |
| **Exhibit 6** | Vivendi S.A. v. AXA Insurance Co., No. 2:09-cv-08893 (C.D. Cal.), Docket |
| **Exhibit 7** | Jody Rosen, The Day the Music Burned, N.Y. TIMES MAGAZINE (June 11, 2019) |
| **Exhibit 8** | Universal Music Group, Inc. Code of Conduct, dated May 2016 (last revised), available at http://www.universalmusic.com/wp-content/ |

---

[3] This issue has been before Judge Rosenbluth as to the scope and priority of certain discovery issues. *See, e.g.*, Dkt. 56 at 4-5, 29-31 (Transcript of November 14, 2019, hearing before Judge Rosenbluth); Dkt. 76 at 28 (Transcript of December 12, 2019, hearing before Judge Rosenbluth).

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

| **Exhibit 9** | uploads/2018/03/Code-of-Conduct.pdf<br>Vivendi S.A. v. AXA Insurance Co., No. 2:09-cv-08893 (C.D. Cal.)<br>(Complaint) |
|---|---|

A motion to dismiss is generally "limited to the contents of the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). In considering materials incorporated into the complaint, the court may review the full text of a document even if the complaint quotes only part of it. *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997). A court may also consider "evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (discussing a provision in a settlement agreement releasing parties from liability).

Fed. R. Evid. 201(b) provides that a court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." More specifically, a court "may take judicial notice of 'matters of public record.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (quoting *Mack v. South Bay Beer Distrib.*, 789 F.2d 1279, 1282 (9th Cir. 1986), *abrogated on other grounds by Astoria Fed. Saving & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991)). Such matters of public record include "documents on file in federal or state courts." *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

Judicial notice of publications introduced to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true" meet the standards required by Fed. R. Evid. 201(b). *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (quoting *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)); *see also In re Am. Apparel, Inc. Shareholder Derivative Litig.*, No. CV 10-06576 MMM, 2012 WL 9506072, at *17-19 (C.D. Cal. July 31, 2012) (taking judicial notice of news reports and press releases as to the market awareness of them and considering similar articles as incorporated by reference into complaint).

Exhibits 1-6 and 9 are filings that were made in proceedings in certain California and federal courts. Judicial notice of these documents is appropriate under Fed. R. Evid. 201(b) because they are matters of public record. *See Harris*, 683 F.3d at 1132.

Exhibit 7 is a newspaper article. Judicial notice is proper of this document for the limited purpose of providing some insight as to whether such information was available in the public realm, but not as to its truth. *See Von Saher*, 592 F.3d at 960. Moreover, this article is, in effect, incorporated by reference into the FAC, whose allegations quote from it. Dkt. 25 ¶ 21.

Exhibit 8 is UMG's Code of Conduct dated May 2016. This document is incorporated by reference in the FAC, whose allegations quote from and cite the document. Dkt. 25 ¶¶ 59, 61; *see also* Dkt. 38 (Plaintiffs' opposition identifying language in paragraphs 59 and 61 as from the UMG Code of Conduct).

For the foregoing reasons, judicial notice of all nine exhibits is appropriate in connection with the consideration of the Motion to Dismiss, and does not convert it into one for summary judgment under

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

Fed. R. Civ. P. 56. *See* Fed. R. Civ. P. 12(d). Therefore, the Request for Judicial Notice in Support of the Motion to Dismiss is **GRANTED**.

**IV.     Factual and Procedural Background**

A.     Parties

Jane Petty was formerly married to Tom Petty, who is now deceased. Dkt. 25 ¶ 9. Tom Petty was an "American singer/songwriter, multi-instrumentalist, record producer and actor, as well as the lead singer of Tom Petty and [the] Heartbreakers." *Id.* The FAC alleges that, in connection with the 1996 divorce proceedings between Jane Petty and Tom Petty, Tom Petty "assigned and transferred to Jane by written assignment an undivided 50% interest to his then-existing intellectual property." *Id.* The FAC alleges that Master Recordings of Tom Petty "embodying the musical works of Petty co-owned by Jane or subject to recording agreements under which Jane has rights to receive royalties" were stored in the UMG Warehouse and destroyed in the fire. *Id.*

The FAC defines the proposed class as follows:

> All persons or entities, and their heirs, successors and assigns, who entered into recording agreements with UMG providing for a sharing of revenues derived from use or exploitation of Master Recordings embodying their musical works, which Master Recordings were stored in a warehouse leased by UMG at the Universal Studios backlot and destroyed in a fire on or about June 1, 2008, or such persons or entities with Master Recording revenue-sharing contracts whose Master Recordings, whether or not actually destroyed, were among those that UMG claimed were destroyed or lost in the Fire[4] in order to recover insurance or litigation proceeds.

Dkt. 25 ¶ 30.

B.     Factual Allegations of the First Amended Complaint

1.     Master Recordings Storage and the 2008 Fire

The FAC alleges that UMG stored the Master Recordings "as well as original video recordings, artwork, and other valuable materials related to Plaintiffs' recording sessions" in the UMG Warehouse on the backlot of Universal Studios. Dkt. 25 ¶ 14. Until 2004, UMG was allegedly "a sister company to Universal City Studios Productions, formerly known as Vivendi Universal Entertainment LLP ('VUE'), and Universal City Studios LLC, formerly known as Universal City Studios LLP ('UCS')." *Id.* ¶ 16. It is alleged that, in 2004, VUE and UCS were acquired by General Electric and are now owned by NBC Universal Media, LLC ("NBC"). *Id.* It is also alleged that, on or about May 4, 2004, UMG and VUE entered into a lease that included the UMG Warehouse on the backlot of Universal Studios. *Id.* As noted, the Master Recordings were stored in this warehouse. *Id.*

---

4  The FAC defines the "Fire" as the June 1, 2008 fire that destroyed Master Recordings in the UMG Warehouse. Dkt. 25 ¶ 4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|----------|--------------------------|------|---------------|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

It is alleged that, on June 1, 2008, the UMG Warehouse was "completely destroyed in a fire." Dkt. 25 ¶ 17. The FAC alleges that the fire destroyed all the Master Recordings. *Id.* ¶ 20. The FAC alleges that the fire started in a different location in the backlot after maintenance workers left hot shingles there that were unattended, and later ignited. *Id.* The FAC alleges that UMG stored the Master Recordings in "an inadequate, substandard storage warehouse located on the backlot of Universal Studios that was a known firetrap." *Id.* ¶ 4.

The FAC alleges that UMG brought an action (the "Fire Lawsuit") against NBC, VUE and UCS (the "Fire Defendants") in the Los Angeles County Superior Court. Dkt. 25 ¶ 18. The FAC alleges that filings by UMG in the Fire Lawsuit show that UMG alleged that the lessors of the UMG Warehouse failed to maintain working sprinkler systems, failed to maintain working fire hydrants, failed to follow "hot work" guidelines, and "persistently ignored the recommendations of their fire prevention and risk assessment expert and their own experiences after a similar fire in 1990 destroyed a similar area on the back lot." *Id.* The FAC alleges that these filings by UMG also reflect its allegations that the lessors ignored "specific warnings" from fire experts from as early as the 1990s. *Id.* ¶ 19.

       2.   <u>UMG Response to the 2008 Fire</u>

         a)   Public Statements

The FAC alleges that after the fire, UMG "did not speak up immediately or even ever inform its recording artists that any Master Recordings embodying their musical works may have been destroyed." Dkt. 25 ¶ 4. Instead, the FAC alleges that UMG "concealed the loss with false public statements" and has still "failed to inform Plaintiffs whether any of their Master Recordings were destroyed in the fire." *Id.*

The FAC next alleges that UMG engaged in a "systematic and fraudulent scheme of misrepresentation and misdirection designed to conceal the loss of the Master Recordings destroyed in the Fire." Dkt. 25 ¶ 23. The FAC identifies a series of published stories, "based on statements by UMG representatives," and alleges that these statements to the press were part of this scheme of "misrepresentation and misdirection." *Id.* It is alleged that UMG stated at the time of the fire, "We had no loss thankfully." *Id.* ¶¶ 23a, 23b. The FAC alleges that UMG also stated that, because many Master Recordings had been digitized, "no irreplaceable master recordings" were lost. *Id.* ¶ 23d. The FAC alleges that UMG identified "obscure artists from the 1940s and '50s" as those whose material was lost in the fire. *Id.* ¶ 23c. The FAC identifies other similar statements that appear in news stories about the fire. *Id.*

         b)   Litigation and Insurance Recoveries

The FAC alleges that, "even as it kept Plaintiffs in the dark and misrepresented the extent of the losses," UMG pursued litigation and insurance claims to "recoup what UMG itself alleged to be the value of the lost Master Recordings." Dkt. 25 ¶ 5. The FAC alleges that UMG valued its litigation and insurance claims at $150 million. *Id.* The FAC alleges that UMG recovered on these claims, but failed to share any of the proceeds with Plaintiffs. *Id.* Plaintiffs allege that they are entitled to a portion of "any UMG proceeds from any uses or exploitations of any Master Recordings -- which would necessarily include the insurance and litigation recoveries." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|----------|--------------------------|------|---------------|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

#

It is alleged that UMG filed an action against the Fire Defendants in the Los Angeles Superior Court. LASC, Case No. SC106213. Dkt. 25 ¶ 18. The FAC alleges that UMG "confidentially settled the Fire Lawsuit in 2013, in what one of its lawyers described as a 'successful' settlement of $150 million it claimed for the loss of the Master Recordings embodying the musical works of members of the class." *Id.* ¶ 44. The FAC also alleges UMG received proceeds from its insurance claims (the "Insurance Recovery"). *Id.* ¶¶ 5, 6, 43, 46. The FAC does not identify a particular policy or any amount recovered. *See, e.g.*, *id.* ¶ 69.

c)      Rosen Article and Alleged Discovery of Loss

The FAC alleges than an article by Jody Rosen (the "Rosen Article""), which was published in June 2019 in *New York Times Magazine*, revealed that the destruction of Master Recordings in the fire was substantially greater than had been previously disclosed. Dkt. 25 ¶ 21. The Rosen Article stated that the recordings that had been destroyed included those of "dozens of legendary artists, a genre-spanning who's who of 20th- and 21st-century popular music." *Id.* ¶ 22. The FAC alleges that this included works by the Plaintiffs: Soundgarden, Tupac, Petty, and Earle. *Id.* The FAC alleges that the Rosen Article revealed the material difference between UMG's public statements about its loss due to the fire and the actual loss of the Master Recordings. *Id.* ¶ 24. The FAC alleges that the Rosen Article "was the first notice to Plaintiffs and the putative class that Master Recordings embodying their musical works were destroyed in the Fire." *Id.*

The FAC alleges that UMG "has not fully informed Plaintiffs whether any Master Recordings embodying musical works owned by them were destroyed in the fire, and has not yet disclosed or accounted to Plaintiffs for settlement proceeds and insurance payments received by UMG for the loss of the Master Recordings." Dkt. 25 ¶ 25. The FAC alleges that UMG "participated in the active concealment of relevant facts from artists" through its public statements and sealing of filings in the Los Angeles Superior Court in the Fire Lawsuit so that they were not available to the public. *Id.* ¶ 26. The FAC alleges that UMG "still maintains that it does not fully know what Master Recordings were lost in the Fire, that some of the Master Recordings previously identified as lost may not have been lost at all, and that it has recently assembled a 'worldwide team' to ascertain the extent of its losses, which assessment remains ongoing." *Id.* ¶ 27.

3.    <u>Language in Contracts</u>

Several contracts related to Plaintiffs' Master Recordings are attached to the FAC. In light of the voluntary dismissal of three of the four named plaintiffs, the relevant contract is the one between Tom Petty and MCA, which is alleged to be a predecessor of UMG. FAC, Ex. 4 (the "Petty Contract"). The Petty Contract is dated February 1984. Its Paragraph 6(I) provides:

> In the event that MCA licenses Masters to third parties on a percentage rate, cent-rate or flat-fee basis, the royalty payable by MCA to Artist shall be one-half (1/2) of the amount (including advances specifically allocable to Masters hereunder) actually received by MCA from such license. The royalty (and Artist's share of any advances specifically allocable to Masters hereunder) provided in this paragraph shall be credited to Artist's account hereunder only after receipt by MCA from such licensees . . . . MCA shall not license any

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

Master hereunder on a percentage rate, cent-rate or a flat-fee basis for non-phonograph record use (e.g., for inclusion in the soundtrack of a motion picture or television show) without Artist's prior written consent.

Dkt. 25-4 at 13-14.

Paragraph 7 describes MCA's rights:

Title to the Masters for the Territory shall vest in MCA from inception of recording and thereafter MCA shall be the sole and exclusive owner in and for the Territory of such Masters; provided, however, MCA shall not in any way use or exploit any such Master until it is delivered to MCA or Artist advises MCA that such Master is completed. MCA shall have the following rights in perpetuity and for the Territory:

(a) The exclusive ownership of all duplicates of the Masters and records manufactured therefrom and the right to use and control the same and the performances embodied therein. . . . .

(b) Subject to the terms and conditions of this Agreement, the exclusive and perpetual right throughout the Territory to manufacture, advertise, publicize, sell, lease, license, or otherwise use or dispose of and exploit records and/or derivatives manufactured from or embodying the Masters, and to permit others to do so . . . upon such terms and conditions as MCA may approve, or . . . to refrain therefrom.

(c) All right, title and interest in the copyright in and to the Masters and all reproductions thereof and the sound performances contained therein . . . .

Dkt. 25-4 at 17-18.

4.     Causes of Action

As noted, there are six causes of action in the FAC: (i) breach of contract - revenue sharing, (ii) breach of contract - bailment, (iii) negligence, (iv) reckless conduct, (v) conversion, and (vi) misrepresentation by omission. Dkt. 25.

With respect to the breach of contract claims, the FAC alleges that the recording agreements between the Named Plaintiffs, members of the putative class and UMG, or its predecessors, provided for sharing of "revenues derived from Master Recordings embodying their musical works." Dkt. 25 ¶ 38. The FAC alleges that the recording agreement of each of the Named Plaintiffs has language requiring revenue sharing for any "'Net Receipts' derived from any use or exploitation of the Master Records other than through the distribution of an album." *Id.* ¶ 40. The FAC alleges that UMG's "recoveries based on its claimed losses of Master Recordings sustained in the Fire through the Fire Lawsuit and the insurance proceeds" constitute Net Receipts that must be shared with Plaintiffs and members of the putative class. *Id.* ¶¶ 42-48. The First Cause of Action also alleges that UMG breached the "implied terms of the recording agreements by failing to act in good faith and in a commercially reasonable manner," because UMG allegedly failed to prevent the losses, to insure such potential losses and to seek to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

recover their full value. *Id.* ¶ 49-50.

The claim for breach of a bailment contract alleges that such a contract was created by the Plaintiffs' delivery of Master Recordings to UMG due to its "express promises made in conjunction with its implied obligation of good faith and fair dealing in the recording agreements" that "establish[ed] its voluntary bailment in connection with the Master Recordings." Dkt. 25 ¶ 54. The FAC alleges that, in the recording agreements, "there is an implied obligation of good faith and fair dealing that neither party to the contract will undertake actions to deprive the other party of the expected fruits and benefits of the contractual relationship." *Id.* ¶ 52. The FAC alleges that UMG breached this obligation by "fail[ing] to take reasonable measures to preserve and maintain the Master Recordings." *Id.* This included the failure safely to store and maintain the Master Recordings. *Id.*

In support of the claim for negligence, the FAC alleges that UMG knew that Plaintiffs "entrusted UMG to preserve and maintain the Master Recordings" and that UMG owed a duty to Plaintiffs "to make commercially reasonable efforts to preserve and maintain the Master Recordings." Dkt. 25 ¶¶ 60-61. The FAC alleges that UMG breached this duty by storing the Master Recordings in an inadequate manner, failing to obtain adequate insurance for the Master Recordings, failing to "seek Plaintiffs' support and participation in seeking to maximize its recovery in the Fire Lawsuit," and by concealing from Plaintiffs the recoveries received for the losses to the Master Recordings through the insurance claims and litigation. *Id.* ¶ 62. The FAC alleges that Plaintiffs suffered damages as a direct and proximate result of this breach of UMG's duty. *Id.* ¶ 63.

The FAC alleges that UMG owed a duty to Plaintiffs' "to make commercially reasonable efforts to preserve and maintain the Master Recordings." Dkt. 25 ¶ 67. The FAC alleges that UMG breached this duty through "reckless conduct," which is identified as the allegations in support of the claim for negligence. It also alleges that Plaintiffs suffered damages as a direct and proximate result. *Id.* ¶¶ 68-60. The FAC alleges that this conduct was "malicious and fraudulent," because UMG knew the value of the assets and "knowingly and willfully disregarded" Plaintiffs' interests by failing to ensure safe storage, obtain sufficient insurance, and share amounts paid to UMG for its claimed losses. *Id.* ¶ 70.

The FAC next alleges that the recording agreements entitled Plaintiffs to share in what UMG recovered through the Fire Lawsuit and insurance claims. Dkt. 25 ¶ 72. The FAC alleges that UMG "knowingly and willfully ignored its obligations to Plaintiffs and kept all of those proceeds for itself, and sought to conceal from Plaintiffs both the loss of Master Recordings and the extent of its recoveries." *Id.* ¶ 73. The FAC alleges that this conduct constitutes a conversion of Plaintiffs' share of these proceeds and warrants an award of punitive damages. *Id.* ¶¶ 74-75.

Finally, the FAC alleges that UMG "knew or should have known" that the storage of the Master Recordings was insufficient to protect them. Dkt. 25 ¶ 76. It also alleges that UMG owed a duty to Plaintiffs timely to disclose these insufficient storage conditions, but failed to do so. *Id.* ¶¶ 77-78. The FAC alleges that the inadequacy of the storage measures that were used constituted "material facts" in connection with a decision by the Plaintiffs to enter recording agreements with UMG. *Id.* ¶ 79. The FAC alleges that Plaintiffs detrimentally relied on UMG's representations that it would obtain or provide adequate, secure storage of the Master Recordings. *Id.* ¶ 80.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

**V.**   **Analysis**

A.   Legal Standards

Fed. R. Civ. P. 8(a)(2) provides that a "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must state facts sufficient to show that a claim for relief is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations, but it must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

A party may move to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations in the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.* 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If a motion to dismiss is granted, the court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Although this policy is to be applied "with extreme liberality," *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)), allowing leave to amend is inappropriate in circumstances where litigants have failed to cure previously identified deficiencies, or where an amendment would be futile, *see Foman v. Davis*, 371 U.S. 178, 182 (1962); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990).

B.   Application

1.   Assignment of Rights to Plaintiff Jane Petty

In support of the Motion to Dismiss, Defendants argue that Petty lacks standing because the FAC does not plead sufficient facts to support a showing that she was an assignee of the rights of Tom Petty. Dkt. 36-1 at 32-33.

a)   Legal Standards

Under California law, "[t]he burden of proving an assignment falls upon the party asserting rights thereunder." *Heritage Pac. Fin., LLC v. Monroy*, 215 Cal. App. 4th 972, 988 (2013) (quoting *Cockerell v. Title Ins. & Trust Co.*, 42 Cal. 2d 284, 292 (1954)). "An assignment agreement 'must describe the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|----------|--------------------------|------|---------------|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

subject matter of the assignment with sufficient particularity to identify the rights assigned.'" *Id.* (quoting *Mission Valley East, Inc. v. Cty. of Kern*, 120 Cal. App. 3d 89, 97 (1981)). "An assignment is 'a manifestation to another person by the owner of the right indicating his [or her] intention to transfer, without further action or manifestation of intention, the right to such other person, or to a third person.'" *Id.* (quoting *Cockerell*, 42 Cal. 2d at 291) (alteration in original). "While no particular form of assignment is required, it is essential to the assignment of a right that the assignor manifests an intention to transfer 'the right.'" *Id.* (quoting *Sunburst Bank v. Exec. Life Ins. Co.*, 24 Cal. App. 4th 1156, 1164 (1994)).

"An assignment of a right generally carries with it an assignment of other rights incident thereto." *Heritage*, 215 Cal. App. 4th at 990 (citing Cal. Civ. Code § 1084). "[I]ncidental rights may include certain ancillary causes of action but the assignment agreement 'must describe the subject matter of the assignment with sufficient particularity to identify the rights assigned.'" *Id.* at 991 (quoting *Mission Valley*, 120 Cal. App. 3d at 97). "[A] special tenet of California contract law dictates that when a particular right or set of rights *is* defined in an assignment, additional rights *not* similarly defined or named cannot be considered part of the rights transferred." *Id.* (quoting *DC3 Entm't, LLC v. John Galt Entm't, Inc.*, 412 F. Supp. 2d 1125, 1144 (W.D. Wash. 2006)) (alteration and emphasis in original).

Under federal law, an "assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Namdy Consulting, Inc. v. UnitedHealthcare Ins. Co.*, No. CV 18-01283-RSWL-KS, 2019 WL 1470849, at *3 (C.D. Cal. Apr. 3, 2019) (quoting *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1291 (9th Cir. 2014)). When an alleged assignment is challenged by a motion to dismiss, that assignment, even if an alleged oral one, must "plausibly manifest" an assignor's "intent to transfer [his] rights." *Yazdi v. Aetna Life & Casualty (Bermuda) Ltd.*, No. CV 18-08345-CJC(SSX), 2019 WL 6720989, at *3 (C.D. Cal. Jan. 2, 2019) (citing *Sunburst Bank*, 24 Cal. App. 4th at 1164).

b)      Application

The FAC alleges that Tom Petty "assigned and transferred to Jane [Petty] by written assignment an undivided 50% interest to his then-existing intellectual property, including his copyrights and rights to receive proceeds [from] Petty's agreements with Defendant. As a result of these transfers, Jane [Petty] is the owner, assignee, and successor in interest to 50% of many of the contractual rights of [Tom] Petty at issue in this action." Dkt. 25 ¶ 9. The FAC does not attach a copy of the written assignment.

The FAC alleges an assignment of contract rights related to the "agreements with Defendant." Dkt. 25 ¶ 9. This is sufficient to allege plausibly that Jane Petty was assigned 50% of the interest in the recording agreements between Tom Petty and UMG, or its predecessors that are at issue here. Thus, the FAC alleges a sufficient assignment of rights for the First and Second Causes of Action, for breach of contract and implied, corresponding obligations. These allegations are also sufficient as to the Fifth Cause of Action, because the conversion claim is based on an alleged conversion of the amounts to which Jane Petty was allegedly entitled based on the assigned agreements.

The FAC also alleges that there was an assignment of Tom Petty's "then-existing intellectual property." Dkt. 25 ¶ 9. The Third and Fourth Causes of Action, which are for negligence and reckless conduct, are tort claims. The underlying, claimed harm arises from the alleged destruction of the Master Recordings and the alleged failure to maximize recoveries and share proceeds from the Fire Lawsuit and Insurance

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | | Date | April 6, 2020 |
|---|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | | |

#

Recovery. *Id.* ¶¶ 62-63, 68-70. The FAC plausibly alleges that Tom Petty assigned to Jane Petty both contractual and intellectual property rights. Given that the harm identified in the Third and Fourth Causes of Action is sufficiently linked to the alleged damage to the value of the assigned intellectual property and contractual rights, the FAC plausibly alleges a sufficient assignment as to both the Third and Fourth Causes of Action.

The Sixth Cause of Action -- misrepresentation by omission -- is based on alleged misrepresentations made to artists that affected their decisions to enter into recording agreements with UMG. Dkt. 25 ¶¶ 79-81. In *Heritage*, a lender assigned a promissory note. 215 Cal. App. 4th at 982. The assignee later brought tort claims against the borrower, including misrepresentation by omission, for alleged false statements in the borrower's loan application that was presented to the lender to induce it to make the loan and receive a promissory note. *Id. Heritage* held that the assignment of the promissory note "did not carry with it a transfer of [the assignor]'s tort rights," because the tort claims were not "incidental to" the promissory note*, i.e.,* the rights within the note itself, and the assignor had not manifested an intent to transfer any tort claims as to any fraud or misrepresentation by the borrower to the lender. *Id.* at 990-91.

The allegations of the FAC are similar to those at issue in *Heritage*. Tom Petty allegedly assigned certain intellectual property and contractual rights to Jane Petty. *See* Dkt. 25 ¶ 9. The FAC does not allege a broad assignment of all related rights sufficient to include tort claims for misrepresentation associated with the entry of the contract between Tom Petty and UMG or its predecessor in interest. *See id.* Therefore, the FAC does not plausibly allege a sufficient basis for Jane Petty's standing to bring the Sixth Cause of Action for misrepresentation by omission for alleged misrepresentations made to artists. Accordingly, the Motion to Dismiss is **GRANTED** as to the Sixth Cause of Action and that cause of action is **DISMISSED WITHOUT PREJUDICE**, *i.e.,* with leave to amend.

      2.   <u>Time Bar</u>

          a)    Whether Claims Arose Outside of the Limitations Periods

The Complaint was filed on June 21, 2019. Dkt. 1. The fire allegedly occurred in June 2008. The Fire Lawsuit was allegedly settled in 2013. Dkt. 25 ¶ 44. The FAC does not allege a timeframe for when the Insurance Recovery occurred. *See id.* ¶ 45. The FAC alleges that, under the recording agreements, UMG was obligated to pay a share of these proceeds to Plaintiffs. *Id.* ¶¶ 46-47. Under the Petty Contract, royalties would be computed and paid within 60 days of January 1 and July 1 of each year for which royalty amounts had accrued during the prior six months. Dkt. 25-4 at 16 (Section 6(o)).

Under California law, a four-year statute of limitations applies to claims for breach of contract. Cal. Code Civ. Proc. § 337(a). A three-year statute of limitations applies to the remaining causes of action. *Coy v. Cty. of Los Angeles*, 235 Cal. App. 3d 1077, 1088 (1991) (three-year period for bailment claims); Cal. Code Civ. Proc. § 338(a)-(d) (three-year period for other causes of action). Plaintiff has not disputed these limitation periods.

Given that it is alleged that there was a settlement in 2013 of the Fire Lawsuit and the six-month period for payment, on its face, the FAC presents an issue as to the timeliness of the claims arising out of the Fire Lawsuit settlement. This issue arises even if there was a delay in payment between the settlement

#

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

and the disbursement. The FAC also fails to allege a timeline for the Insurance Recovery. However, the fire allegedly occurred in 2008, which was more than 10 years before the original Complaint was filed. This also raises an issue as to whether the corresponding claims are time barred. For these reasons, although a plaintiff is not generally obligated to anticipate an affirmative defense through the allegations in the complaint, here the issue could reasonably have been anticipated, and has been presented through the Motion to Dismiss as to the First Cause of Action. *See Haaland v. Garfield Beach CVS, LLC*, No. LA CV-18-01115-JAK-MRWx, 2018 WL 5086493, at *3 (C.D. Cal. June 6, 2018) (citing *Union Carbide Corp. v. Super. Ct.*, 36 Cal. 3d 15, 25 (1984)). Consequently, it is appropriate to address it at this time.

> b)      Tolling

When an issue as to a statute of limitation appears on the face of a complaint, the plaintiff may bear the burden to "anticipate the defense and plead facts to negative the bar." *Haaland*, 2018 WL 5086493, at *3 (quoting *Union Carbide*, 36 Cal. 3d at 25). In a federal court proceeding, "[s]tate law . . . determines when the statute of limitations begins to run on state claims." *Norco Const., Inc. v. King Cty.*, 801 F.2d 1143, 1145 (9th Cir. 1986); *see also Evans v. United States*, No. CV 18-06546 AB (ASx), 2019 WL 2970830, at *2 (C.D. Cal. Apr. 17, 2019) (same). In diversity actions advancing causes of action under California law, California tolling doctrines apply. *See, e.g., Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th Cir. 2008) (applying California's discovery rule and fraudulent concealment rule to California claims).[5]  "Resolution of the statute of limitations issue is normally a question of fact." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 810 (2005).

> (1)      Discovery Rule

Under California law, the "discovery rule" "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox*, 35 Cal. 4th at 807. "A plaintiff has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its elements.'" *Id.* (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 398 (1999)). A plaintiff is "required to conduct a reasonable investigation after becoming aware of an injury, and [is] charged with knowledge of the information that would have been revealed by such an investigation." *Id.*

To plead adequately the discovery rule under California law, a plaintiff must "plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808 (quoting *McKelvey v. Boeing N. Am.*, 74 Cal. App. 4th 151, 160 (1999), *superseded by statute as recognized by Lopez v. Sony Elecs., Inc.*, 5 Cal. 5th 627, 633 n.3 (2018)) (emphasis in original). "Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury." *Id.* "If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitation begins to run on that cause of action when the investigation would have brought such information to light." *Id.* at 808-09. A putative plaintiff must have had reason to suspect the wrongdoing essential to a cause of action. *See*

---

[5]  Although the parties blend California tolling doctrines and federal tolling doctrines applied to federal causes of action, *e.g.*, Sherman Act antitrust actions, this analysis is limited appropriately to the application of California law to tolling a California statute of limitation.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|----------|--------------------------|------|---------------|
| Title    | Soundgarden, et al. v. UMG Recordings, Inc. | | |

*id.* at 811-813 (citing *Norgart*, 21 Cal. 4th at 398).

The discovery rule applies in tort as well as certain breach of contract actions. In *April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805 (1983), producers of a television show sued a television station that had erased video tapes of the show that the station owned, but that were part of a profit-sharing and syndication agreement with the producers. *Id.* at 813-14. *April Enterprises* held that a breach of contract action would accrue under the discovery rule -- *i.e.*, when the plaintiffs discovered or should have discovered that the tapes had been erased -- and that, it would be "especially onerous" to impose on the producers a "duty to continually monitor" the custodians of the tapes. *Id.* at 831-32.

The Ninth Circuit has held that "the discovery rule applies to the unique breach of contract cases when: 1) '[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect'; 2) 'the defendant has been in a far superior position to comprehend the act and injury'; or 3) 'the defendant had reason to believe the plaintiff remained ignorant [that] he had been wronged.'" *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1039 (9th Cir. 2003) (quoting *April Enterprises*, 147 Cal. App. 3d at 831). What's more, the defendant in such an action cannot "seek[] to avoid application of the discovery rule by arguing that [the plaintiff] failed to exercise due diligence in discovering a cause of action" when the defendant's misrepresentations hindered discovery of the wrongdoing. *See id.* at 1039-40; *see also Santos v. Carmax Bus. Servs., LLC*, No. 17-cv-02447-RS, 2017 WL 6558590, at *2 (N.D. Cal. Dec. 22, 2017) (citing *El Pollo Loco*, 316 F.3d at 1040) (similar); *Weatherly v. Universal Music Publ'g Grp.*, 125 Cal. App. 4th 913, 920 (2004) ("The reasoning of *El Pollo Loco, Inc.* is consistent with the purpose of the delayed discovery doctrine: a plaintiff, prevented from discovery, should not suffer and a defendant should not profit from the plaintiff's ignorance.").

The FAC alleges that the June 2019 Rosen Article was the "first notice to Plaintiffs and the putative class that Master Recordings embodying their musical works were destroyed in the fire." Dkt. 25 ¶ 24. As explained in *Fox*, the discovery rule requires investigation by "a potential plaintiff who suspects that an injury has been wrongfully caused." 35 Cal. 4th at 808. The FAC alleges plausibly that Petty did not suspect an injury had been wrongfully caused. The premise of this lack of suspicion are the statements by UMG that allegedly minimized the extent of the loss of Master Recordings, if any, and the alleged absence of any prior notice by UMG as to the potential loss of any of Petty's Master Recordings. Dkt. 25 ¶¶ 4-5, 23-27. The FAC then alleges that Plaintiffs were "not put on alert as to their claims earlier." *Id.* ¶ 27.

Because the FAC alleges plausibly that Petty did not suspect an injury, *i.e.*, lacked inquiry notice, as pleaded, there was no corresponding duty to conduct a reasonable investigation. These allegations distinguish the FAC from the allegations in other cases as to awareness of injury, *e.g.*, an adverse reaction to the use of a medication. *Plumlee v. Pfizer, Inc.*, 664 Fed. Appx. 651, 653 (9th Cir. 2016) (a plaintiff had a duty to investigate once she "believed [a drug] was ineffective . . . contrary to Pfizer's representations"); *Soliman v. Philip Morris Inc.*, 311 F.3d 966, 971-72 (9th Cir. 2002) (a plaintiff had inquiry notice as to product liability claim once he thinks he was "injured by a product he believed to be safe"); *Vanella v. Ford Motor Co.*, No. 3:19-CV-07956-WHO, 2020 WL 887975, at *5 (N.D. Cal. Feb. 24, 2020) (a purchaser of a motor vehicle had reason to suspect injury due to alleged, repeated breakdowns and defects). Therefore, the FAC plausibly alleges a basis for the timeliness of the claims.

   (2)  <u>Fraudulent Concealment</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
| --- | --- | --- | --- |
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

A "close cousin of the discovery rule is the 'well accepted principle . . . of fraudulent concealment.'" *Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 931 (9th Cir. 1994) (quoting *Sanchez v. S. Hoover Hosp.*, 18 Cal. 3d 93, 99 (1976)). "It has long been established that the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." *Id.* (quoting *Sanchez*, 18 Cal. 3d at 99). The rule of fraudulent concealment is an "equitable principle" based on the rationale that a "culpable defendant should be estopped from profiting by his own wrong to the extent that it hindered an 'otherwise diligent' plaintiff in discovering his cause of action." *Id.* (quoting *Sanchez*, 18 Cal. 3d at 100).

"In order to establish fraudulent concealment, the complaint must show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Raifman v. Wachovia Secs., LLC*, 649 Fed. Appx. 611, 613 (9th Cir. 2016) (quoting *Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d 315, 321 (1974)); *see also Platt Elec. Supply*, 522 F.3d at 1055 (same). "[W]here no duty is imposed by law to make inquiry, and where, under the circumstances, a prudent man would not be put on inquiry, the mere fact that means of knowledge are open and not availed of does not operate to give constructive notice of the facts." *Bally v. State Farm Life Ins. Co.*, No. 18-cv-04954-CRB, 2019 WL 3891149, at *3 (N.D. Cal. Aug. 19, 2019) (quoting *Baker*, 39 Cal. App. 3d at 321-22); *see also Weatherly*, 125 Cal. App. 4th at 919 (same).

As to the first two prongs, the FAC sufficiently alleges that the underlying facts were not discovered until June 2019 due to the publication of the Rosen Article. As to the third prong, the FAC alleges adequately that Petty had "no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Raifman*, 649 Fed. Appx. at 613 (quoting *Baker*, 39 Cal. App. 3d at 321); *see also Platt Elec. Supply*, 522 F.3d at 1055. The FAC alleges that, although it was common knowledge that a fire had occurred at the Universal Studios backlot, Petty was not "put on alert" as to the possibility of wrongdoing with respect to scope of losses and UMG's possible monetary recovery on the loss of the Master Recordings. *See* Dkt. 25 ¶¶ 23-24, 27. The allegations that UMG repeatedly assured the public that losses of Master Recordings were minimal also support the plausibility of the allegation that certain Plaintiffs, including Petty, did not know and were not "on alert" as to possible claims arising out of the fire. Therefore, the FAC alleges adequately that UMG fraudulently concealed possible causes of action.

For the foregoing reasons, the Motion to Dismiss is **DENIED-IN-PART** as to the requested dismissal based on the untimeliness of the claims, without prejudice to a renewal of this issue based on a factual record.

3. <u>First Cause of Action: Breach of Contract - Revenue Sharing</u>

a) Legal Standards

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (citing *Reichert v. General Ins. Co.*, 68 Cal. 2d 822, 830 (1968)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

"A written contract may be pleaded either by its terms -- set out verbatim in the complaint or a copy of the contract attached to the complaint and incorporated therein by reference -- or by its legal effect," which also requires allegations as to "the substance of its relevant terms." *Haskins v. Symantec Corp.*, No. 13-CV-1834-JST, 2013 WL 6234610, at *10 (N.D. Cal. Dec. 2, 2013) (quoting *McKell v. Wash. Mut. Inc.*, 142 Cal. App. 4th 1457, 1489 (2006)). "[I]t is unnecessary for a plaintiff to allege the terms of the alleged contract with precision," but "the Court must be able generally to discern at least what material obligation of the contract the defendant allegedly breached." *Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 979 (N.D. Cal. 2014).

To state a claim for breach of contract, Plaintiffs must allege a plausible or reasonable interpretation of the contracts at issue. *Ass'n of L.A. City Attorneys v. City of Los Angeles*, CV 12-4235 MMM (JCx), 2012 WL 12887541, at *6 (C.D. Cal. Nov. 12, 2012) (citing *Sisley v. Sprint Comms. Co., LP*, 284 Fed. Appx. 463, 466 (9th Cir. 2008)); *see also 9Global, Inc v. Avant Credit Corp.*, No. C 15-898 WHA, 2015 WL 3832799, at *3 (N.D. Cal. June 19, 2015). A complaint may be dismissed where it presents interpretations of contractual provisions that are implausible or unreasonable. *Zody v. Microsoft Corp.*, No. C-12-00942-YGR, 2013 WL 2468250, at *5 (N.D. Cal. June 7, 2013).

b)      Application

The issues presented are whether UMG was obligated to pay Plaintiffs a share of the Fire Lawsuit settlement and Insurance Recovery proceeds and whether UMG breached that obligation by failing to do so.

Paragraph 6(l) of the Petty Contract provides:

> In the event that MCA licenses Masters to third parties on a percentage rate, cent-rate or flat-fee basis, the royalty payable by MCA to Artist shall be one-half (1/2) of the amount (including advances specifically allocable to Masters hereunder) actually received by MCA from such license. The royalty (and Artist's share of any advances specifically allocable to Masters hereunder) provided in this paragraph shall be credited to Artist's account hereunder only after receipt by MCA from such licensees . . . . MCA shall not license any Master hereunder on a percentage rate, cent-rate or a flat-fee basis for non-phonograph record use (e.g., for inclusion in the soundtrack of a motion picture or television show) without Artist's prior written consent.

Dkt. 25-4 at 13-14.

UMG's obligations to pay royalties under the Petty Contract are triggered when MCA, or its successors, "licenses Masters to third parties on a percentage rate, cent-rate, or flat-fee basis." Dkt. 25-4 at 13. The parties disagree as to what constitutes a reasonable interpretation of "licenses."

Petty argues that "to license" means "to give official permission to (someone or something) to do or use something." Dkt. 38 at 13 (quoting *License*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/license (accessed Sept. 19, 2019)). Petty maintains that, "[w]hen UMG entered agreements with warehouse owners and insurance companies, it retroactively permitted a specific, and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

otherwise prohibition 'use' of the masters -- their destruction -- in exchange for flat fee payments." *Id.*

UMG argues that, as used in the Petty Contract, the term "license" has a meaning that is specific to the music industry. Dkt. 39 at 9-11. Consequently, UMG claims that "to license" means granting a right to manufacture, distribute, sell and/or perform recordings. *Id.* at 9 (citing Donald S. Passman, *All You Need to Know About the Music Business* 140 (9th Ed. 2015); Black's Law Dictionary (11th ed. 2019)). UMG argues that "to license" is limited to permission to use Master Recordings as intended, *i.e.*, for music and entertainment. UMG disagrees with Petty's reliance on the Merriam-Webster "English Language Learners Definition" of the verb "to license" and instead adopts the more specific definition of license in definition 2b: "a grant by the holder of a copyright or patent to another of any of the rights embodied in the copyright or patent short of an assignment of all rights." *License*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/license (accessed Oct. 4, 2019).

In light of the present allegations in the FAC, it is not reasonable to interpret "license" as used in Paragraph 6(l) of the Petty Contract as encompassing proceeds from the Fire Lawsuit settlement or the Insurance Recovery. Executing the settlement agreement in the Fire Lawsuit cannot reasonably be interpreted as a retroactive license for the Fire Defendants to destroy Master Recordings in exchange for a flat fee. Similarly, it is not reasonable to interpret the recovery under an insurance policy for destruction of the Master Recordings as a retroactive license for destruction on a flat fee basis.

Because the FAC fails to allege plausibly that the Master Recordings were licensed on a flat-fee basis, a requirement for an entitlement to revenue shares, the FAC fails to state a claim for breach of contract on that claim. Therefore, the Motion to Dismiss is **GRANTED** as to the First Cause of Action. The First Cause of Action is **DISMISSED WITHOUT PREJUDICE**, *i.e.*, with leave to amend.

        4.    <u>Second Cause of Action: Breach of Bailment Contract</u>

            a)    Bailment Contract

                (1)    <u>Legal Standards</u>

Under California law, bailments are referred to as "deposits." *Gebert v. Yank*, 172 Cal. App. 3d 544, 551 (1985). A person who receives a deposit is a depositary, whereas, at common law, that person or entity is a bailee. A "deposit for keeping" is one where the "depositary," *i.e.*, the bailee, is bound to "return the identical thing deposited." Cal. Civ. Code § 1817. A "deposit for exchange" is one where the depositary is "only bound to return a thing corresponding in kind to that which is deposited." Cal. Civ. Code § 1818. Under a deposit for exchange, title transfers from the depositor to the depositary and a new relationship is created. The depositor becomes a creditor who may require the depositary to act as a debtor and pay the debt by returning something corresponding in kind to what had been deposited. *See* Cal. Civ. Code § 1878.

"A bailment, or 'deposit for keeping,' does not involve the transfer of title." *Associated Beverage Co. v. Bd. of Equalization*, 224 Cal. App. 3d 192, 208-09 (1990) (quoting Cal. Civ. Code § 1817); *see also Royale Pigments & Chems. LLC v. Bomanite Corp.*, No CV F 09-0413 LJO (DLBx), 2009 WL 800911, at *3 n.1 (E.D. Cal. Mar. 25, 2009) (citing *H.S. Crocker Co. v. McFaddin*, 148 Cal. App. 2d 639, 644 (1957)) (same). "Unless the receiving party is obligated to return or account for the property, there is a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

sale rather than a bailment." *Id.* at 209 (citing *H.S. Crocker Co.*, 148 Cal. App. 2d at 644); *see also United States v. Alcaraz-Garcia*, 79 F.3d 769, 775 (9th Cir. 1996) ("Ordinarily, a bailment does not alter the bailor's title interest in the bailed property."); *Royale Pigments*, 2009 WL 800911, at *3 n.1. "No bailment can be implied where it appears it was the intention of the parties, as derived from their relationship to each other and from the circumstances of the case, that the property was to be held by the party in possession in some capacity other than as bailee." *H.S. Crocker Co.*, 148 Cal. App. 2d at 644.

"If there is a transfer of ownership the transaction is a sale." *H.S. Crocker Co.*, 148 Cal. App. 2d at 644; *see also Cal-Metal Corp. v. State Bd. of Equalization*, 161 Cal. App. 3d 759, 765 (1984) (citing *H.S. Crocker Co.*, 148 Cal. App. 2d at 644) (same). A "sale" is a transfer of property in return for consideration that need not be money and may be "any valuable consideration." *H.S. Crocker Co.*, 148 Cal. App. 2d at 644-45; *see also Amdahl Corp v. Cty. of Santa Clara*, 116 Cal. App. 4th 604, 615 (2004) (citing *H.S. Crocker Co.*, 148 Cal. App. 2d at 644-45) (same).

(2)   Application

Paragraph 7 describes MCA's rights:

Title to the Masters for the Territory shall vest in MCA from inception of recording and thereafter MCA shall be the sole and exclusive owner in and for the Territory of such Masters; provided, however, MCA shall not in any way use or exploit any such Master until it is delivered to MCA or Artist advises MCA that such Master is completed. MCA shall have the following rights in perpetuity and for the Territory:

(a) The exclusive ownership of all duplicates of the Masters and records manufactured therefrom and the right to use and control the same and the performances embodied therein. . . . .

(b) Subject to the terms and conditions of this Agreement, the exclusive and perpetual right throughout the Territory to manufacture, advertise, publicize, sell, lease, license, or otherwise use or dispose of and exploit records and/or derivatives manufactured from or embodying the Masters, and to permit others to do so . . . upon such terms and conditions as MCA may approve, or . . . to refrain therefrom.

(c) All right, title and interest in the copyright in and to the Masters and all reproductions thereof and the sound performances contained therein . . . .

Dkt. 25-4 at 17-18.

Because the Petty Contract states that Tom Petty did not retain title to the Master Recordings, it cannot reasonably be interpreted as a bailment contract, *i.e.,* a deposit for keeping. In addition, UMG's publications about "obligations to preserve master recordings," *see* Dkt. 38 at 19 (citing Dkt. 25 ¶¶ 3, 4, 14, 15, 19, 52, 55, 56), do not create an express or implied bailment contract where Tom Petty had already conveyed ownership and title to the Master Recordings to UMG or its predecessors. Petty maintains that alleged reversionary interests exist under copyright law -- 17 U.S.C. § 203. Dkt. 38 at 19

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

& n.8 (citing, *inter alia*, Dkt. 25 ¶ 52). Plaintiffs cite to no authority that supports the position that a possible future copyright interest reflects a bailment relationship as to the physical Master Recordings.

Therefore, the FAC fails to state a claim for breach of bailment contract. The Motion to Dismiss is **GRANTED** as to the bailment claim within the Second Cause of Action and that claim is **DISMISSED WITHOUT PREJUDICE**, *i.e.*, with leave to amend.

> b)    Breach of Implied Covenant of Good Faith and Fair Dealing

> (1)    Legal Standards

"California law recognizes in every contract . . . an implied covenant of good faith and fair dealing." *Trishan Air, Inc. v. Fed. Ins. Co.*, 635 F.3d 422, 434 (9th Cir. 2011) (quoting *Brehm v. 21st Century Ins. Co.*, 166 Cal. App. 4th 1225, 1235 (2008)). A breach of the underlying contract is not required to establish a cause of action for breach of good faith and fair dealing. *See Solomon v. N. Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1137 (9th Cir. 1998) (citing *Carma Developers Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992)). However, a cause of action for breach of good faith and fair dealing cannot be established when, under the terms of the underlying contract, the defendant is expressly permitted to engage in the conduct that is alleged to have violated the good faith covenant. *Id.*

"[A] 'breach of a specific provision of the contract is not a necessary prerequisite' to establishing a breach of the implied covenant of good faith and fair dealing," but it "is universally recognized [that] the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Berger v. Home Depot U.S.A., Inc.*, 476 F. Supp. 2d 1174, 1177 (C.D. Cal. 2007) (quoting *Carma*, 2 Cal. 4th at 373) ("The implied covenant will not apply where no express term exists on which to hinge an implied duty, or where there has been compliance with the contract's express terms." (quoting *In re Sizzler Rests. Int'l*, 225 B.R. 466, 476 (Bankr. C.D. Cal. 1998))); *see also Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1117 (N.D. Cal. 2011) ("A party must take on an obligation, either expressly or impliedly, before it can be said to have acted in bad faith by not carrying it out.").

When a party brings claims for breach of the implied covenant of good faith and fair dealing and breach of contract, if the "allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract clause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990). One exception to this rule is when the defendant allegedly acted in bad faith to impede the benefits that plaintiff was to have derived from the contract. *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 353 n.18 (2000). Relief may be available as to such a claim even if the breach of contract claim fails. *See Celador Int'l, Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 852-53 (C.D. Cal. 2004) ("[T]he Court should not mechanically inquire whether the same facts are alleged and whether the same remedy is sought. Rather, the challenge brought by *Careau* and its progeny is to distinguish two claims based on the same facts. If they cannot be distinguished, then the natural conclusion is that they are duplicative. Plaintiffs have distinguished their claims here.").

An alleged breach of contract, without more, is not sufficient to state a claim for breach of the implied

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|----------|--------------------------|------|---------------|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

covenant. Nor can such a claim be stated through conclusory allegations as to the bad faith of the defendant. Instead, "plaintiffs must plead facts showing bad faith and demonstrating 'a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence, but rather by a conscious and deliberate act.'" *Env't Furniture, Inc. v. Bina*, No. CV 09-7978 PSG (JCx), 2010 WL 5060381, at *3 (C.D. Cal. Dec. 6, 2010) (quoting *Careau*, 222 Cal. App. 3d at 1395).

(2)   Application

The FAC does not present an independent cause of action for a breach of the implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is only mentioned within the cause of action for "Breach of Contract -- Bailment." *See* Dkt. 25 ¶¶ 51-57. The FAC blends the allegations related to the claims for bailment and implied covenant of good faith and fair dealing. Because the FAC fails to allege adequately a bailment contract, it also fails to allege adequately a breach of the implied covenant based on such a bailment contract. Therefore, the Motion to Dismiss is **GRANTED** as to the breach of the implied covenant of good faith and fair dealing claim in the Second Cause of Action and that claim is **DISMISSED WITHOUT PREJUDICE**, *i.e.*, with leave to amend.

5.   Third Cause of Action: Negligence

a)   Legal Standards

(1)   General Principles

Under California law, negligence "consists of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm." *City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 753-54 (2007). "In order to establish negligence under California law, a plaintiff must establish four required elements: (1) duty; (2) breach; (3) causation; and (4) damages." *Ileto v. Glock Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003); *Mendoza v. City of Los Angeles*, 66 Cal. App. 4th 1333, 1339 (1998).

Duty is a question of law for the court. *Kesner v. Superior Court*, 1 Cal. 5th 1132, 1142 (2016); *see also Ileto*, 349 F.3d at 1203 (same). Under California law, the "'general rule' is that people owe a duty of care to avoid causing harm to others and that they are thus usually liable for injuries their negligence inflicts." *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 398 (2019).

(2)   Distinction between Torts and Contract Remedies

"[T]he distinction between tort and contract is well grounded in common law, and divergent objectives underlie the remedies created in the two areas. Whereas contract actions are created to enforce the intentions of the parties to the agreement, tort law is primarily designed to vindicate 'social policy.'" *Erlich v. Menezes*, 21 Cal. 4th 543, 550-51 (1999) (*quoting Hunter v. Up-Right, Inc.*, 6 Cal. 4th 1174, 1180 (1993)) (alteration in original). "While the purposes behind contract and tort law are distinct, the boundary line between them is not . . . ." *Id.* at 551. "[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law." *Id.* "Whether a defendant owes a duty of care is a question of law. Its existence depends upon

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability." *Id.* at 552 (quoting *Burgess v. Superior Court*, 2 Cal. 4th 1064, 1072 (1992)).

"Restrictions on contract remedies serve to protect the 'freedom to bargain over special risks and [to] promote contract formation by limiting liability to the value of the promise.'" *Erlich*, 21 Cal. 4th at 553 (quoting *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 98 (1995)). "[C]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." *Id.* at 552 (quoting *Freeman & Mills*, 11 Cal. 4th at 107 (Mosk, J., concurring and dissenting)) (alteration in original).

(3)    <u>Economic Loss Rule and Independent Tort Duty</u>

California law provides that "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . ." Cal. Civ. Code § 1714(a). In cases involving "traditionally compensable forms of injury -- like physical harm to person or property -- we presume the defendant owed the plaintiff a duty of care and then ask whether the circumstances 'justify a departure' from that usual presumption." *Gas Leak Cases*, 7 Cal. 5th at 398 (quoting *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 771 (2011)).

Cal. Civ. Code § 1714 does not "impose a presumptive duty of care to guard against any conceivable harm that a negligent act might cause." *Gas Leak Cases*, 7 Cal. 5th at 399. "Liability in negligence for purely economic losses" is a "case in point." *Id.* at 400. In general, California law does not permit recovery for purely economic losses that are caused by negligence. *Id.* The "primary exception" to this general rule is "where the plaintiff and the defendant have a 'special relationship.'" *Id.* (quoting *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 806 (1979)). A "special relationship" is in place when "the plaintiff was an intended beneficiary of a particular transaction but was harmed by the defendant's negligence in carrying it out." *Id.*

One example of a special relationship is where the "intended beneficiary of a will could recover for assets she would have received if the notary had not been negligent in preparing the document." *Gas Leak Cases*, 7 Cal. 5th at 400 (citing *Biakanja v. Irving*, 49 Cal. 2d 647 (1958)). This was deemed a special relationship because the "end and aim" of the transaction was to pass an estate to the intended beneficiary. *Id.* (quoting *Biakanja*, 49 Cal. 2d at 650). Similarly, it has been determined that "a special relationship existed between a restaurant operator and a contractor hired by a third-party property owner to renovate the space rented by the restaurant operator." *Id.* (citing *J'Aire*, 24 Cal. 3d at 804-05). Due to this special relationship, the restaurant operator could recover purely economic losses suffered when the contractor failed to complete the work on time. *Id.*

Six factors are considered in determining whether a special relationship is present that permits recovery for purely economic losses: (i) "the extent to which the transaction was intended to affect the plaintiff"; (ii) "the foreseeability of harm to the plaintiff"; (iii) "the degree of certainty that the plaintiff suffered injury"; (iv) "the closeness of the connection between the defendant's conduct and the injury suffered"; (v) "the moral blame attached to the defendant's conduct"; and (vi) "the policy of preventing future harm." *Gas Leak Cases*, 7 Cal. 5th at 401 (quoting *J'Aire*, 24 Cal. 3d at 804). Later decisions

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|----------|--------------------------|------|---------------|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

"underscored for negligence cases involving purely economic losses what is true of all negligence cases. Deciding whether to impose a duty of care turns on a careful consideration of 'the sum total' of the policy considerations at play, not a mere tallying of some finite, one-size-fits-all set of factors." *Id.* (quoting *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 397 (1992)).

*Gas Leak Cases* recognized the need to consider the potential problem that would be raised if there is liability for purely economic loss in the context of incidents for which the amount of that liability could be very substantial. *See* 7 Cal. 5th at 402-03 (citing Robert L. Rabin, *Tort Recovery for Economic Loss: A Reassessment*, 37 Stan. L. Rev. 1513, 1536-38 (1985)). "Man-made calamity" with a wide scope often leads to courts rejecting tort liability for purely economic losses. *See id.* at 403-407 (collecting cases). In *Gas Leak Cases*, the plaintiffs were local businesses near a neighborhood whose residents were required to evacuate because of gas leaks from a utility's gas lines. It was held that the plaintiffs could not recover for purely economic losses. *Id.* at 414. The court relied on the "lack [of] clear spatial bounds within which to cabin claims like those asserted here," because it was impossible to limit the class of plaintiffs possibly affected by the evacuations due to the gas leaks. *Id.* at 408-10. The availability of legislative, regulatory, and insurance alternatives as solutions to the losses incurred by the plaintiffs were presented as a basis for applying the economic loss rule. Legislative action could bring expertise to bear on an industry-specific problem. *Id.* at 413. Insurance carriers could also provide a means to recover lost profits. *Id.* Finally, defendants would be deterred given existing losses spent on remedial measures and regulatory settlements. *Id.*

In *Gas Leak Cases*, there was no contractual privity between plaintiffs and defendants with respect to the gas leak. *Biakanja* and *J'Aire* addressed the special relationship inquiry based on how the plaintiffs were, in effect, intended beneficiaries of arrangements between non-parties, *e.g.*, the notary and the testator or the property owner and the third-party contractor. In *Bily*, the California Supreme Court explained that the "checklist of factors" was employed "in the absence of privity of contract between a plaintiff and a defendant." 3 Cal. 4th at 397. *Bily* was premised on a "central concern[]" that, for sophisticated classes of plaintiffs, "effective use of contract rather than tort liability to control and adjust the relevant risks" worked against imposing tort liability. *Id.* at 398.[6] "As a matter of economic and social policy, third parties should be encouraged to rely on their own prudence, diligence, and contracting power, as well as other informational tools." *Id.* at 403.

        b)    Application

Defendant argues that Plaintiffs' negligence claim fails because it relies solely on duties created by the contracts between Defendant and Plaintiffs. Plaintiffs respond that a record company has a duty, independent of those imposed by the contract, to preserve and protect Master Recordings and that this duty is acknowledged in UMG's code of conduct.

---

[6] A plaintiff entering a transaction, has a "full chance to consider how to manage the risks involved, whether by inspecting the item or investment, obtaining insurance against the risk of disappointment, or making a contract that assigns the risk of loss to someone else." Restatement (Third) of Torts: Liability for Economic Harm § 1 (2019). "A contract that allocates responsibility for such a risk will therefore be preferable in most cases to a judicial assignment of liability after harm is done. The contract will better reflect the preferences of the parties and help prevent the need for speculation and litigation later." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

The FAC alleges that "to retain any value, and for Plaintiffs copyright termination rights and other reversionary interests under their recording agreements to have any potential value, the Master Recordings needed to be safely and securely preserved and maintained." Dkt. 25 ¶ 59. It then alleges that UMG had a duty "to make commercially reasonable efforts to preserve and maintain the Master Recordings." *Id.* ¶ 61. The FAC alleges that UMG's statements on its website and in publications reflect that UMG assumes responsibility to take all reasonable steps to preserve the Master Recordings. *Id.* ¶ 59. Based on these assertions, the FAC alleges that UMG owed a duty to Plaintiffs to make commercially reasonable efforts to preserve and maintain UMG's own property due to Plaintiff's alleged contract rights to proceeds from certain uses of UMG's property and Plaintiff's alleged reversionary interests in the property in the event of copyright termination.

The next step in the process is to apply the aforementioned six factors identified by *Gas Leak Cases* to determine whether Plaintiffs can state a viable claim based on a duty of care that was independent of those imposed by the applicable contracts. The factors are: (i) "the extent to which the transaction was intended to affect the plaintiff"; (ii) "the foreseeability of harm to the plaintiff"; (iii) "the degree of certainty that the plaintiff suffered injury"; (iv) "the closeness of the connection between the defendant's conduct and the injury suffered"; (v) "the moral blame attached to the defendant's conduct"; and (vi) "the policy of preventing future harm." 7 Cal. 5th at 401.

The first five factors provide limited support for imposing a non-contractual duty. However, the sixth factor weighs substantially against imposing such a duty on UMG as to Jane Petty whose contractual rights were obtained by an assignment by Tom Petty. Tom Petty and UMG's alleged predecessor, MCA, entered into a contractual relationship related to the Master Recordings. The Petty Contract provided them with the opportunity both to negotiate and then allocate risks that would establish the rights and duties of the parties, but at the same time set financial terms that would be set, in part, based on these allocations. The Petty Contract could have "control[led] and adjust[ed] the relevant risks" related to the recording company's storage of the Master Recordings by, for example, imposing a duty on MCA to ensure commercially reasonable efforts would be taken to protect the Master Recordings. *See Bily*, 3 Cal. 4th at 397-98. The Petty Contract does not do so. Moreover, the Petty Contract could have identified other circumstances under which Tom Petty would have been entitled to certain revenue*, e.g.,* the amounts recovered through litigation or insurance claims. The Petty Contract did not do so. The ability to contract provides plaintiffs generally the "freedom to bargain over special risks and [to] promote contract formation by limiting liability to the value of the promise." *Erlich*, 21 Cal. 4th at 553 (quoting *Freeman & Mills*, 11 Cal. 4th at 98) (alteration in original).

In contrast, Tom Petty had no opportunity to negotiate with the lessors of the UMG Warehouse. This presents circumstances analogous to those in *Biakanja* and *J'Aire* where a plaintiff was deemed an intended beneficiary of a transaction.

Although the possibility of insurance was raised at the hearing, counsel for Plaintiffs and Defendant stated that they were aware of no such policies held by the artists as to the Master Recordings in the possession of recording companies. Counsel for Plaintiffs stated that such insurance policies were unlikely. *See, e.g.*, Dkt. 50 at 30:19-25 ("No artist in my history has ever even considered nor inquired as to whether insurance on those masters for the benefit of the artist is available for the reason that, A, I don't think it is available; and, B, the artist trusts the record label to preserve those master recordings and insure them as necessary.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

Considered collectively based on the factual allegations of the FAC, the factors adopted in *Gas Leak Cases* do not support imposing a tort duty on UMG to exercise reasonable care to avoid economic loss in storing its own property -- the Master Recordings. Therefore, the FAC fails to state a claim for negligence. The Motion to Dismiss is **GRANTED** as to the Third Cause of Action and that cause of action is **DISMISSED WITHOUT PREJUDICE**, *i.e.*, with leave to amend.

6.     Fourth Cause of Action: Reckless Conduct

To establish a claim for reckless conduct, a plaintiff must show both recklessness and the traditional elements of negligence: duty, breach, causation, and damages. *See Faustino v. Alcon Labs., Inc.*, No. CV 15-04145 RGK (AJWx), 2015 WL 12839161, at *6 (C.D. Cal. Sept. 22, 2015); *see also, Frittelli, Inc. v. 350 N. Canon Drive, LP*, 202 Cal. App. 4th 35, 52 (2011) ("[G]ross negligence is pleaded by alleging the traditional elements of negligence: duty, breach, causation, and damages" in addition to "extreme conduct.").

Because the FAC fails to allege adequately that UMG owed Plaintiff a duty of care as to the safekeeping of the Master Recordings, the cause of action for reckless conduct necessarily fails. Therefore, the Motion to Dismiss is **GRANTED** as to the Fourth Cause of Action and the Fourth Cause of Action is **DISMISSED WITHOUT PREJUDICE**, *i.e.*, with leave to amend.

7.     Fifth Cause of Action: Conversion

a)     Legal Standards

"The elements of a conversion are the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages." *Oakdale Vill. Grp. v. Fong*, 43 Cal. App. 4th 539, 543-44 (1996), *as modified on denial of reh'g* (Apr. 10, 1996). "[P]laintiff must establish an actual interference with his *ownership* or *right of possession*. . . . Where plaintiff neither has title to the property alleged to have been converted, nor possession thereof, he cannot maintain an action for conversion." *Moore v. Regents of Univ. of Cal.*, 51 Cal. 3d 120, 136 (1990) (emphasis in original).

"[A] mere contractual right of payment, without more, does not entitle the obligee to the immediate possession necessary to establish a cause of action for the tort of conversion." *In re Bailey*, 197 F.3d 997, 1000 (9th Cir. 1999) (applying California law). "Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved." *PCO Inc v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 395 (2007) (quoting *McKell*, 142 Cal. App. 4th at 1491). A general allegation that a defendant failed to pay royalties over a certain period of time does not identify sufficiently a specific sum of money. *Gerawan Farming, Inc. v. Rehrig Pac. Co.*, No. 1:11-cv-01273 LJO (BAMx), 2012 WL 691758, at *6 (E.D. Cal. Mar. 2, 2012). A claim for conversion of money can be stated where there is an attorney's lien on settlement proceeds or a specific amount held in trust. *See id.*

b)     Application

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | Date | April 6, 2020 |
|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | |

The FAC fails to state a claim for conversion for two reasons. *First*, the FAC fails to allege sufficiently that UMG was obligated to share proceeds from the Fire Lawsuit and Insurance Recovery with Plaintiff under the terms of the Petty Contract. Therefore, the FAC fails to allege sufficiently that Plaintiffs were entitled to royalty payments under the relevant contracts from UMG. As a result, the FAC fails to allege the amount of royalty payments that was allegedly converted by UMG.

*Second*, the property interest stated in the FAC is only that of a right to royalty obligations from the relevant contracts with UMG. This is stating the "mere contractual right of payment" that cannot support a claim for conversion. *See In re Bailey*, 197 F.3d at 1000; *see also Vestis, LLC v. Caramel Sales, Ltd.*, No. SA CV 18-2257 DOC (KESx), 2019 WL 3312212, at *8 (C.D. Cal. Apr. 30, 2019) (same). Therefore, the Motion to Dismiss is **GRANTED** as to the Fifth Cause of Action and the Fifth Cause of Action is **DISMISSED WITHOUT PREJUDICE**, *i.e.*, with leave to amend.

8.   Sixth Cause of Action: Misrepresentation by Omission

a)   Legal Standards

Plaintiffs argue that the FAC states a claim for misrepresentation by omission because it pleads the elements necessary for "concealment" under California law. Dkt. 38 at 24 (citing *Great Pac. Sec. v. Barclays Capital, Inc.*, 743 Fed. Appx. 780, 782 (9th Cir. 2018); CACI 1901). The elements of a cause of action for fraudulent concealment are: "(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 248 (2011) (quoting *Hahn v. Mirda*, 147 Cal. App. 4th 740, 748 (2007)); *see also Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d 1149, 1159 (C.D. Cal. 2011) (citing *Hahn*, 147 Cal. App. 4th at 748) (same); *Moncada v. W. Coast Quartz Corp.*, 221 Cal. App. 4th 768, 775 (2013) (same). A claim for fraudulent omission must be stated with the particularity required by Fed. R. Civ. P. 9(b). *Peel*, 788 F. Supp. 2d at 1160.

b)   Application

(1)   Materiality

The FAC alleges that UMG's methods of storage for the Master Recordings was a material fact "that a reasonable person would have considered" to be "important in deciding whether or not to enter into a recording agreement with UMG and thereby entrusting their musical legacy embodied in the Master Records to UMG." Dkt. 25 ¶ 79. The allegedly unsafe manner of storage was not disclosed to Petty. *Id.* ¶ 80. The FAC alleges adequately that the nature of storage methods for Master Recordings was a material fact at the time the recording agreement was entered.

(2)   Duty to Disclose

"Under California law,'[i]n transactions which do not involve fiduciary or confidential relations, a cause

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | | Date | April 6, 2020 |
|---|---|---|---|---|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | | |

of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the Plaintiff.'" *Signal Hill Serv., Inc. v. Macquarie Bank Ltd.*, No. CV 11-1539 MMM (JEMx), 2013 WL 12244056, at *12 (C.D. Cal. June 12, 2013) (quoting *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 294 (1970)); *see also Los Angeles Unified Sch. Dist. v. Great Am. Ins. Co.*, 49 Cal. 4th 739, 749 (2010) (quoting *Warner*, 2 Cal. 3d at 294).

The FAC alleges that this duty arose given the "superior position" of UMG "to know the true state of the facts about the manner and location in which the Master Recordings would be stored, specifically in an inadequate and substandard, non-fireproof, storage warehouse located on the back-lot of Universal Studios." Dkt. 25 ¶ 78. In addition, the FAC alleges the duty existed based on the lack of public information as to such storage methods and based on the partial representations made by UMG as to the storage of the Master Recordings. *Id.*

As explained above, the allegations in the FAC focus on how alleged omissions affected the decision by an artist to enter a recording agreement. *See* Dkt. 25 ¶ 79. The FAC alleges materiality based on an artist "deciding whether or not to enter into a recording agreement with UMG." *Id.* Thus, the relevant inquiry is whether there was a duty to disclose the alleged material facts at the time that an artist decided to enter a recording agreement. Any such alleged duty must be stated with particularity.

The parties to the Petty Contract were Tom Petty and MCA, an alleged predecessor in interest to UMG. The contract was allegedly entered in 1984. Dkt. 25-4 at 2. The FAC fails to allege adequately that there was a duty to disclose at the time that the contract was negotiated and entered. It also does not sufficiently allege what MCA knew about the relevant storage methods for Master Recordings at that time, and what was not disclosed about them. Nor does it allege what storage methods were then commonly used. Nor are there allegations as to MCA's knowledge that there could be a later potential assignment of its rights to another party who could make different decisions about the method for storage that would be used. Nor are there allegations that later contracts were negotiated and entered between Tom Petty and UMG with respect to which there were obligations to disclose.

For the foregoing reasons, the FAC fails to state a claim for misrepresentation for omission. Therefore, the Motion to Dismiss is **GRANTED** as to the Sixth Cause of Action and that cause of action is **DISMISSED WITHOUT PREJUDICE**, *i.e.*, with leave to amend.

## VI.   Conclusion

For the reasons stated in this Order, the Motion to Dismiss is **MOOT-IN-PART** as to Plaintiffs Soundgarden, Whalley and Earle. The Motion to Dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART** as to Plaintiff Petty and the FAC is **DISMISSED WITHOUT PREJUDICE**, with leave to amend. The Request for Decision is **GRANTED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV19-05449 JAK (JPRx) | | Date | April 6, 2020 |
|----------|--------------------------|---|------|---------------|
| Title | Soundgarden, et al. v. UMG Recordings, Inc. | | | |

\#

Any Second Amended Class Action Complaint shall be filed on or before 21 days from the issuance of this Order.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer      cw  _____

\#